CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

September 09, 2024
LAURA A. AUSTIN, CLERK
BY   s/ S. MELVIN
DEPUTY CLERK

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

CLAUDE DAVID CONVISSER                                    )
                                                         )
    and                                              )
                                                         )
POP DIESEL AFRICA, INC.,                                  )
                                                         )
    Plaintiffs,                                      )
                                                         )
v.                                                       )    Jury Demand
                                                         )    in Part
1.   EXXON MOBIL CORPORATION                            )
    <u>Serve:</u>  Corporation Service Company, Registered Agent )
    100 Shockoe Slip Fl 2                              )
    Richmond, Virginia 23219-4100,                     )
                                                         )
2.   JOHN DOE STANDARD OIL TRUST                        )
    INTELLIGENCE SERVICE NO. 1,                        )
                                                         )
3.   JOHN DOE STANDARD OIL TRUST                        )
    INTELLIGENCE SERVICE NO. 2,                        )    Civil Action No.
                                                         )    3:24-cv-00072
4.   JOHN DOE STANDARD OIL TRUST                        )
    INTELLIGENCE SERVICE NO. 3,                        )
                                                         )
5.   JANE DOE NEW YORK ORGANIZED CRIME MAFIA NO. 1,      )
                                                         )
6.   JANE DOE NEW YORK ORGANIZED CRIME MAFIA NO. 2,      )
                                                         )
7.   JANE DOE RETIRED GOVERNMENT                        )
    SECURITY AGENT INTELLIGENCE SERVICE,               )
                                                         )
8.   MARCUS T. WILEY,                                   )
    as agent of one or more of defendants number 1 and/or 4 above )
    and in his personal, individual capacity           )
    beyond the scope of that agency                    )
    <u>Serve:</u> 4289 Free Union Road                       )
          Free Union, Virginia                    )
                                                         )
9.   MICHAEL GOFF a/k/a MICHAEL LAIRD,                  )
    as agent of defendant number 5 above and in his personal, )
    individual capacity beyond the scope of that agency )

|  | Serve: 63 Mosby Lane | ) |
|  | Faber, Virginia 22938 | ) |
|  |  | ) |
| 10. | KEITH FORD | ) |
|  | Serve: western Albemarle County, Virginia | ) |
|  |  | ) |
| 11. | CHARLES L. PINNELL, | ) |
|  | Serve: 1982 White Hall Road | ) |
|  | Crozet, Virginia 22932, | ) |
|  | as agent of one or more of defendants number 5 and/or 6 above | ) |
|  | and in his personal, individual capacity | ) |
|  | beyond the scope of that agency, | ) |
|  |  | ) |
| 12. | HUNTER S. WYANT | ) |
|  | Serve: 3320 Brown's Gap Turnpike | ) |
|  | Crozet, Virginia 22932 | ) |
|  | as agent of defendant number 6 above and in his personal, | ) |
|  | individual capacity beyond the scope of that agency, | ) |
|  |  | ) |
| 13. | RAY W. HUGHES | ) |
|  | Serve: 239 Turkey Ridge Road | ) |
|  | Charlottesville, Virginia 22903, | ) |
|  | as agent of defendant number 7 above and in his personal, | ) |
|  | individual capacity beyond the scope of that agency, | ) |
|  |  | ) |
| 14. | ELIZABETH ANN HUGHES | ) |
|  | Serve: 239 Turkey Ridge Road | ) |
|  | Charlottesville, Virginia 22903, | ) |
|  |  | ) |
| 15. | EMIL KUTILAK | ) |
|  | Serve: 5689 Cottonwood Farm | ) |
|  | Crozet, Virginia 22932, | ) |
|  | as agent of one or more of defendants number 5 and/or 7 above | ) |
|  | and in his personal, individual capacity | ) |
|  | beyond the scope of that agency | ) |
|  |  | ) |
| 16. | CHARLES M. STEPPE | ) |
|  | Serve: 5390 Brown's Gap Turnpike | ) |
|  | Crozet, Virginia 22932 | ) |
|  |  | ) |
| 17. | DAVID R. BUTLER | ) |
|  | Serve: 2066 Meyers Way | ) |
|  | Crozet, Virginia 22932, | ) |
|  | as agent of defendant number 7 above and in his personal, | ) |
|  | individual capacity beyond the scope of that agency, | ) |
|  |  | ) |

18.    WENDE'S WHERE'S THE BEEF HEALTHY                    )
       VEGETABLE SAUCE MANUFACTURING COMPANY              )
                                                          )
19.    WENDE'S WHERE'S THE BEEF TROPICAL                  )
       JATROPHA TREE PLANTING COMPANY                     )
                                                          )
20.    JOHN J. DAVIDSON,                                  )
       as agent of one or more of defendants number 1, 4 and 7  )
       above and in his personal, individual capacity    )
       beyond the scope of that agency                    )
       Serve:  8996 Kildownet Court                       )
               Vienna, Virginia 22182,                    )
                                                          )
21.    RAJAN KRISHNAN,                                    )
       as agent of one or more of defendants number 1 and 4 above  )
       and in his personal, individual capacity          )
       beyond the scope of that agency                    )
       Serve:  1360 Lancia Drive                          )
               McLean, Virginia 22102,                    )
                                                          )
22.    KENNETH E. STEBEN                                  )
       as agent of one or more of defendants number 1 and 4 above  )
       and in his personal, individual capacity          )
       Serve:  14811 Poplar Hills Road,                   )
                                                          )
23.    LINDEN HOUSE, LLC                                  )
       Serve:  Graham L. Adelman, Registered Agent        )
               3000 Boonesville Road                      )
               Free Union, Virginia 22940-1605,           )
                                                          )
24.    WIAL, LLC                                          )
       Serve:  Graham L. Adelman, Registered Agent        )
               3000 Boonesville Road                      )
               Free Union, Virginia 22940-1605,           )
                                                          )
25.    CAMBRIDGE HEALTHCARE HOLDINGS, LLC                 )
       Serve:  Graham L. Adelman, Registered Agent        )
               1300 Branchlands Drive                     )
               Charlottesville, Virginia 22901            )
                                                          )
26.    JULIE MICHELLE CONVISSER,                          )
       as agent of one or more of defendants number 1 through 4 and 7  )
       above and in her personal, individual capacity     )
       beyond the scope of that agency                    )
       Serve:  305 Huntley Ave.                           )
               Charlottesville, Virginia 22903,           )

|  |  |
|---|---|
| or | ) |
| 710 East High Street, # 201 | ) |
| Charlottesville, Virginia | ) |
|  | ) |
| 27. WENDE S, DUFLON | ) |
| <u>Serve</u>: 1222 Smith Street, Apartment M | ) |
| Charlottesville, Virginia 22901, | ) |
|  | ) |
| 28. KATHI L. AYERS | ) |
| <u>Serve</u>: Vaughan, Fincher and Sotelo, P.C. | ) |
| 8609 Westwood Center Drive, Suite 400 | ) |
| Tysons, Virginia 22182, | ) |
|  | ) |
| 29. JENNIFER C. MCMANUS | ) |
| <u>Serve</u>: Ally Legal Planning | ) |
| 5560 Sterrett Place, Unit 310 | ) |
| Columbia, Maryland 21044, | ) |
|  | ) |
| and | ) |
|  | ) |
| 30. JAMES P. COX, III | ) |
| <u>Serve</u>: MichieHamlett, Attorneys at Law | ) |
| 310 4th Street, N.E. | ) |
| Charlottesville, Virginia 22902, | ) |
|  | ) |
| Defendants, | ) |
|  | ) |
| and | ) |
|  | ) |
| CLAUDE DAVID CONVISSER, | ) |
|  | ) |
| Petitioner, | ) |
|  | ) |
| v. | ) |
|  | ) |
| COLETTE MARIE CONVISSER, | ) |
| as her best friend | ) |
| <u>Serve</u>: Linden House, 1250 Branchlands Drive, Apartment 404 | ) |
| Charlottesville, Virginia 22901, | ) |
|  | ) |
| MARTIN CONVISSER, | ) |
| as his best friend | ) |
| <u>Serve</u>: Linden House, 1250 Branchlands Drive, Apartment 404 | ) |
| Charlottesville, Virginia 22901, | ) |
|  | ) |
| and | ) |

4

MARTIN CONVISSER TRUST,                    )
by Julie Michelle Convisser, Trustee       )
address above                              )
                                           )
                                           )
          Respondents.                     )

## COMPLAINT

Plaintiff Claude David Convisser, representing himself, and plaintiff POP Diesel Africa, Inc., by its General Counsel the same attorney at law (together "plaintiffs"), state as their complaint against defendants Exxon Mobil Corporation, John Doe Standard Oil Trust Intelligence Service Numbers 1 through 3, Jane Doe New York Organized Crime Mafia Numbers 1 and 2, Jane Doe Retired Government Security Agent Intelligence Service, Marcus T. Wiley, Michael Goff a/k/a Michael Laird, Keith Ford, Charles L. Pinnell, Hunter S. Wyant, Ray W. Hughes, Elizabeth Ann Hughes, Emil Kutilak, Charles M. Steppe, David R. Butler, Wende's Where's the Beef Healthy Vegetable Sauce Manufacturing Company, Wende's Where's the Beef Tropical Jatropha Tree Planting Company, John J. Davidson, Rajan Krishnan, Kenneth E. Steben, Linden House, LLC, WIAL, LLC, Cambridge Healthcare Holdings, LLC, Julie Michelle Convisser, Wende S. Duflon, Kathi L. Ayers, Jennifer C. McManus, and James P. Cox, III, and petitioner Claude David Convisser ("petitioner") states as his petition for legal guardianship of respondents Colette Marie Convisser and Martin Convisser and for Lee Cress, CPA, to be appointed as conservator of their estate and financial affairs, to which petition the Martin Convisser Trust, by its Trustee defendant Julie M. Convisser, is a respondent, as follows:

## OVERVIEW

1.      Plaintiffs Claude David Convisser and POP Diesel Africa, Inc. sue all of the defendants in Count 1 for colluding together in one and several business conspiracies with legal malice to injure them in their reputation, trade, business or profession under Virginia Code Title

18.2, sections 499 and 500, with the purpose and effect of depriving them of securing $100

billion in equity investment pursuant to plaintiff POP Diesel Africa, Inc.'s pending Stock

Subscription Undertaking, and stealing this opportunity for themselves.

2.      Plaintiffs sue some of the defendants for civil damages in Count 2 arising under

Title 18, United States Code section 1964 for violating the Racketeer Influenced and Corrupt

Organization Act, United States Code Title 18, sections 1961, *et seq.* ("civil RICO").

3.      Petitioner Claude David Convisser petitions this Court in Count 5 to appoint

himself as the legal guardian of his aged and now infirm parents, respondents Colette Marie

Convisser and Martin Convisser and for Charlottesville CPA Lee Cress to be appointed

conservator of their estate and financial affairs and take these responsibilities from the current

holder of their power-of-attorney, defendant Julie Michelle Convisser.

4.      Since defendant Julie Michelle Convisser is a point person in the other

defendants' business conspiracy against the plaintiffs and her improper motive, bad faith, and

breaches of statutory, contract and fiduciary duties have impaired her decision-making regarding

her principals, respondents Martin and Colette Convisser, plaintiff and petitioner Claude David

Convisser sues her in Counts 3, 4 and 6 to terminate the power of attorney and end her authority

under their Advanced Directives, and for an accounting of and constructive trust to be placed on

their assets.

6.      Due to critical danger facing respondent Colette Marie Convisser, age 94, from a

plot by her daughter defendant Julie Convisser and caregivers surrounding respondent Colette

Marie Convisser at defendant Linden House Assisted Living Facility done at the behest of lead

defendants in the business conspiracy to starve her of life-prolonging nutrition while they

fraudulently bill Medicare for hospice care when she does not have any terminal illness, and due

also to failures in the care of respondent Martin Convisser, petitioner Claude David Convisser

seeks in Count 6 for an emergency restraining order and other emergency relief, court-ordered

health care, and permanent injunction under Virginia Code Title 54.1, section 2985.1 of the

Health Care Decisions Act; Virginia Code Title 64.2, sections 2981, *et seq.*, the Uniform Power

of Attorney Act; and Virginia Code Title 18.2, section 500(B).

7.    <u>**CONTENTS**</u>

| Section heading | Beginning paragraph | Page |
|---|---|---|
| Overview ……………………………………………………... | 5 | 5 |
| Subject Matter Jurisdiction ………………………………………… | 8 | 8 |
| Personal Jurisdiction ……………………………………………….. | 13 | 8 |
| Venue …………………………………………………………… | 15 | 9 |
| Parties ………………………………………………………….. | 16 | 9 |
| Factual Allegations …………………………………………………… | 165 | 49 |
|   Earlier Predicate Acts …………………………………………… | 169 | 50 |
|   Chronology in Ghana ……………………………………………… | 179 | 68 |
|   Chronology in Mali ……………………………………………... | 204 | 76 |
|   Effect on Plaintiff POP Diesel's Business of the Defendants' | | |
|    Inflicting Harm upon Plaintiff | | |
|    Claude David Convisser's Reputation …………………………. | 215 | 81 |
|   Advent of POP Diesel's $100 Billion Investment Prospectus | | |
|    and Stock Subscription Undertaking ……………………………. | 228 | 84 |
|   Sabotage of the Investment Raise in Albemarle County ……………… | 237 | 87 |
|   Defendant Julie Michelle Convisser's Agency | | |
|    for the Exxon Mobil Defendants ………………………………. | 258 | 102 |
|   Damages ………………………………………………………... | 319 | 135 |
| Legal Claims | | |
|   1. Civil Relief for Conspiracy to Injure Plaintiffs in | | |
|    Their Reputation, Trade, Business and Profession …….. | 327 | 142 |
|   2. Civil Relief under the Racketeering-Influenced | | |
|    and Corrupt Organizations Act ………………………… | 343 | 144 |
|   3. Judicial Relief under Virginia Code § 64.2-1614 ……………… | 355 | 147 |
|   4. Breach of Contract, the Convisser Family Trust ……………… | 375 | 154 |
|   5. Petition for Guardianship of and Conservatorship for | | |
|    Colette Marie Convisser and Martin Convisser ………... | 398 | 159 |
|   6. Injunction and Court-ordered Health Care ……………………... | 443 | 172 |
| Jury Demand ……………………………………………………………… | 449 | 175 |
| Prayer for Relief …………………………………………………………….. | - | 175 |

## SUBJECT MATTER JURISDICTION

8.      Original subject matter jurisdiction in this Court is premised on Title 28 U.S.C. section 1331 and the civil action arising under Title 18 U.S.C. section 1964 (civil RICO) against some of the defendants, all defendants of whom are part of the same overall business conspiracy against plaintiffs claimed by plaintiffs under Virginia Code Title 18.2, sections 499 and 500.

9.      Original subject matter jurisdiction in this Court is also premised on Title 28 U.S.C. section 1332 on diversity of citizenship between the plaintiffs / petitioner and defendants/ respondents and the amount in controversy exceeding $75,000, exclusive of interest and costs.

10.     Plaintiff / petitioner Claude David Convisser is a citizen of South Dakota and plaintiff POP Diesel Africa, Inc. is registered in Delaware, with its principal place of business in South Dakota.

11.     None of the defendants or respondents is a citizen of South Dakota or Delaware.

12.     In addition, this Court has supplemental or pendent jurisdiction over plaintiff and petitioner Claude David Convisser's additional claims by virtue of Title 28, United States Code section 1367(a) in that they are so related to the legal claims in the action within original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

## PERSONAL JURISDICTION

13.     As set forth below, each of the defendants is a citizen of Virginia residing with the jurisdiction of the Charlottesville Division of this Court or some other part of Virginia or has transacted business in Virginia and the jurisdiction of the Charlottesville Division of this Court directly or by their agent(s) identified in this complaint related to the specific subject matter described herein.

14.    Each of the defendants has had sufficient, substantial contacts with Virginia on the specific subject matter described herein for this Court to exercise personal jurisdiction over him, her or it.

## VENUE

15.    Venue lies properly in this Court pursuant to Title 28 U.S.C. section 1391(b)(1), 1391(b)(2), and 1391(b)(3).

## PARTIES

### Plaintiff and petitioner Claude David Convisser

16.    Plaintiff and petitioner Claude David Convisser, a citizen of South Dakota, is the Chairman, sole Director, Chief Executive Officer, and at this time, sole shareholder in trust for smallholder farmers in tropical areas of the world of plaintiff POP Diesel Africa, Inc., the successor in interest to Plant Oil Powered (POP) Diesel, Inc., which he led since January 2008 beginning in New Mexico.

17.    Plaintiff Claude David Convisser and the POP Diesel companies are the world's foremost advocates for the use of pure plant oil, which is straight vegetable or fruit oil like the cooking oil in your kitchen, to power compression ignition (diesel) engines, for which they secured the first-ever approval from the U.S. Environmental Protection Agency ("EPA") and the U.S. Department of Transportation, in June 2013 to run in used engines, and which they call POP Diesel Fuel.

18.    Plaintiff Claude David Convisser is also an attorney at law in good standing with the Virginia State Bar, a 1991 honors graduate of the University of Virginia School of Law who then clerked for Judge Albert V. Bryan, Jr., of the Alexandria Division of the U.S. District Court

for the Eastern District of Virginia, and then conducted a solo law practice in Alexandria from 1993 to 2004 before joining plaintiff POP Diesel in 2007.

19.    Petitioner Claude David Convisser is the son of Colette Marie Convisser and Martin Convisser whom he petitions this Court to be appointed legal guardian of and for whose estate and financial affairs he petitions Lee Cress, CPA, be appointed conservator.

20.    Petitioner Claude David Convisser has never been married and does not have any children or other dependents to support.

21.    Respondent Martin Convisser appealed to plaintiff and petitioner Claude David Convisser in 2015 to give up on plaintiff POP Diesel and return to law practice in northern Virginia.

    a.    Plaintiff Claude David Convisser declined respondent Martin Convisser's appeal with the explanation that if he did not stick with a 100 percent renewable, straight vegetable oil alternative to petroleum diesel fuel that is better performing and price competitive, which has compelled him also to stand up to the defendants' bullying, nobody else would.

    b.    Thereupon, respondent Martin Convisser gave his power of attorney to defendant Julie Michelle Convisser.

    c.    Nonetheless, respondent Martin Convisser remained a significant and unwavering moral and financial supporter of the plaintiffs; he simply and reasonably did not want his son to be in charge of his and his wife respondent Colette Marie Convisser's estate and financial affairs so long as plaintiff Claude David Convisser remained against long odds dedicated to plaintiff POP Diesel.

22.    At all times and in all capacities stated in this complaint while engaged in business activities, plaintiff Claude David Convisser was acting on behalf of plaintiff POP Diesel

Africa, Inc. or one of its predecessor or African subsidiary POP Diesel companies which he also ran or runs.

23.     The interests of plaintiffs Claude David Convisser and POP Diesel Africa, Inc. are synonymous.  Furthermore, their interests will remain without conflict after other investors contribute capital to plaintiff POP Diesel Africa, Inc.'s pending drive for $100 billion in equity investment, since per the terms of the Stock Subscription Undertaking, even at its fulfillment at the level of $100 billion, plaintiff Claude David Convisser will continue to own the controlling shares in trust for smallholder, tropical farmers.

<u>Plaintiff POP Diesel Africa, Inc.</u>

24.     Plaintiff POP Diesel Africa, Inc. ("the plaintiff Company") is a corporation formed in Delaware in June 2023, with its principal place of business in South Dakota, to take in a large sum of equity investment, $100 billion pursuant to its Investment Prospectus and Stock Subscription Undertaking dated July 1, 2024 ("the Investment Prospectus" or "Stock Subscription Undertaking"), to support subsistence farmers grow the *jatropha curcas* tree to use its inedible fruit-seed oil as biofuel and to grow other plants and process them, sharing profits with the farmers, in non-arid, non-forested areas of the tropical world.

25.     Plaintiff POP Diesel's Investment Prospectus contains sensitive, confidential and trade secret information that plaintiffs try to take reasonable measures to guard the secrecy of.

26.     The plaintiff Company's pending Stock Subscription Undertaking culminated POP Diesel's development of an agricultural model that began in 2012 in Mexico, whose federal government offered the Company a 90% subsidy in 2014 to expand its project there supporting small-scale farmers to grow *jatropha* trees, an offer the Company declined after it found better

conditions overall for taking on big investment in West Africa, starting specifically in non-forested, northern Ghana.

27.    Having studied all of the failed *jatropha* tree cultivation projects world-wide since the early 2000s, plaintiffs developed their agricultural model to avoid the pitfalls that felled all of them.

28.    The result is, in summary:

a.    Support for subsistence farmers to grow food crops, in addition to the *jatropha* tree;

b.    Guaranteed purchase of their crop harvests at prices set in contract beforehand.

c.    Integration of industrial processing for all crops at a site central to the growing area, powered by renewable electricity whose source is the biomass left-over from plant oil extraction from the *jatropha* fruit seeds;

d.    Sharing profits from the value addition with the farmers, so they will have incentive for continuing to care for and collect the fruit from the perennial trees year after year, and;

e.    Working with all of the smallholder farmers within a concentrated growing area, 30,000 at a time (in sum, "POP Diesel's integrated agricultural and industrial model").

<u>Defendant Exxon Mobil Corporation</u>

29.    Defendant Exxon Mobil Corporation, a New Jersey corporation with its principal place of business in Texas, is, at market capitalization of $525 billion, by far the biggest

petroleum and natural gas production and sales company in the United States, and one of the biggest ones in the world.

30.    In July 2017 at the U.S. Congress's Renewable Energy Forum and Expo where plaintiff POP Diesel had a stall and plaintiff Claude David Convisser spoke, defendant Exxon Mobil Corporation inquired if they would consider partnering to turn inedible *jatropha* plant oil into engine lubricating oil, rather than compete with their petroleum diesel fuel.

31.    Plaintiffs rejected defendant Exxon Mobil Corporation's invitation outright, since plaintiffs' intent has always been for inedible, pure *jatropha* plant oil to achieve its full potential in averting the worst ravages of global warming by competing with petroleum in the much bigger market for diesel fuel, rather than cabining it to engine lubricating oil.  Plaintiffs' view has always been that the only way to lure $100 billion and more in investment is if the resulting pure plant oil diesel engine fuel is price-competitive with petroleum diesel fuel.

32.    Thereupon, defendant Exxon Mobil Corporation turned on the plaintiffs maliciously in earnest, as described in the Factual Allegations below.

<u>Defendant John Doe Standard Oil Trust Intelligence Service Number 1</u>

33.    Defendant John Doe Standard Oil Trust Intelligence Service Number 1, based outside Virginia, has operated in Ghana, West Africa and other parts of Africa since the early 1990s for the benefit of defendant Exxon Mobil Corporation.

34.    The U.S. Central Intelligence Agency ("CIA") assigned its employee Brenda Jones of Richmond, Virginia to organize and lead defendant John Doe Standard Oil Trust Intelligence Service Number 1 in 1995.

35.    Following a period of retirement, Brenda Jones resumed her role as "Queen Mother" of this defendant John Doe standard Oil Trust Intelligence Service Number 1, in which

capacity and on which occasion in October 2023 she met with plaintiff Claude David Convisser for one hour in Accra, Ghana.

John Doe Standard Oil Trust Intelligence Service Number 2

36.    Defendant John Doe Standard Oil Trust Intelligence Service Number 2, based outside Virginia, operates around the world in support of the activities of defendant Exxon Mobil Corporation, as documented generally in the book *Private Empire: Exxon Mobil and American Power*, published in 2012 by the Penguin Press, authored by Pulitzer Prize-winning journalist Steve Coll who is now the Dean of the Columbia School of Journalism, and incorporated herein by reference in its entirety.

37.    In several approaches by their American agents visiting India, including defendant Kenneth E. Steben and Pat Ryan, his subordinate, defendant John Doe Standard Oil Trust Intelligence Service Numbers 2 and 3 sought again on behalf of defendant Exxon Mobil Corporation to corral plaintiff Claude David Convisser into surrendering on POP Diesel and the idea of using pure plant oil as a substitute for petroleum diesel fuel at 100 percent concentration during plaintiff Claude David Convisser's six month sojourn in India from December 2023 to June 2024.

Defendant John Doe Standard Oil Trust Intelligence Service Number 3

38.    Defendant John Doe Standard Oil Trust Intelligence Service Number 3, based outside Virginia, operates in the domestic United States, including Virginia, for the benefit of defendant Exxon Mobil Corporation and other inheritors of the Standard Oil Trust disbanded into 34 parts by the United States Supreme Court in 1911, but allowed to retain common ownership among the 34 parts and thereby to continue colluding on various matters.

39.     As a measure of the tremendous wealth the inheritors of the Standard Oil Trust accumulated and used by investing in and controlling significant swaths of the American economy, John D. Rockefeller's 25% ownership interest in the 34 parts of the former Standard Oil Trust, of which Standard Oil of New Jersey, now called defendant Exxon Mobil Corporation, was the biggest, reached $900 million in 1913, or around 2.3% of the gross national product of the United States.  An equivalent sum today, 2.3% of today's GNP of $7.1 trillion, would be $163 billion.  Four times that for the value then of all the assets of the Standard Oil Trust would be roughly the equivalent today of four Jeff Bezoses (worth $177 billion) or Elon Musks ($151 billion).

40.     Defendant John Doe Standard Oil Trust Intelligence Service No. 3 acted as agent of defendant Exxon Mobil in stealing a copy of plaintiff POP Diesel Africa, Inc.'s Investment Prospectus seeking $100 billion in equity investment in Charlottesville, Virginia in July 2024 for the purpose of maliciously undermining it and deploying John Doe Standard Oil Trust Intelligence Services Numbers 1 and 2 and other defendants to replicate it abroad.

41.     Together, defendants Exxon Mobil Corporation and John Doe Standard Oil Trust Intelligence Service Numbers 1 through 3 may hereinafter be referred to as "the Exxon Mobil defendants."

### Defendant Jane Doe New York Crime Mafia Number 1

42.     Defendant Jane Doe New York Organized Crime Mafia Number 1, based in New York and operating in Virginia, is an umbrella which organizes and monopolizes the international narcotics trade from South and Central America to North America and Europe, trash and waste collection and processing across the United States of America ("USA"), the erection of cellular

telephone towers, and the biodiesel industry in the USA and abroad, among many other business ventures.

43.    Defendant Jane Doe New York Organized Crime Mafia Number 1 aims to grow marijuana in Africa for export to European countries like Germany where consumption was recently decriminalized.

44.    Biodiesel starts as pure plant oil which then undergoes an energy-intensive and expensive transformation of the molecule turning the triglyceride molecules into two products, soap and fatty acid methyl esters (biodiesel), which biodiesel can safely run in a diesel engine in at most a 20 percent concentration, as compared to POP Diesel Fuel which runs at 100 percent, except for the brief start-up and shut-down periods on petroleum diesel fuel.

45.    Defendant Jane Doe New York Organized Crime Mafia Number 1 controls the biodiesel industry by virtue of its domination of waste collection, which gave it, to start, a monopoly on waste cooking oil which restaurants are required to dispose of daily in an outside bin, which waste cooking oil became the cheapest and first feedstock for making biodiesel when the idea of blending a small portion of biodiesel into petroleum diesel caught on in the 1990s.

46.    Due to the heavy and energy-intensive processing which requires the use of hazardous chemicals and results in hazardous waste, and in the case of feedstock coming from edible oils such as soy, canola or rapeseed, the destruction of forest land and diversion of food crop land to make biofuel, environmental campaigners in Europe criticize biodiesel as being overall worse for the environment than petroleum diesel fuel.

47.    Most of the biodiesel sold in the USA is B-5, meaning 5 percent biodiesel and 95 percent petroleum diesel fuel.

48.     Defendant Jane Doe New York Organized Crime Mafia Numbers 1 and 2, with the support of the Exxon Mobil defendants, have been clever to establish biodiesel processing facilities in nearly every Congressional District in the country, which has helped them win and earn for nearly the last twenty years exorbitant federal tax credits worth in total $2 per gallon of biodiesel they manufacture.

49.     Defendant Jane Doe New York Organized Crime Mafia Number 1 is the descendant of the organized crime element that served and partnered with John D. Rockefeller when he consolidated the Titusville, Pennsylvania oil fields in the early 1870s into the Standard Oil Trust monopoly.

50.     Defendant Jane Doe New York Organized Crime Mafia Number 1 cooperates closely with the American petroleum industry led by defendant Exxon Mobil Corporation in preserving the hegemony of petroleum and reserving a small market share for their B-5 biodiesel.

<u>Defendant Jane Doe New York Organized Crime Mafia Number 2</u>

51.     Defendant Jane Doe New York Organized Crime Mafia Number 2, based in New York and operating in Virginia, funds and finances investments from the proceeds of the activities of Defendant Jane Doe New York Organized Crime Mafia Number 1.

52.     Defendant Jane Doe New York Organized Crime Mafia Number 2's agent, including Hunter Wyant and a man whose first name is Joe, have met with plaintiff Claude David Convisser in Albemarle County, Virginia, just as its senior agent named Rusty met him India earlier in 2024 inquiring about an agricultural partnership in Africa, India and other tropical areas of the world.

53.    As well, defendant Jane Doe New York Organized Crime Mafia Number 2 is using a purloined copy of POP Diesel Africa, Inc.'s July 1, 2024 Investment Prospectus to assemble money for their own, copycat projects in the tropical world.

54.    Hereinafter, Jane Does New York Organized Crime Mafias Numbers 1 and 2 and their agents may be referred to as the New York Organized Crime Mafia defendants.

<u>Defendant Jane Doe Retired Government Security Agent Intelligence Service</u>

55.    Defendant Jane Doe Retired Government Security Agent Intelligence Service, based in and outside Virginia and operating herein, offers U.S. government employees who were employed by any of the 17 federal intelligence and security agencies, federal, state and local law enforcement or security, or private contractors working for federal or state government in the areas of defense, intelligence and information technology a means to capitalize financially on their knowledge of U.S. Government intelligence gathering capabilities and contacts with the U.S. intelligence gathering community.  This defendant equally operates in foreign countries, with comparable foreign government retirees and employees serving as its agents.

56.    Defendant Jane Doe Retired Government Security Agent Intelligence Service makes investments in and finds post-government employment for its agents in projects also funded by defendants John Doe Standard Oil Trust Intelligence Service Number 3 and Jane Doe New York Organized Crime Mafia Number 2.

57.    Agents of defendant Jane Doe Retired Government Security Agent Intelligence Service monitored plaintiff Claude David Convisser's trip and followed him in motor vehicles as he rode his bicycle from Manassas to Charlottesville, Virginia on June 27, 2024, until its agent Bruce R. Hegyi, a former federal banking law enforcement prosecutor, was able to introduce

himself and invite plaintiff Claude David Conviser to stay at their retreat complex in Rapidan,

Virginia, and plan business together in Ghana.

58.    Although technically independent of the other John Doe and Jane Doe defendants,

Jane Doe Retired Government Security Agent Intelligence Service works for and serves as the

agent of whoever and whichever interest will allow its members to capitalize on their intelligence

and security expertise to earn money.  Typically, this means that it assists those interests with

money in American society, such as the petroleum industry and John Doe Standard Oil Trust

Intelligence Service Number 3.  An example is its member defendant John J. Davidson, who as

discussed below has the responsibility for it of monitoring plaintiff Claude David Conviser's

childhood friends and high school classmates for the benefit not only of it, but also the other

John Doe and Jane Doe defendants.

<u>Defendant Marcus T. Wiley</u>

59.    Defendant Marcus T. Wiley, a resident of Free Union, Virginia, is an agent of

defendant Exxon Mobil Corporation and/or defendant John Doe Standard Oil Trust Intelligence

Service Number 3 who on or around July 26, 2024 visited a gathering of men in Albemarle

County, some of whom were considering plaintiff POP Diesel Africa, Inc.'s July 1, 2024

Investment Prospectus and investing in the plaintiff Company.

60.    Defendant Marcus T. Wiley made this visit and followed it up in a way so as to

malign plaintiff Claude David Conviser, deny his and all of the stockholdings in POP Diesel

Africa, Inc. any value, and maliciously divert investment from the plaintiff Company to copycat

projects operated and funded by defendants John Doe Standard Oil Trust Intelligence Service

Number 3 in the United States and Jane Doe New York Organized Crime Mafia Numbers 1 and 2

and John Doe Standard Oil Trust Intelligence Service Numbers 1 and 2 in tropical countries abroad.

61.    Upon information and belief, defendant Marcus T. Wiley is a former leather-working associate of defendant Charles L. Pinnell, a resident of Albemarle County, Virginia who used to be substantially involved in the marijuana trade and therefore is connected to Jane Doe New York Organized Crime Mafia Numbers 1 and 2.

### Defendant Michael Goff a/k/a Michael Laird

62.    Defendant Michael Goff, a resident of central Virginia who sometimes goes by the last name Laird, is engaged in the cultivation of marijuana in several African countries for export abroad, principally to Europe.

63.    Defendant Michael Goff's business in Africa is supported and funded by defendant Jane Doe New York Organized Crime Mafia Number 2 and run by Jane Doe New York Organized Crime Mafia Number 1.

64.    In conjunction with defendant Marcus T. Wiley's sabotage of POP Diesel's investment prospects coming from western Albemarle County, defendant Michael Goff gained unauthorized access to plaintiff POP Diesel Africa, Inc.'s July 1, 2024 Investment Prospectus and is circulating it among others affiliated with defendant Jane Doe New York Organized Crime Mafia Numbers 1 and 2, seeking to copy and emulate it in Africa.

65.    Defendant Michael Goff is an associate of a man whose first name is Ollie who works in agricultural operations with Jane Doe New York Organized Crime Mafia Number 1 in Virginia and who also came to meet with plaintiff Claude David Conviser in western Albemarle County.

66.     Defendant Michael Goff volunteered to plaintiff Claude David Convisser in mid-July 2024 that all or a lot of the contraband in Africa is channeled through Nigeria to Europe and elsewhere, where he said his organization's marijuana is exported from.

a.      Plaintiff POP Diesel's Stock Subscription Undertaking requires signers to agree that its business will fail unless the New York Organized Crime Mafia defendants cease all of their unlawful trafficking through Nigeria, which causes untold corruption and violence across the Western Sahel.

b.      Defendant Michael Goff maintained that his organization only cultivates and deals in marijuana, not harder drugs or stolen petroleum and other goods.

c.      The significance of defendant Michael Goff's message recited at the beginning of this paragraph was two-fold:

i.      It showed that he was aware of the condition recited above in plaintiff POP Diesel's Stock Subscription Undertaking from having read it himself or someone else's having briefed him on it before he came to speak with plaintiff Claude David Convisser. Therefore, he was admitting that the New York Organized Crime Mafia defendants had received a purloined copy of plaintiff POP Diesel's Investment Prospectus.

ii.     It showed that at least his faction of the New York Organized Crime Mafias was willing to consider stopping their use of Nigeria as a corrupt center for their trafficking operations in Africa, and hopefully just give up on them and refrain from relocating them elsewhere.

<u>Defendant Keith Ford</u>

67.     Defendant Keith Ford is a life-time resident of western Albemarle County, and a farmer, grave-digger, and handyman by trade and avocation.

68.    He knows witness Wick McNeely well and informed plaintiff Claude David Convisser that he would inquire of this witness about him when they first met on or around July 12, 2024.

69.    Upon information and belief, he used his acquaintance with Wick McNeely to misconstrue to others in western Albemarle County, such as Elbert Dale and defendant Ray W. Hughes, that plaintiff Claude David Convisser was not honest, trustworthy or reliable.

70.    He is personable, loquacious and outgoing, and has drawn other residents of western Albemarle County unknown to plaintiffs into the defendants' offerings for investment alternative to plaintiff POP Diesel, which are defendants Wende's Where's the Beef Healthy Vegetable Sauce Manufacturing Company and Wende's Where's the Beef Tropical Jatropha Tree Planting Company.

71.    He strategized with defendant Elizabeth Ann Hughes on August 3, 2024 about maneuvering behind plaintiff Claude David Convisser's back to divert investment from plaintiff POP Diesel to defendants Wende's Where's the Beef Healthy Vegetable Sauce Manufacturing Company and Wende's Where's the Beef Tropical Jatropha Tree Planting Company.

72.    The Exxon Mobil and New York Organized Crime Mafia defendants behind the scenes had already convinced defendant Keith Ford to work for them in knee-capping plaintiffs investment prospects in western Albemarle County before he ever met plaintiff Claude David Convisser at the breakfast group on or around July 12, 2024.

73.    Upon information and belief, defendants Hunter S. Wyant and Charles L. Pinnell advised the New York Organized Crime Mafia defendants to recruit defendant Keith Ford to their cause against plaintiffs, as referred to in the preceding paragraph.

<u>Defendant Charles L. Pinnell</u>

74.    Defendant Charles L. Pinnell, aged in his 60s and a long-time resident of Albemarle County, was a senior operative in the marijuana cultivation business in western Albemarle County, but has since retired from active duty to it.

a.    He stored marijuana cultivated there in the 13-foot high basement of his large residence and workshop in Crozet, Virginia for shipment elsewhere.

b.    At one point, he managed a staff of 13 people employed in the comings and goings of his marijuana warehouse.

75.    He is one of three leaders on the ground in western Albemarle, along with defendants Ray W. Hughes and Emil Kutilak, in planning the usurpation of plaintiff POP Diesel's Investment Prospectus for the benefit of others of their co-conspirators and other defendants.

76.    Defendant Charles L. Pinnell's contribution to this triumvirate is his connection with the New York Organized Crime Mafia defendants and in particular defendant New York Organized Crime Mafia Number 2 and its agent defendant Hunter S. Wyant, who is one of their lead business and investment liaisons in central Virginia.

77.    Defendant Charles L. Pinnell holds a regular Friday afternoon meeting at defendant Emil Kutilak's Cottonwood Farm with him and defendant Ray W. Hughes where they discuss the progress of their scheme to invest in alternative businesses to plaintiff POP Diesel which the Exxon Mobil and New York Organized Crime Mafia defendants have presented to them, in particular defendants Wende's Where's the Beef Healthy Vegetable Sauce Manufacturing Company and Wende's Where's the Beef Tropical Jatropha Tree Planting Company.

Defendant Hunter S. Wyant

78.    Defendant Hunter S. Wyant, age 45, is a life-long resident of western Albemarle County, a businessman, and a shareholder in companies and partnerships based in New York which are part of, owned by, and affiliated with defendant New York Organized Crime Mafia Number 2.

79.    Defendant Hunter S. Wyant is an insurance agent for State Farm Insurance.

80.    Defendant Hunter S. Wyant made a point of attending a breakfast restaurant in western Albemarle County and meeting plaintiff Claude David Convisser there the first few times the plaintiff showed up, in early to mid-July 2024.

81.    Upon information and belief, defendant Hunter S. Wyant recruited defendant Keith Ford to solicit interest in other residents of western Albemarle County to invest in defendants Wende's Where's the Beef Healthy Vegetable Sauce Manufacturing Company and Wende's Where's the Beef Tropical Jatropha Tree Planting Company, instead of plaintiff POP Diesel.

82.    Defendant Hunter S. Wyant, as liaison to the leadership of defendant New York Organized Crime Mafia Number 2, follows their directions and relays to them guidance coming from the triumvirate of elders, defendants Charles L. Pinnell, Ray W. Hughes, and Emil Kutilak, regarding the lead defendants' latest exploit of plaintiffs, on the ground of western Albemarle County.

Defendant Ray W. Hughes

83.    Defendant Ray W. Hughes, a fit and sharp age 88, is, according to him, a former executive of Smithfield Hams, who retired at the time of its purchase by Chinese investors.

84.    Following his first acquaintance with plaintiff Claude David Convisser on or around July 5, 2024, he was sympathetic to and interested in aiding plaintiffs, but was diverted

from that path by the aggressive and predatory opponents of plaintiff POP Diesel in the business conspiracy.

85.     Since this diversion, he has worked to steer potential investors he knows in western Albemarle County, China and elsewhere to defendants Wende's Where's the Beef Healthy Vegetable Sauce Manufacturing Company and Wende's Where's the Beef Tropical Jatropha Tree Planting Company and away from plaintiff POP Diesel.

86.     The son of defendant Ray W. Hughes is an intelligence or security agent of the United States Government based in Tasmania, Australia.  At some point during his interactions with plaintiff Claude David Conviser beginning early July 2024, defendant Ray W. Hughes may have started following the directions of defendant Jane Doe Retired Government Security Agent Intelligence Service.

87.     He falsely blamed plaintiff Claude David Conviser for missing an appointment with he and his wife defendant Elizabeth Ann Hughes on Monday, July 29, 2024, which he wrote was the final step in their vetting an investment in plaintiff POP Diesel.  However, plaintiff Claude David Conviser would never have made an appointment on that date, due to his pre-arranged travel and appointments in northern Virginia.

88.     He has weekly meetings on Friday evenings, Sunday afternoons, and Tuesday and Wednesday mornings with other of the defendants and others seeking to take advantage of having procured plaintiff POP Diesel's Investment Prospectus for their own benefit exclusive of plaintiffs.

<u>Defendant Elizabeth Ann Hughes</u>

89.     Defendant Elizabeth Ann Hughes, the 74 year-old wife of defendant Ray W. Hughes, spent her career as a lobbyist in Richmond.

90.     She followed directions of petroleum allies in Richmond affiliated with the Exxon Mobil defendants or defendant Retired Government Security Agent Intelligence Service in derailing her husband's interest in investing in plaintiff POP Diesel.

91.     She falsely told plaintiff Claude David Convisser on August 3, 2024 that without his ever asking, she had shredded the 130-page copy of plaintiff POP Diesel's July 1, 2024 Investment Prospectus in her office shredding machine, after she called him on the phone on July 31, 2024 to say that she and her husband would not be investing in plaintiff POP Diesel.

a.     When plaintiff Claude David Convisser asked defendant Ray W. Hughes for the return of plaintiff's Investment Prospectus, he did not know what to say in reply.

b.     Defendant Elizabeth Ann Hughes jumped in with the excuse that plaintiff Claude David Convisser had informed them a few days before that he was going to make a few small corrections to the document, and that was why she said that without any prompting, she had shredded the whole thing.

c.     In fact, her husband defendant Ray W. Hughes had been impressed with plaintiff POP Diesel's Investment Prospectus to the point that he had already discussed it with and shown it to other potential investors.

<u>Defendant Emil Kutilak</u>

92.     Defendant Emil Kutilak, 89 years old, has been living in western Albemarle County since he left the army at age 22.

93.     He appears every morning at a particular restaurant in western Albemarle County to have coffee and chat with other residents of that area who make an appearance.

94.     He is a former pilot for Piedmont Airlines and hobbyist builder of older model, single- or two-person, private airplanes who thereby became intimately familiar with the terrain of the central Appalachian mountains and valleys.

95.     Defendant Emil Kutilak's home and farm in western Albemarle County has a 2,000-foot airstrip on it from which he and other pilots of small aircraft used to take off and land.

96.     Upon information and belief, he formerly transported contraband inside the wings and other parts of the small aircraft he flew from his farm to delivery and distribution points elsewhere, or he permitted others to use his airstrip for that purpose who worked with defendant Charles L. Pinnell and for defendant New York Organized Crime Mafia Number 1.

97.     He is well known and liked in western Albemarle County and other residents of western Albemarle County have come to his home, the breakfast restaurant where he spends the first part of every morning, or the Veterans of Foreign Wars post and restaurant starting Sunday afternoons at 1:00 p.m., to enroll and invest with him in the defendants' alternative business opportunity to plaintiff POP Diesel, which in Albemarle County is defendants Wende's Where's the Beef Healthy Vegetable Sauce Manufacturing Company and Wende's Where's the Beef Tropical Jatropha Tree Planting Company.

### Defendant Charles M. Steppe

98.     Defendant Charles M. Steppe, a lifelong resident of western Albemarle County aged 66, kindly agreed in early July 2024 to inform at least six wealthy people he works for of the identity of plaintiff Claude David Convisser and that the latter had an opportunity for them to invest in plaintiff POP Diesel, without giving any more detail about the opportunity..

99.    Defendant Charles M. Steppe heard other of the defendants, such as defendant Keith Ford, making negative comments about plaintiff Claude David Convisser on or around the weeks of July 14 and 21, 2024, which general fact he admitted to him on August 3, 2024.

100.    His brother-in-law defendant David R. Butler, acting on instructions from defendant Retired Government Security Agent Intelligence Service, persuaded defendant Charles M. Steppe to divert his patrons from potentially investing in plaintiff POP Diesel to instead, considering investing in defendants Wende's Where's the Beef Healthy Vegetable Sauce Manufacturing Company and Wende's Where's the Beef Tropical Jatropha Tree Planting Company.

101.    Consequently, defendant Charles M. Steppe aided the other defendants and business conspiracy to sap plaintiff POP Diesel of the opportunity plaintiff Claude David Convisser had informed him briefly of, and to boost the alternative offering.

<u>Defendant David R. Butler</u>

102.    Defendant David R. Butler, age 45, is a life-long resident of western Albemarle County presently living in a townhouse in Crozet, Virginia.

103.    The University of Virginia employs him in its information technology department.

104.    He also volunteers part-time as a fireman for the Crozet Volunteer Fire Department.

105.    After plaintiff Claude David Convisser first showed up to have breakfast at a neighborhood restaurant in western Albemarle County in early July 2024, defendant David R. Butler started appearing every single time plaintiff was there, even though before then, he had not been a regular attendee.

      a.     On instruction from his principal, defendant Jane Doe Retired Government Security Agent Intelligence Service, he was there to monitor the conversation and report back any possible favorable developments regarding investment in plaintiff POP Diesel so that these could be thwarted.

      b.     For instance, he maintained to plaintiff Claude David Convisser that nobody had ever said anything negative about plaintiffs in front of him, even though others told plaintiff Claude David Convisser they had.

106.    Three times during preparation and drafting of this complaint, after plaintiff Claude David Convisser used a computer terminal available to the public at the University of Virginia School of Law's Library to check his email (he does not use a smart phone for reasons of security because they can be readily hacked and monitored), someone changed the password, and he was blocked out of his email account.

      a.     These incidents were a purposeful attempt by the Exxon Mobil defendants to delay filing of this complaint.

      b.     The matter awaits discovery to determine if defendant David Butler had anything to do with monitoring and interfering with plaintiff Claude David Convisser's email communications from his perch in the University of Virginia's IT department.

      c.     Certainly, plaintiff Claude David Convisser suffered unusual blockage of his ability to register online to gain admission as a lawyer to practice in this Court.

      i.     The U.S. Government's Public Access to Court Records website (pacer.gov) kept bumping him off while he was trying repeatedly to so register from multiple computer terminals and accounts at the Central Branch of the Jefferson-Madison Regional Public Library.

ii.    Eric Buckenmeyer, a reference librarian there, wrote a letter to the

Clerk of this Court attesting to this problem, which plaintiff Claude David Convisser never

delivered because the next day, he was able to gain access and complete the registration from a

computer elsewhere.

<u>Defendant Wende's Where's the Beef Healthy Vegetable Sauce Manufacturing Company</u>

107.    Defendant Wende's Where's the Beef Healthy Vegetable Sauce Manufacturing

Company is a pseudonym for a business entity lead defendants and / or their local subordinates

established to divert investment by potential investors in central Virginia away from plaintiff

POP Diesel.

<u>Defendant Wende's Where's the Beef Tropical *Jatropha* Tree Planting Company</u>

108.    Defendant Wende's Where's the Beef Tropical *Jatropha* Tree Company is a

pseudonym for a business entity lead defendants and / or their local subordinates established to

divert investment by potential investors in central Virginia away from plaintiff POP Diesel.

109.    Together, Wende's Where's the Beef Healthy Vegetable Sauce Manufacturing

Company and Wende's Where's the Beef Tropical Jatropha Tree Planting Company may be

referred to hereinafter as "the Wende's Where's the Beef defendants."

<u>Defendant John J. Davidson</u>

110.    Defendant John J. Davidson, a resident of Vienna, Virginia, is one of plaintiff

Claude David Convisser's earliest childhood friends from northern Virginia.  He loves him like a

brother.

111.    Formerly employed in law enforcement as a lawyer prosecutor with a federal

banking regulatory agency, defendant John J. Davidson worked as E-trade Bank's senior officer

in charge of compliance with federal anti-money laundering and anti-bribery statutes.

30

112.    Defendant John J. Davidson serves as an agent of some combination of defendants Exxon Mobil Corporation, John Doe Standard Oil Trust Intelligence Service Number 3, and Jane Doe Retired Government Security Agent Intelligence Service appointed, among other responsibilities, with monitoring plaintiff Claude David Convisser, their JEB Stuart (now Justice) High School Class of 1980, and their mutual friends.

113.    Defendant John J. Davidson has used these connections purposely to try to sabotage the prospects for plaintiff POP Diesel's investment and the Company's operational success in Africa and elsewhere.

Defendant Rajan Krishnan

114.    Defendant Rajan Krishnan, a native of India, U.S. citizen, and resident of McLean, Virginia, is a former executive of defendant Exxon Mobil Corporation and serves as its agent today.

115.    Defendant Rajan Krishnan advised defendant John Doe Standard Oil Trust Intelligence Service Number 3 to purchase and build ashrams and temples dedicated to the Indian humanitarian and spiritual figure Mata Amritanandamayi ("M.A."), commonly known around the world as "Amma" or the "Hugging Saint."  He supported the channeling of funds therefrom by defendant Kenneth E. Steben to purchase and renovate the M.A. Center D.C. in Potomac, Maryland, as well as around a dozen other temples and ashrams around North America, the United Kingdom, and Europe, and most recently in July 2024, to host Amma's 4-day program at the National Conference Center in Leesburg, Virginia.

116.    The ultimate purpose of the investments and expenditures described in the preceding paragraph was surreptitiously to be able to monitor and control Amma's North American organization and thereby limit the American and worldwide influence of Amma and

31

her devotees such as plaintiff Claude David Convisser and thereby, keep his business enterprise plaintiff POP Diesel from gaining a foothold in the fuel market competing with defendant Exxon Mobil Corporation.

117.    They did this to create a venue and forum, as described below, for agents of John Doe Standard Oil Trust Intelligence Service Number 3 to sidle up close to plaintiff Claude David Convisser, to gain the means for imposing comprehensive, unlawful electronic surveillance of him and thus countering plaintiff POP Diesel at every turn, repeatedly poisoning him by putting bad germs and other contaminants in his food with the goal of demoralizing him into quitting plaintiff POP Diesel, and discrediting him before a group of natural allies and potential supporters of and investors in plaintiff POP Diesel, his spiritual cohorts in devotion to Amma and Sanatana Dharma (Hinduism).

118.    For instance, at Amma's program near Detroit, Michigan in early December 2019, defendant Rajan Krishan supported, if not initiated the idea of, the ostracizing of plaintiff Claude David Convisser in front of dozens of other Amma devotees by defendant John Doe Standard Oil Trust Intelligence Service Number 3's falsely accusing him of being some kind of security danger to Amma or her other devotees.

119.    Word of this ostracization spread to Amma communities around North America. Plaintiff Claude David Convisser learned that it was complete when he visited the temple in Santa Fe, New Mexico dedicated to Amma in November 2023 but was personally rebuffed there.

110.    Similarly, upon information and belief, on defendant Rajan Krishnan's guidance or on his active promotion, agents of defendant Jane Dow New York Organized Crime Mafia Number 1 attempted to isolate and keep plaintiff Claude David Convisser's standing among Amma's U.S. devotees low while at Amma's program in Leesburg in July 2024.

a.    They contrived to give him tickets to greet her very late in the program, as compared to the ticket he originally had for much earlier in the program.

b.    The earlier ticket offered the chance that she would invite him to stand directly behind her on the stage for the rest of the night, showing other devotees of her support for him, as she has done on past occasions.

### Defendant Kenneth E. Steben

111.    Defendant Kenneth E. Steben, a devotee of Amma since the early 2000s, manages an investment fund worth more than $300 million for John Doe Standard Oil Trust Intelligence Service Number 3.

112.    He persuaded John Doe Standard Oil Trust Intelligence Service Number 3 that it would be worth their while to purchase ashrams and temples for Amma, starting with the M.A. Center D.C. in Potomac, Maryland, which he purchased with their money in or around 2010.

113.    Although he does not occupy a formal office in Amma's organization in and around Washington, D.C., everyone who is part of that spiritual community recognizes that he is the boss.

a.    His word is final, apart from Amma's, although she is sensitive not to offend him in any way.

b.    Plaintiff Claude David Convisser was an active participant in the Washington, D.C. spiritual association devoted to Amma until defendant Kenneth E. Steben and his subordinate agents acting for defendant John Doe Standard Oil Trust Intelligence Service Number 3 and Retired Government Security Agent Intelligence Service constructively forced him to leave it in 2017.

114.    Plaintiff Claude David Convisser clashed with defendant Kenneth E. Steben when the latter blocked his initiative to have revered Congressman John Lewis nominate Amma for the Nobel Peace Prize in 2018.

a.    Congressman Lewis was willing and ready to make the nomination, and to sign a nominating letter plaintiff Claude David Convisser had drafted.

b.    All that remained was for a few other devotees of Amma from the Washington, D.C. spiritual group to meet with the Congressman, in case he had any questions about her or her good works.

c.    However, defendant Kenneth E. Steben would not permit any other devotees to accompany plaintiff Claude David Convisser to the meeting with Congressman Lewis.  Therefore, the initiative died.

115.    In February and March 2019, plaintiff Claude David Convisser wrote and submitted to Amma two substantial memoranda giving details of what he thought then was the Federal Bureau of Investigation's ("FBI") or the CIA's unlawful interference in the functioning of her North American spiritual communities.

a.    She authorized him to disseminate these memoranda to the board of directors and her senior disciples.

b.    He realized after meeting Brenda Jones in Accra, Ghana in October 2023 that the responsible party was not the U.S. Government, but the Exxon Mobil defendants, whose point-person was defendant Kenneth E. Steben.

116.    Defendant Kenneth E. Steben seemed to tolerate plaintiff Claude David Convisser's free speech, but on direction from the broader business conspiracy, nonetheless took

retaliatory actions against him because of and to harm his business affiliation with plaintiff POP Diesel.

117.    Defendant Kenneth E. Steben made the decision to conduct Amma's program in late July 2024 at the National Conference Center in Leesburg, Virginia.

### Defendant Linden House, LLC

118.    Defendant Linden House, LLC, a company formed in Virginia, operates Linden House Assisted Living facility in Albemarle County, Virginia, where defendant Julie Michelle Convisser placed respondents Colette Marie Convisser, about to turn age 94, and Martin Convisser, now age 92 ½, for residence in October 2021.

119.    Upon information and belief, defendant Linden House, LLC is ultimately controlled and directed by Graham Lewis Adelman and his partners in defendant Cambridge Healthcare Holdings, LLC.  Graham Lewis Adelman spent his early years as a lawyer beginning in 1976 working for petroleum companies and then channeled investments from John Doe Standard Oil Trust Intelligence Service Number 3 into manufacturing and starting in 2003, elder health care, including defendant Cambridge Healthcare Holdings, LLC.

120.    Defendant Linden House, LLC at all times monitored or permitted John Doe Standard Oil Trust Intelligence Service Number 3 to monitor the relations between plaintiff Claude David Convisser and his parents respondents Colette Marie Convisser and Martin Convisser to further the malign objectives against plaintiffs of defendants Exxon Mobil Corporation and John Doe Standard Oil Trust Intelligence Service Number 3, and defendant Linden House, LLC engaged in negligent and purposely abusive care of those respondents.

### Defendant WIAL, LLC

121.    Defendant WIAL, LLC, a company registered in Virginia, is upon information and belief the owner of the physical facility in which Linden House, LLC operates and respondents Colette Marie Convisser and Martin Convisser reside.

122.    Upon information and belief, defendant WIAL, LLC, like defendant Linden House, LLC, is under the control and direction of Graham Lewis Adelman and his partners affiliated with defendant John Doe Standard Oil Trust Intelligence Service 3 in defendant Cambridge Healthcare Holdings, LLC.

123.    Defendant WIAL, LLC bears responsibility for defendant John Doe Standard Oil Trust Intelligence Service Number 3's installation and use of technological surveillance and manipulation equipment built into Linden House to further the aims of defendants Exxon Mobil Corporation and Standard Oil Trust Intelligence Service Number 3 against plaintiffs and respondents Colette Marie Convisser, and Martin Convisser.

### Defendant Cambridge Healthcare Holdings, LLC

124.    Defendant Cambridge Healthcare Holdings, LLC, a company registered in Virginia, upon information and belief owns defendants Linden House, LLC and WIAL, LLC.

125.    Defendant Cambridge Healthcare Holdings, LLC is controlled and directed by Graham Lewis Adelman and others affiliated with defendant John Doe Standard Oil Trust Intelligence Service Number 3 or who have loyalty to it and defendant Exxon Mobil Corporation and are willing to perform their will in monitoring the relations between plaintiff Claude David Convisser and his parents resident at Linden House, in furthering their malign objectives against plaintiffs as part of a business conspiracy, and in neglecting and abusing Colette Marie Convisser and Martin Convisser.

126.    Together, defendants Linden House, LLC, WIAL, LLC, and Cambridge Healthcare Holdings, LLC may be referred to hereinafter together as the "Linden House defendants" or "defendants Linden House."

Defendant Julie Michelle Convisser

127.    Defendant Julie Michelle Convisser is a licensed clinical social worker in and resident of Charlottesville, Virginia.

128.    Defendant Julie Michelle Convisser is the only sibling and younger sister of plaintiff Claude David Convisser. She moved their parents respondents Colette Marie Convisser and Martin Convisser from independent living in northern Virginia into Linden House in October 2021, when Martin was no longer able to take complete physical care of Colette after she became wheelchair-bound following a fall and failed hip-replacement surgery.

129.    Defendant Julie Michelle Convisser has been following the business conspiracy's directions given her, among others, by Wende S. DuFlon, into whose arms she was put in recovery from a traumatic experience in Guatemala in 1995, where defendant Wende S. Duflon then lived with her husband, both then agents of the CIA or defendant John Doe Standard Oil Trust Intelligence Service Number 2.

130.    The husband of defendant Julie Michelle Convisser, Greg Goering who resides with her in Charlottesville, at all times has aided and abetted her tortious actions. He obfuscated to respondent Martin Convisser about his financial affairs and accompanied her to various meetings and in communications with him as an extra person and able-bodied male to intimidate him from challenging her with any questions or disputes.

131.    Jeanne L. Reimers exercises a senior or supervisory role to defendant Julie Michelle Convisser for John Doe Standard Oil Trust Intelligence Service Number 3. A former

neighbor of respondents Martin and Colette Marie Convisser in Falls Church, Virginia, originally

from Texas with a background or connection to the petroleum industry there, Jeanne L. Reimers

had the responsibility for it dating back years of ingratiating herself upon respondents Colette

Marie Convisser and Martin Convisser, to gather information from them about plaintiff Claude

David Convisser, and to nudge them in ways it desired.

132.    A racist against Black people with a personal political viewpoint far from theirs,

Jeanne L. Reimers visited respondents Martin and Colette Marie Convisser at defendant Linden

House in 2023 to boost the respondents' confidence in their place of residence and familiarize

herself with their new surroundings.

## Defendant Wende S. Duflon

133.    Defendant Wende S. Duflon nee Fré moved from Guatemala to Charlottesville in

2020 with her husband and the responsibility of supervising defendant Julie Michelle

Convisser's interactions with her parents, respondents Martin and Colette Convisser and brother

plaintiff Claude David Convisser, furthering the malign designs against plaintiffs of defendants

Exxon Mobil Corporation and John Doe Standard Oil Trust Intelligence Service Number 3.

134.    Defendant Wende S. Duflon introduced defendant Julie Michelle Convisser to

Marta Staples, whom she pays to spend time with her parents every Tuesday afternoon, rather

than visit them herself.

a.    Defendant Julie Michelle Convisser posits that Marta Staples is a

professional elder care-giver.

b.    However, Marta Staples will not assist respondent Colette Marie

Convisser to go to the toilet for fear of incurring liability.

c.       Marta Staples was formerly an agent of the CIA or John Doe Standard Oil Intelligence Service Number 2 stationed in Egypt.

d       Marta Staples functions as an additional set of eyes-and-ears monitoring respondents Martin and Colette Convisser in their interactions with plaintiff Claude David Convisser when he is visiting them, since defendant Julie Michelle Convisser has avoided nearly all contact with him in person and by telephone and email, except the barest of communications out of absolute necessity, since deepening her activity in the business conspiracy against plaintiffs beginning with the premature declaration of respondent Martin Convisser's mental incapacity in August 2021.

135.    Defendant Wende S. Duflon also introduced defendant Julie Michelle Convisser to Jackie Erskin, an agent of the CIA or Jane Doe Retired Government Security Agent Intelligence Service.

a.       Her responsibility is to take respondent Martin Convisser to the public library.

b.       She does not do that often enough to satisfy him, because there is no one trustworthy who will stay with respondent Colette Marie Convisser while he is away and it is too complicated for her to take respondent Colette Marie Convisser along in her wheelchair.

Defendant Kathi L. Ayers

136.    Defendant Kathi L. Ayers is a Virginia-licensed attorney at law in private practice with Vaughan, Fincher and Sotelo, P.C. in Tysons, Virginia who drafted the Will and Trusts of respondent Martin and Colette Convisser and the power of attorney which he assigned to defendant Julie Michelle Convisser.

137.    Upon information and belief, defendant Kathi L. Ayers wrongly informed defendant Julie Michelle Convisser and respondent Martin Convisser as late as October 2022, on which errant advice they relied to the entire Convisser family's detriment, that (a) the Martin Convisser Trust and the Convisser Family Trust were irrevocable, when by their terms, they plainly were not, and (b) respondent Martin Convisser was legally incapacitated from making changes to them.

138.    This erroneous advice was part of the defendants' scheme to deny respondent Martin Convisser's financial support for plaintiffs.

139.    Upon information and belief, defendant Kathi L. Ayers drafted, or supervised the drafting of, the Will, Trusts, power of attorney, and Advanced Directive of respondents Martin and Colette Convisser in such a way as to facilitate a coup against their autonomy as embodied in Martin Convisser's full and competent mental capacity until 2023, against their loyal moral and financial support of plaintiffs' business venture, and against plaintiff Claude David Convisser's inheritance, as set forth below.

140.    Because defendant Kathi L. Ayers upon information and belief was aware of the other defendants' malicious business goal against plaintiffs and purposely acted to implement them, she knowingly participated in and aided their fraudulent take-overs referred to in the preceding paragraph, based in part on a letter discussed below written by Dr. James L. Bicksel.

Defendant Jennifer C. McManus

141.    Defendant Jennifer C. McManus is a Virginia-licensed attorney at law in solo private practice in Columbia, Maryland.

142.    Upon information and belief, defendant Kathi L. Ayers nominated defendant Jennifer C. McManus to respondent Martin Convisser to become the first Trustee of the

Convisser Family Trust and the Claude Convisser Trust thereunder, a position she held until October 2022.

143.    Defendant Jennifer C. McManus wrongly reiterated to defendant Julie Convisser, respondent Martin Convisser, and others in 2022 defendant Kathi L. Ayers's erroneous advice as part of the same scheme against plaintiffs that (a) the Martin Convisser Trust and the Convisser Family Trust were irrevocable, when by their terms, they plainly were not, and (b) Martin Convisser was legally incapacitated from making changes to them.

Defendant James P. Cox, II

144.    Defendant James P. Cox, III is a Virginia-licensed attorney at law practicing in Charlottesville and is the head of his law firm MichieHamlett's elder law, trusts and estates practice group.

145.    Upon information and belief, defendant James P. Cox, III advised defendant Julie Convisser to cause defendants Linden House, LLC and WIAL, LLC to issue a No Trespass Order against plaintiff Claude David Convisser on July 19, 2024 and to cut off funds for him from the Claude Convisser Trust as a result of his having raised the day before the subject of a plot to kill Colette Marie Convisser by starving her of the Ensure® high-vitamin and high-protein beverage she must drink at least three cartons of per day to receive her life-sustaining nutrition.

    a.    Upon information and belief, defendant James P. Cox, III was aware of plaintiff Claude David Convisser's email of July 18, 2024 or its substance referred to in the preceding paragraph.

    b.    Upon information and belief, defendant James P. Cox, III was aware of plaintiff Claude David Convisser's previously having raised a question about fraudulent billing

of Medicare authorized by defendant Julie Michelle Convisser for respondent Colette Marie
Convisser's unlawful hospice care.

      c.     Defendants Julie Michelle Convisser, defendants Linden House, and John
Doe Standard Oil Trust Intelligence Service Number 3 are all complicit in this plot.

      d.     Martin Convisser is going along with this plot only because he is unaware
of any better option such as the relief this complaint prays for and because the defendants have
rendered him powerless and now completely alone and isolated in trying to protect his wife
respondent Colette Marie Convisser.

146.    Defendant James P. Cox, III advised defendant Julie Michelle Convisser to
retaliate against plaintiff Claude David Convisser and banish him from being able to see their
parents and defendant Linden House's staff for the additional reasons that plaintiff Claude David
Convisser had objected on July 15, 2024 to these defendants', with defendant Julie Michelle
Convisser's approval, giving respondent Colette Marie Convisser solid foods to eat contrary to
medical advice that she have a liquid-only diet to manage her paraesophageal hiatal (PEH) hernia
and thereby remain healthy and free of mortal risk.

147.    Upon information and belief, defendant James P. Cox, III's advice to defendant
Julie Michelle Convisser was in knowing furtherance of the design of defendant John Doe
Standard Oil Trust Intelligence Service Number 3 and other defendants to interfere with plaintiff
Claude David Convisser's relations with his parents and starve plaintiffs of their financial
support to remain in business.

<u>Respondent Colette Marie Convisser</u>

148.    Respondent Colette Marie Conviser suffers from Stage 5 or 6 Alzheimer's Disease following her initial diagnosis in or around 2012, which Stages are short of the Stage 7 terminal phase.

149.    The diagnosing neurologist stated at the time that because respondent Colette Marie Conviser had always used her mind in her career as a child psychologist for Fairfax County Public Schools and otherwise, the Alzheimer's would progress slowly in her case and she would not die of it.

150.    Moreover, respondent Colette Marie Conviser's PEH hernia is not a terminal condition because it can be managed by abidance to a liquid diet, provided she is served and consumes at least three small cartons of Ensure® per day.

151.    Respondent Colette Marie Conviser is alert; verbally communicative and at times articulate; can recount and analyze events in her past; almost always recognizes family members around her; regularly expresses love, affection and gratitude for the devotion her husband Martin Conviser gives her; is fully attuned at the emotional level to events and dialogue happening around her, even if she is not fully comprehending of exactly what is going on or being said, as evidenced by questions and comments she offers afterwards; retains and expresses a sense of humor; plays Scrabble most evenings with Martin, even though he must choose and place the squares for her on the board; and is capable of getting herself out of bed alone and into her wheelchair if it is nearby and rolling it into the bathroom, even though everyone tells her to call for help so that she does not have another fall.  Alzheimer's Disease has altered her personality for the better, by lifting a lifelong pessimism and rendering her radiant and sweet, on top of her enduring big-heartedness.  In short, she is not worthy of condemnation to a premature death.

<u>Respondent Martin Conviser</u>

152.    Respondent Martin Convisser retained his full cognitive capacities at least until October 2022, but showed noticeable signs of a gradual decline by February 2023.

153.    Respondent Martin Convisser has the capacity and ability to care for himself with moderate assistance, but is no longer capable of caring for respondent Colette Marie Convisser without near-constant help.

154.    Respondent Martin Convisser has suffered from congestive heart failure since April 2019, but not as a condition that would normally lead to his death within the next six months.  Defendant Julie Michelle Convisser has not placed him on hospice care.

155.    A former senior executive in the federal civil service who was once the budget examiner for the CIA in the Executive Office of the President, respondent Martin Convisser remarked admiringly in December 2022 upon reading an earlier version of POP Diesel's Investment Prospectus that it took a lot of courage and toughness for plaintiff Claude David Convisser to stand up to the CIA in pursuing plaintiff POP Diesel's business in West Africa.

156.    Respondent Martin Convisser is very protective of his wife respondent Colette Marie Convisser but is no longer capable of standing up for her and his own health care needs.

<u>Respondent the Martin Convisser Trust, by Trustee Julie Michelle Convisser</u>

157.    Respondent the Martin Convisser Trust holds the estate and assets of respondents Martin and Colette Marie Convisser.

158.    Defendant Julie Michelle Convisser is Trustee of the Martin Convisser Trust.

<u>All Defendants</u>

159.    The defendants have at all times functioned as agents of their principals and one or more business conspiracies against plaintiffs as described herein, except that defendants Michael T. Wiley, Michael Goff, Charles L. Pinnell, Keith Ford, Hunter S. Wyant, Ray W.

Hughes, Elizabeth Ann Hughes, Emil Kutilak, David R. Butler, John J. Davidson, Rajan Krishnan, Kenneth E. Steben, Linden House, LLC, WIAL, LLC, Cambridge Healthcare Holdings, LLC, Julie Michelle Convisser, and Wende S. Duflon, are sued also in their individual, personal capacities for their tortious actions done outside the scope of their respective agencies.

      a.    The specific defendants identified in the preceding paragraph exhibited an independent personal stake in the overall business conspiracy's enterprise, in that, with the three exceptions stated next, they were independent actors in the investment marketplace and sought personal profits or gain apart from income their principal ordinarily shared or will share with them.

      b.    Defendant Julie Michelle Convisser's independent interest apart from the overall business conspiracy's and her principals' well-being was in viewing her inheritance as a zero-sum gain with plaintiff Claude David Convisser, as described below, and attempting to seize more of it unlawfully for her own.

      c.    Defendants Rajan Krishnan and Kenneth E. Steben acted in part out of a misguided sense that their persecution of plaintiff Claude David Convisser, which they directed against him because of his business interest in plaintiff POP Diesel, would bring them spiritual advancement.

160.    All of the defendants at all times complained of fundamentally served the interests of defendant Exxon Mobil Corporation and served as its agents.

161.    All of the defendants acted in mutual support of each other in the business conspiracies, fulfilling their tortious goals opposing plaintiffs and sharing their tortious motivations described herein.

162.    Hereinafter, the principal defendants comprising the Exxon Mobil and New York Organized Crime Mafia defendants, and their agents, may be referred to together as the "Petroleum-Mafia."

163.    The John and Jane Doe defendants are secretive organizations whose agents may be reluctant to reveal their principals.  Nonetheless, plaintiff alleges that the John and Jane Doe defendants and the Wende's Where's the Beef defendants actually exist.  Each of the John and Jane Doe defendants and the Wende Where's the Beef defendants may actually consist of one or more persons or entities.  After plaintiffs discover their true identities and addresses, plaintiffs will file a Notice of Inaccurate Party Name or move this Court for leave to amend by substituting the true and correct names for the pseudonyms and they will effect service at that time.

164.    Agencies of the United States Government were, generally speaking, at most or all times until February 2023 acting in support of defendants Exxon Mobil Corporation, John Doe Standard Oil Trust Intelligence Services 1 through 3, and Jane Doe New York Organized Crime Mafias Numbers 1 and 2 and as their agents within the overall business conspiracy against plaintiffs.

a.    Hereinafter, when acting with the support of agencies of the U.S. Government, the principal defendants, and their agents, may be referred to together as the "Petroleum-Mafia-CIA," in which case, agents of the U.S. Government were working for and aiding the goals of the defendants' business conspiracy against plaintiffs.  If the agency of the U.S. Government was working in support of principally the petroleum industry and Exxon Mobil defendants, then that part of the business conspiracy against plaintiffs may be referred to together as the "Petroleum-CIA."

46

b.      In February 2023, the CIA informed plaintiff Claude David Convisser in Annandale, Virginia that they had been in error about his various efforts in the USA and abroad described herein, and that they now appreciated his efforts.

c.      Since that time, plaintiffs have noticed that the CIA and other federal agencies have at times been helpful to them.

d.      An example is that they seem for the most part to have protected plaintiff Claude David Convisser's laptop computer from destruction by the defendants' malware and other technological means, which had been a regular occurrence from 2020 to 2022.

e.      However, defendant Jane Doe Retired Government Security Agent Intelligence Service seems to still owe its primary allegiance to the Exxon Mobil and Organized Crime Mafia defendants over plaintiff POP Diesel or instead of remaining neutral.

i.      Examples come from the actions of defendant John J. Davidson, an agent of defendant Jane Doe Retired Government Security Agent Intelligence Service.  First, in August 2021 in Vienna, Virginia, he warned plaintiff Claude David Convisser on behalf of the business conspiracy that if the latter did not stop resisting the defendants' oppression of him and fall into place behind the bound-to-fail projects copying plaintiff POP Diesels *jatropha* tree cultivation model of defendant John Doe Standard Oil Trust Intelligence Service Numbers 1 and 2 and Jane Doe New York Organized Crime Mafia Number 1 in Ghana and elsewhere, he would raise spurious rumors that plaintiff Claude David Convisser is a homosexual and had a homosexual attraction to their mutual high school friend Kurt E. Stahl, neither of which is true.

A.      Because plaintiff Claude David Convisser has never backed down, defendant John J. Davidson did rouse these spurious rumors in 2023.

47

B.      While plaintiffs have nothing against homosexuals and the USA has moved towards accepting the equality of homosexuals in many spheres, the narrative that plaintiff Claude David Conviser is a gay is intended to damage and defame his leadership of plaintiff POP Diesel in Africa, where mores about homosexuality are far less tolerant.

ii.      Second, defendant John J. Davidson reminded plaintiff Claude David Conviser that another mutual friend of theirs from childhood who moved to Massachusetts at age 13, David Zraket, due to inherited and earned wealth, might be a strong candidate to become an angel investor in plaintiff POP Diesel.  Then the conspiracy's principal organizations acting on intelligence provided to them by defendant John J. Davidson set about sabotaging that opportunity in a way that would be most injurious to plaintiffs, designed to put them on the street bankrupt.

A.       Plaintiff contacted David Zraket in October 2023 and asked to visit him in Massachusetts, which appeal David Zraket welcomed.

B.      However, the moment plaintiff Claude David Conviser raised the subject of considering investing in plaintiff POP Diesel, David Zraket kicked him out of his house and put him on the street.  He made an extreme and uncalled for accusation that plaintiff Claude David Conviser was attempting to monetize their friendship.

C.      Unbeknownst to plaintiff Claude David Conviser at the time, defendants Standard Oil Trust Intelligence Service Numbers 2 or 3 had bought out David Zraket's medical engineering company at a stage before it was fully ready to be sold, thus giving him a windfall, but also compelling him to follow their directions, as the need arose.

D.      The whole point of the business conspiracy's purchase of David Zraket's company was to prepare for plaintiff Claude David Conviser's eventual

48

approach to him seeking investment based on the spark provided by defendant John J. Davidson, so that David Zraket would be in a position to follow the conspiracy's instructions on how best to dispense with and injure plaintiffs' business venture.

E.    As a result of David Zraket's abrupt termination of plaintiff Claude David Convisser's visit to him, the latter, bereft of spare cash to stay in a cheap hotel, spent one Saturday night, October 28, 2023, in a homeless shelter in Boston, before very fortunately, other friends took him in temporarily until more funds became available.

## FACTUAL ALLEGATIONS

165.    Plaintiffs reiterate paragraphs 1 – 164 and these paragraphs are incorporated as if re-stated herein.

166.    It is certain that human combustion of fossil fuels like petroleum and natural gas is causing global warming.

167.    It is certain that human-induced global warming will cause negative, drastic effects on the weather, climate, earth ecosystem, and humanity's ability to survive in anything resembling today's society, unless humanity makes major changes abruptly.

168.    Defendant Exxon Mobil Corporation implemented a corporate strategy for the last sixty years of:

a.    generating and exaggerating doubt about the scientific basis for anthropomorphic global warming, including its causal connection to fossil fuels and the scale and magnitude of the problem and its effects;

b.    spying on, attacking, intimidating, obstructing, undermining and terminating people, entities and interests who advocated opposite viewpoints from defendant Exxon Mobil Corporation on the matter of global warming, and;

c.    engaging politicians and government officials in the USA and other

countries by all means to eschew effective measures to counter global warming, and instead, to

adopt laws, regulations and policies enshrining fossil fuel dominance.

### Earlier Predicate Acts

169.    The plaintiffs' interactions with the New York Organized Crime Mafia defendants

date to 2008, when their biodiesel faction first tried to steal the Company's dual-tank, engine

enabling technology for straight vegetable oil resulting in a judgment in New Mexico state court

and recovery for Plant Oil Powered (POP) Diesel, Inc.

170.    The plaintiffs' interactions with defendant Exxon Mobil Corporation and its

domestic and foreign intelligence and security service, the other Exxon Mobil defendants, date to

2010, when plaintiffs joined defendant Exxon Mobil's ASTM International Petroleum Products

Committee seeking vainly to stop their use of fuel quality standards to bar POP Diesel Fuel from

the marketplace.  That conflict led to plaintiff POP Diesel's filing a lawsuit in the U.S. District

Court for the District of New Mexico alleging antitrust violations, which lawsuit ended

inconclusively.

171.    For the sake of brevity, plaintiffs will skip over many additional incidents and

experiences with all sets of defendants that happened in the years following indicative of the

compulsive thievery of the New York Organized Crime Mafia defendants and the aggressive and

murderous hostility of the Exxon Mobil defendants, noting only the sample of predicate acts

which follow and show the defendants' *mens rea*, before plaintiffs delve into a chronology

leading from ten years ago beginning in Ghana and then Mali in West Africa to the present day in Virginia.

172.    Of note with regards to defendants Jane Doe New York Organized Crime Mafias Numbers 1 and 2, acting in coordination with and on behalf of defendants Exxon Mobil Corporation and John Doe Standard Oil Trust Intelligence Service Number 3:

a.    They set plaintiffs up with the fraudulent sale of a brand new 2008 Dodge Ram 2500 Series pick-up truck whose fuel injectors they had sabotaged from the factory because they knew from their unlawful surveillance that plaintiffs intended to use this truck for EPA certification of POP Diesel Fuel and the Company's self-developed vegetable oil fuel engine enabling equipment.  The sabotage led to catastrophic engine failure which Chrysler / Fiat, acting as these defendants' agent, attempted to blame on the vegetable oil fuel, but which they ended up paying a settlement for following suit in New Mexico state court.

b.    They sabotaged plaintiff POP Diesel's first installation of its equipment on what should have become its first customer fleet of trucks in 2013, belonging to Southwest Abatement in Albuquerque, New Mexico.  They did this by placing an explosive charge on the front axel which when it detonated *en route*, caused the axel to sever and slam back into the box containing POP Diesel's enabling equipment, maliciously destroying it.

c.    In 2014, they stole the sole, confidential copy of the theory of operation of plaintiff POP Diesel's next generation computer controls for its engine enabling equipment ("POP Diesel's theory of operation"), which was stored electronically on a pen drive hidden underneath the spare tire in the trunk of plaintiff Claude David Convisser's car parked at the Albuquerque Airport.

      i.     They were only able to pull of stunts like this thanks to their comprehensive, unlawful, electronic surveillance of all of the plaintiffs' residences, places of work, motor vehicles, and telephonic and Internet communications, which activity and intelligence they shared, as discussed below, with John Doe Standard Oil Trust Intelligence Service Numbers 1 through 3 and Jane Doe Retired Government Security Agent Intelligence Agent.

      ii.     For these defendants, the British auto engineering firm Ricardo developed POP Diesel's theory of operation into actual computer controls for use by a copycat company Optimus Technologies, Inc. these defendants started in Pittsburgh, Pennsylvania, whose primary purpose for existing was to divert investment and contacts away from plaintiff POP Diesel.

      iii.     With POP Diesel's theory of operation and second-generation engine controls, Optimus Technologies, Inc. then won EPA approval to use and sell 100% biodiesel in equipment designed by POP Diesel, at double the cost of POP Diesel Fuel and, according to European environmental activists, no global warming-mitigation value.

      d.     In 2020, they lured POP Diesel's Chief Technology Officer Abel R. Teller, on furlough from the Company since 2014 and for the time being employed elsewhere, into disclosing and thereby misappropriating the Company's trade secrets surrounding CNC fabrication of POP Diesel's valve set permitting clean switching between the petroleum diesel and POP Diesel Fuel supplies of a dual-tank fuel system leading to a diesel engine.

      i.     In breach of his duties to the Company, Mr. Teller engineered and built the valve set at Butterman Tool in Rio Rancho, New Mexico.

ii.    This was for end use by Optimus Technologies, Inc.'s trucking customers to run on 100% biodiesel.

iii.    With the benefit of POP Diesel's misappropriated valve set, Optimus Technologies, Inc. in 2023 lured more than $15 million in investment, including funding from the Japanese international commodities trading company Mitsui, to begin transporting inedible, pure *jatropha* plant oil from defendant Jane Doe New York Crime Mafia Intelligence Service Number 1's *jatropha* tree cultivation projects in West Africa and elsewhere.

A.    Defendant Jane Doe New York Crime Mafia Intelligence Service Number 1 copied its *jatropha* tree cultivation projects from plaintiff POP Diesel's model.

B.    An early incident in which defendant Jane Doe New York Crime Maria Intelligence Service Number 1, in cooperation with defendant John Doe Standard Oil Trust Intelligence Service Number 1, fraudulently procured the confidential, written business plan for plaintiff POP Diesel's integrated agricultural and industrial model took place in Ghana in July 2018.

I.    A man who called himself Akambasi Afoko who said he was the younger brother of the former Chairman of Ghana's ruling New Patriot Party, introduced plaintiff Claude David Convisser to a man whom he said was Gabby Okyere Asare Darko, the nephew and right-hand man of President Nana Addo Danquah Akufo-Addo, on the promise of a $10 million loan from the President's office.

II.    However, the man impersonating the President's nephew turned out to be a professional actor and plaintiff Claude David Convisser learned when he met the real brother of the former Chairman of Ghana's New Patriotic Party that the man promising the $10 million loan was also engaged in an impersonation.

III.    These defendants later contributed the $10 million to plaintiffs' former partner Adam Awal to start a *jatropha* and food crop cultivation project in northern Ghana designed to steal plaintiffs' initiative there.

C.    The sole intent of defendant Jane Doe New York Crime Mafia Intelligence Service Number 1, in cooperation with John Doe Standard Oil Trust Intelligence Services 1 and 2, in then starting its *jatropha* tree cultivation projects in various countries of the tropical world was to preempt plaintiffs from the ability to raise funding to fulfill plaintiff POP Diesel's Stock Subscription Undertaking.

D.    They procured investment for their company Optimus Technologies's emulation of plaintiff POP Diesel's 100 percent biofuel engine enabling equipment from the Japanese company Mitsui, rather than from an American multinational commodities trading company such as Cargill or ADM, because they wanted to appeal to the Japanese Government to devote $500 million in funding it previously pledged to support peace efforts in Africa towards the peace joint initiative of defendants John Doe Standard Oil Trust Intelligence Service Numbers 1 and 2 and Jane Doe New York Crime Mafia Intelligence Service Number 1.

E.    The foregoing defendants started their peace initiative solely to divert attention and funding from plaintiff Claude David Convisser's peace initiative launched in Mali in August 2021, discussed below.

F.    The foregoing defendants' peace initiative was part of their and the overall business conspiracy's comprehensive effort relying on ever-present, unlawful electronic, Internet and telecommunications surveillance to steal all of plaintiffs' ideas, contacts,

leads and technologies, to deny plaintiffs any and all funding that they could use to advance plaintiff POP Diesel's business.

173.    Of note with regards to defendants Exxon Mobil Corporation and its John Doe Standard Oil Trust Intelligence Service Number 1, along with Jane Doe Retired Government Security Agent Intelligence Service with whom they cooperate in carrying out the aims against plaintiffs of the defendants' business conspiracy:

a.    In plaintiffs' first presentation and exhibit at the U.S. Congress's Renewable Fuel Forum and Expo in July 2016, plaintiff Claude David Convisser in a 14-minute presentation available here

https://www.youtube.com/watch?v=zaU39XqMKOI&feature=youtu.be&t=29m23s explained how the Company was capable of replacing as much as 22% of worldwide petroleum diesel consumption with inedible, pure *jatropha* plant oil running in POP Diesel, inexpensively equipped diesel engines.  Thereupon, three things happened.

b.    The first was that plaintiff Claude David Convisser's mobile phone stopped functioning altogether.  T-Mobile checked the cellular phone towers he usually relied on, which were all working fine, changed his phone's SIM card, and eventually even swapped out the phone itself, but plaintiff Claude David Convisser was unable to place any phone call on the cell number he had been using for the previous ten years.  T-Mobile told him the malfunction could only be due to a higher governmental power, such as the U.S. National Security Agency, which focuses on telecommunications.  His service only resumed when he accepted a telephone invitation to speak at a conference organized by these defendants' front organization Futures Agribusiness in Bethesda, Maryland specifically to glean and copy what they could from his presentation about *jatropha* tree cultivation in West Africa.

c.      The second incident resulting from plaintiffs' 2016 presentation to the U.S. Congress was that an agent John Begg of defendants Retired Government Security Agent Intelligence Service or subordinate to defendant Kenneth E. Steben in John Doe Standard Oil Trust Intelligence Service Number 3 shortly thereafter informed plaintiff Claude David Convisser at the M.A. Center D.C. in Potomac, Maryland, that they surreptitiously placed surveillance and tracking devices on all of his clothing, and that he was a test case for this tactic about which he John Begg had already made a presentation to other, similar agents in Harper's Ferry, Virginia.

i.      Simply a filament of thread inter-woven into clothing can serve as a microphone picking up fluctuations in sound and voice, and they can put batteries to power a transmitter inside a shirt button or tap the body's electro-magnetic field therefor.

ii.      From countless experiences that plaintiff Claude David Convisser has had since then of conversations overheard and destinations and actions anticipated, John Begg's disclosure was and is true.

iii.      (Note that the plaintiff Claude David Convisser has not violated any laws or committed any infraction against defendants that he is aware of to warrant such attention.).

iv.      The Exxon Mobil defendants, New York Organized Crime Mafia defendants, and defendant Jane Doe Retired Government Security Agent Intelligence Service know at almost all times exactly what plaintiff Claude David Convisser is seeing, saying to people, and hearing from people he sees and who are around him.  They use this trickery to harass plaintiff Claude David Convisser, and by him plaintiff POP Diesel, to no end; steal all his and plaintiff POP Diesel's business ideas, contacts and leads; and complicate their lives at every

turn.

v.      From that point forward, the Exxon Mobil defendants, defendant

Jane Doe Retired Government Security Agent Intelligence Service, and the New York Organized

Crime Mafia defendants, who shared intelligence thus gleaned with each other and the other

defendants, all pursued their objectives with regards to plaintiffs by the means of unauthorized

and therefore unlawful intercept, surveillance, recording and divulging of their communications

and tracking of their persons and movements in public and private places.  These practices

violated Maryland Statutes, Criminal Law Sections 3-901 and 10-402, where John Begg

impressed them upon plaintiff Claude David Convisser, just as, when this plaintiff returned as

John Begg knew he would to plaintiff POP Diesel's then home in Virginia, they offended

Virginia Code, Title 18.2, section 60.5 on unauthorized use of an electronic tracking device and

Title 19.2, section 62 on the unlawfulness of interception, disclosure, etc. of wire, electronic or

oral communications.

vi.      However, the FBI and U.S. Department of Homeland Security

declined plaintiff Claude David Convisser's requests to investigate and stop these unlawful

practices of defendants, saying they were not so equipped and there was nothing they could do

about it.

c.      Third, within weeks of plaintiff Claude David Convisser's presentation of

plaintiff POP Diesel's business plan to the U.S. Congress Renewable Energy Forum in July

2016, defendants poisoned plaintiff Claude David Convisser non-lethally for the first of

countless subsequent times in the USA, West Africa, and India, and on airplanes between those

places.

i.      This first poisoning by bad flu germs took place at the M.A. Center

D.C. in Potomac, Maryland, purchased and controlled by defendant John Doe Standard Oil Trust

Intelligence Service Number 3.  After plaintiff Claude David Convisser had consumed the

poisoned food which this defendant's agent Wendy Steben specifically offered him, its other

agent Pat Ryan, in the throes of a cold, let him know what they had done by sitting down next to

him and showing and talking about his symptoms, which plaintiff Claude David Convisser soon

developed.

ii.      Defendants intended their repeated, dozens of poisonings of

plaintiff Claude David Convisser's food and drink which continued to 2024 to be a means of

driving him into quitting on plaintiff POP Diesel and driving its business into the ground.

iii.      In a similar vein, the Exxon Mobil and New York Organized Crime

Mafia defendants interfered with plaintiff Claude David Convisser's medical care in the USA

and Ghana starting in December 2019, running from ophthalmologist and optometrist eye

examinations and prescription eye-ware to dental work to emergency hospital care to a mis-

aligning massage by a masseuse they had bribed.

174.    In 2017, plaintiffs paid $1,000 to make a presentation to a group of angel

investors, the Combined Angel Accelerator Group of alumni from Harvard and Stanford

Business Schools ("CAAG") in Tysons Corners, Virginia on October 27, 2016.  Angel investors

are wealthy individuals who are willing to help start-up companies to reach the stage of

commercial viability, as compared to venture capital firms who enter after commercial viability

has been established.

a.      Concerned about the chance that plaintiff POP Diesel could land

investment from some of these investors to start commercial-scale *jatropha* tree cultivation in

Ghana, defendant John Doe Standard Oil Trust Intelligence Service Number 3 caused the same group to invite plaintiffs to present to CAAG in the Maryland suburbs of Washington, D.C. on February 15, 2017, in which forum they organized the following scheme.

b.     On the excuse of being a Stanford Business School alumnus, an Indian national then working for the World Bank in Washington, D.C. named Parth Tewari attended plaintiffs' presentation.

c.     Parth Tewari was a Lead Private Sector Development Specialist and the Head of Operations for the Competitive Industries Practice of the World Bank, focusing on micro-, small and medium enterprise development.

d.     A few days afterwards, at a meeting near the Arlington, Virginia campus of George Mason University, Parth Tewari, speaking as an agent of defendant John Doe Standard Oil Trust Intelligence Service Number 3 and those aiding it, informed plaintiff Claude David Convisser that he was going to spend a year living in Portugal, where he was going to devise a plan for undermining POP Diesel's integrated agricultural and industrial model by creating a competitive market for *jatropha* seeds.

i.     While a competitive market for agricultural produce is at first blush sensible and the way most of the world's agricultural sector functions, it has never succeeded for *jatropha* fruit or seeds.

ii.     Plaintiffs' goal of rendering the *jatropha* plant oil price competitive with petroleum diesel fuel is the best way for it to achieve its full potential of drawing funding to displace a significant share of fossil fuel petroleum diesel fuel worldwide.

iii.    Because the *jatropha* fruit and seeds are inedible, their only commercial use is to make biofuel. Therefore, they must be transported to a processing facility dedicated to making inedible *jatropha* plant oil.

iv.    If the market price for the *jatropha* seeds is determined by a market, it becomes either too high, in which case the plant oil resulting from such feedstock becomes too expensive to compete with petroleum diesel fuel on price and future investment dries up, or the market price becomes too low, in which case the farmers suffer and give up caring for the *jatropha* trees.

v.    The reason is transportation. If transportation costs to a distant marketplace or oil extraction facility are more than negligible, they will consume any potential profit margin and drive up the price of the resulting *jatropha* plant oil to the point the investment in the whole enterprise, including the processing facility, no longer makes sense and it dries up.

vi.    Plaintiff POP Diesel's solution for producing plant oil that is price competitive with petroleum diesel fuel is to do the oil extraction and other crop processing locally; pay the farmers a price for their *jatropha* seeds set in a long-term contract, thus assuring a reasonable price for the extracted plant oil; and share profits with them from the food crop processing so they will care for and harvest from the trees year after year.

vii.    Under the Company's integrated agricultural and industrial model, 30,000 smallholder farmers in a concentrated area are required to sell the entirety of their *jatropha* harvest to the Company at the price set in a contract, in order for the Company to operate the factory near full capacity and profitably and to justify the level of investment necessary for success, $100 million, or $3,333 per each of 30,000 smallholder farmers.

e.    If a market for *jatropha* seeds existed alongside POP Diesel's model, it would undermine it by giving POP Diesel's farmers the appearance of a more attractive buyer to whom to sell their seeds, thus nullifying the Company's investment in processing facilities which must run near full capacity requiring supply of all of their *jatropha* harvests to result in shared benefit and profits.

f.    Similarly, by introducing subsistence farmers to a model and pricing that is designed incorrectly from the start, whether it be negligently or purposely, the farmers will be reluctant to change mid-stream or trust a second model after the first one fails.  Since the ultimate goal of the Exxon Mobil defendants is to wreak failure of plaintiff POP Diesel and the notion of *jatropha* biofuel, they do not care about proper project design or retaining the trust of farmers.

g.    Therefore, Parth Tewari's move to Portugal was an attempt by the business conspiracy to introduce a market model that would disrupt plaintiff's POP Diesel's integrated agricultural and industrial model and inevitably lead to more failures for *jatropha*.

h.    The lead defendants for the conspiracy chose Portugal as the world headquarters for defeating plaintiffs to curry favor with United Nations Secretary General António Guterres, a former Prime Minister of Portugal.

i.    Thereupon, defendant John Doe Standard Oil Trust Intelligence Service Number 3 invited many people near and dear to plaintiff Claude David Convisser to visit their worldwide headquarters for defeating plaintiffs in Portugal, and to woo and attempt to bribe them to their side.

j.    Among those who made the trip to the Portugal headquarters at the behest of defendant John Doe Standard Oil Trust Intelligence Service Number 3 in 2021 were

61

defendants John J. Davidson and Julie Michelle Convisser, her husband Greg Goering, and plaintiff Claude David Convisser's ex-girlfriend in New Mexico, Janeen Maas.

        k.      Note that agents of the defendants often speak expansively in the first person of what he or she may do.  In speaking of "I," they often mean their particular principal within the overall business conspiracy.  Therefore, if Parth Tewari did not spend the entirety of one year in Portugal as he told plaintiff Claude David Convisser he would do, surely others working with him in the conspiracy did.  They remain in Portugal now running the headquarters of the Exxon Mobil defendants' conspiracy to defeat plaintiff POP Diesel worldwide and by any, every and all means.  Regardless, given his technical expertise in developing market-based agricultural projects, Parth Tewari likely would have made an important contribution to designing the market mechanism intended maliciously to undermine POP Diesel's model.

        i.      Following directions from headquarters in Portugal, the Exxon Mobil defendants and defendant Jane Doe New York Organized Crime Mafia Number 1 then spent a lot of money and expended great effort with partners and staff stolen from plaintiff POP Diesel Africa to establish a market for jatropha fruit and seeds in Ghana beginning in 2019 in Sandema in the Upper East Region and extending south to Bimbila in the Northern Region and elsewhere, a market they have the intent of lasting only so long as plaintiff POP Diesel remains in existence, purposely to starve it of investment, support and opportunities of any kind.

        ii.      Following directions from headquarters in Portugal, the Exxon Mobil defendants and defendant Jane Doe New York Organized Crime Mafia Number 1 got the Dutch Government's development agency SNV in 2023 to support farmers across Mali to grow the *jatropha* tree to supply biomass to small-scale, natural gas digesters, with the intent of

sowing disloyalty by these farmers when plaintiff POP Diesel introduces its model requiring sale of all *jatropha* fruit and seeds to the Company.

175.    Beginning in 2019 and lasting until August 2022, when plaintiff Claude David Convisser was in Ghana, Mali and Virginia in the USA, plaintiffs suffered destruction by malware of every single new and second-hand laptop computer he purchased for plaintiff POP Diesel's use, around fifteen in succession.

a.    Agents of defendants John Doe Standard Oil Trust Intelligence Service Numbers 1 and 2 and Jane Doe New York Organized Crime Mafia Number 1 were responsible.

b.    The malware would become apparent within a matter of days of its purchase, and the computer would be rendered useless and unsalvageable within two weeks.

c.    As a result, plaintiff Claude David Convisser was forced to do all of his computer work using terminals at public Internet and cyber cafes, where it was easy relying on spyware for the defendants to follow his every keystroke and email coming in and going out, and to copy and steal all of his data stored on an external hard drive that he would have to plug in to the public computer terminal.

d.    Finally one day, having been unable to keep pace with the defendants' destruction of his laptop computers purchased in succession, by accident, plaintiff Claude David Convisser dropped the external hard drive which then stored all of his data onto the floor, breaking it.  As a result, he lost all his data going back thirty years.

176.    From the very first time defendant Jane Doe New York Organized Crime Mafia Number 1 broke into plaintiff Claude David Convisser's house in Santa Fe, New Mexico shortly after he started with POP Diesel in late 2007, he made reports to the Police of break-ins by it and later by John Doe Standard Oil Trust Intelligence Service Number 3.

a.    Between 2009 and 2015, plaintiff Claude David Convisser made at least twenty reports to the local police in Albuquerque and Santa Fe, New Mexico and Falls Church, Virginia, including reports of theft from plaintiff POP Diesel's office of the 2008 Dodge Ram fuel injectors which Chrysler – Fiat, as agents of Jane Doe New York Organized Crime Mafia Number 1, had rigged to fail, which were central evidence to the warranty lawsuit against Chrysler mentioned above that was then underway, and theft from underneath the spare tire in the trunk of his care the theory of operation of plaintiff POP Diesel's Fuel System second-generation computer controls.   He also visited the offices of the FBI six times in New Mexico and Manassas, Virginia to make similar complaints.

b.    Finally, in July 2015, the Washington Field Office of the FBI assigned undercover Special Agent Colin Derek Moncrieff Yeates to serve as a liaison to plaintiff Claude David Convisser.

i.    Special Agent Yeates met plaintiff Claude David Convisser at the M.A. Center D.C. in Potomac, Maryland and events in the Washington, D.C. area associated with Amma.  His cover was that he was the boyfriend of a female federal government agent whose first name was Louella who attended Amma's programs and events regularly.

ii.    FBI Special Agent Yeates's initial and repeated advice on behalf of the U.S. Government was that plaintiff Claude David Convisser should just give up on plaintiff POP Diesel and its business mission of establishing pure plant oil as an alternative to petroleum diesel fuel and biodiesel because the Petroleum-Mafia's opposition would be too formidable.  He said there were already many trucks running on hydrogen and hydrogen would be the renewable fuel of the future (even though a supply of hydrogen is only renewable if it has been created using renewable energy).

iii.    FBI Special Agent Yeates informed petitioner Claude David Convisser that there were "a lot" of private intelligence services who had their own networks of contacts and associates with active employees of and within every one of the federal government's intelligence, security and law enforcement agencies, as well as at the state and local levels, and that they each had the capability of spying on and taking illicit action against him and plaintiff POP Diesel in pursuit of their agenda.

177.    On December 31, 2015 at the M.A. Center D.C. in Potomac, Maryland, FBI Special Agent Yeates, speaking as an agent of the Petroleum-CIA and giving petitioner Claude David Convisser a warning, told him that if he did not stop trying to advance plaintiff POP Diesel, raise investment funding for it, and establish pure, inedible jatropha plant oil diesel engine fuel in the marketplace, then the people who control the Internet would delete his extensive profile from the Internet and anybody who did an Internet search about him would not be able to find anything positive about him.

a.    The Petroleum-CIA then deleted the many positive things about plaintiff Claude David Convisser from the Internet, leaving only one unfavorable item, his 2010 discipline by the New Mexico Supreme Court which he unsuccessfully petitioned the U.S. Supreme Court to grant *certiorari* on and self-reported to the Virginia State Bar, who upon looking into the matter, did not even bring charges against him because concluded at the outset he had not done anything unethical.

b.    Petitioner complained to the United States Senate Committee on Government Oversight, then chaired by Sen. Ron Johnson of Wisconsin, which was investigating President Donal Trump's allegations of being targeted by the "Deep State."  Afterwards, a small

portion of petitioner Claude David Convisser's positive Internet profile was restored, but it disappeared again within six months.

      c.    When plaintiff Claude David Convisser informed FBI Special Agent Yeates of several incidents of monitoring and harassment by what he was then coming to recognize was John Doe Standard Oil Trust Intelligence Services 1 through 3, FBI Special Agent Yeates reminded him in an email dated August 18, 2016, that since he would be working abroad independently, he should report any problems to the host government and "most if not all interests of money, power and control reside here in the good old USA."

178.    It took plaintiff Claude David Convisser nine years beginning in 2008, the last three years 2015 to 2017 of which, having moved from New Mexico back to northern Virginia, he spent most of his time lobbying the U.S. Congress and the Executive Branch, for him to realize that essentially all of the laws, regulations and policies in place supposedly to tackle the problem of global warming and humankind's uncontrolled production of greenhouse gas emissions in fact further enshrine the use of fossil fuels, in particular petroleum and natural gas mined and sold by the American petroleum industry dominated by defendant Exxon Mobil Corporation.

      a.    While plaintiff POP Diesel was able to overcome EPA reticence to win approval for the Company's plant oil fuel engine enabling equipment and POP Diesel Fuel on a test engine, various other EPA regulations still have the effect of blocking them from the marketplace, including one effectively barring POP Diesel Fuel from new engines.

      b.    Since the 1970s, nationwide fuel economy standards for new motor vehicles have based on emissions coming from the tailpipe ("the Tailpipe Rule").

i.      The Tailpipe Rule favors petroleum over plant oil fuel because when it comes to carbon emissions that cause global warming, petroleum, when combusted in an engine, emits fewer carbon dioxide molecules than plant oil does.

ii.      Therefore, all new motor vehicles in the USA sold with combustion engines have been and are still required to favor petroleum over plant oil fuel.

iii.      Upon information and belief, the federal Tailpipe Rule is based on state-wide standards that California put into effect in the 1960s.

iv.      Under the Tailpipe Rule, an engine bearing the POP Diesel Fuel System and running on POP Diesel Fuel will never be able to win EPA approval for sale in the USA because it will produce higher carbon dioxide emissions out the tailpipe than petroleum diesel fuel would

v.      However, considering the fact that the trees and plants that produced the plant oil extracted the carbon they put into it from the atmosphere in the first place, plant oil fuel has a carbon life-cycle that is neutral, except for any fossil fuels combusted to grow the plants and process their seeds into oil.  Whereas, petroleum combustion takes carbon that was safely sequestered deep inside the earth and transfers it to atmosphere in the form of the greenhouse gas carbon dioxide.

vi.      The Tailpipe Rule, versus a life-cycle measure for greenhouse gas emissions, is law because of the influence of defendant Exxon Mobil on California and federal regulators.

c.      Another, recent example is tax credits for electric motor vehicles forming the centerpiece of the Green New Deal adopted as part of the Inflation Reduction Act in 2023.

i.      The qualification for earning these tax credits is domestic content: the motor vehicle must have a certain percentage of its componentry manufactured in the USA.

ii.      In a 2022 documentary produced by CNBC available on the Peacock streaming service titled, "Exxon Mobil at the Crossroads," its Chief Executive Officer Darren Wood explained that defendant Exxon Mobil Corporation determined that from a nationwide motor vehicle fleet entirely powered by electricity in 2040, that Corporation will earn the same in profit as it did in 2014, with which he said it would be content.

iii.      The reason is that the domestic content triggering the tax credits will come mainly from plastic auto bodies fabricated by defendant Exxon Mobil Corporation at its facility near Houston in the USA.

iv.      After winning such a sizable taxpayer credit for its petroleum refining, it is a wonder that that Corporation and defendant then turned around and had the temerity to sue shareholders who proposed that it transition away from petroleum fuel altogether, as was reported in *The Irish Times*.

d.      The above realizations led plaintiff Claude David Convisser as a final resort to draft and plaintiff POP Diesel to host on its website beginning in 2018 the America First, Comprehensive, World-wide Fossil Fuel Tax Act, which remains posted here: http://popdiesel.com/news.php .

i.      This bill proposes to eliminate subsidies and credits worldwide on fossil as well as renewable fuels, in exchange for adopting a progressive tax on the mining of fossil fuels that all countries would follow American guidance in imposing together.

ii.    Upon information and belief, the publication of this bill rejuvenated the Exxon Mobil defendants' enmity towards the plaintiffs and revived their determination to stomp plaintiffs out.

### Chronology in Ghana

179.    After plaintiffs rejected defendant Exxon Mobil Corporation's attempt in July 2017 to coopt them into turning inedible, pure *jatropha* plant oil into engine lubricating oil instead of fuel competing on price with petroleum diesel, defendant Exxon Mobil Corporation followed plaintiffs to Ghana with the malicious intent of blocking its project and funding.

180.    Defendant Exxon Mobil Corporation formed a subsidiary, Exxon Mobil Exploration and Production Ghana (Deepwater) Limited.  It asked the Government of Ghana in late 2017 for, and was given, a no-bid contract for off-shore petroleum exploration at the Deepwater Cape Three Points Block off western Ghana, promising to increase Ghana's daily petroleum production from 180,000 barrels per day to 1.5 million barrels per day (BPD) and generate nearly ten times as much revenue, $20 billion per year, by 2021, peaking at 3.5 million BPD afterwards.

181.    However, on plaintiffs' filing of a lawsuit against them in Ghanaian High Court in 2021, even though it was never served, rather than face charges like this complaint levies, defendant Exxon Mobil Corporation and its subsidiary withdrew from Ghana without ever having mined a single drop of petroleum.

182.    The speciousness of the foregoing deal was apparent from the beginning, since Vanco Energy and Lukoil had each previously, already relinquished this same Deepwater Cape Three Points Block.

183.    Having nonetheless ingratiated itself with the Government with its vacuous promises, defendant Exxon Mobil Corporation by defendants John Doe Standard Oil Trust Intelligence Service 1 and Jane Doe New York Organized Crime Mafia Numbers 1 and 2 set about in 2019 and 2020 stealing plaintiffs' preparations for POP Diesel's integrated agricultural and industrial project supporting smallholder farmers to grow the *jatropha* tree and food crops and processing them and blocking all funding for plaintiffs except whatever small amounts plaintiff Claude David Convisser's was still able to raise from his family and friends, whom by then were nearly all tapped out from his various appeals extending back ten years.

a.    These defendants first lured plaintiff Claude David Convisser's two Ghanaian partners away by funding each one's attempt to replicate part of plaintiff POP Diesel's business, Adam Awal food crop and *jatropha* plant oil processing in December 2019 and Bernard Fiagbe soy milk in April 2020.

b.    To defeat plaintiff POP Diesel's proposal made every year from 2018 to 2021 to the Ghana School Feeding Program to supply all schoolchildren in that country's most impoverished area in the north half of their daily protein requirement by an inexpensive, lunchtime vegetable sauce containing textured soy protein ("TSP"), these defendants funded a company in central-southern Ghana, the home of the most wealthy and influential Ashanti tribe in Ghana, to produce textured soy protein alone.  The Ashanti company then gave training to School Feeding chefs to incorporate TSP into their meal preparations, a less efficacious method than plaintiff POP Diesel's for stamping out malnourishment, since the chefs would have the option whether or not to use the new, high protein food product.

c.    Eventually, these defendants hired away into their copycat agricultural projects all of the dozens of Ghanaian staff plaintiffs had identified and trained, but had never been able to hire full-time, due to these defendants' constriction of plaintiffs' investment.

184.    Having kept quiet since his first visit to Ghana in 2014 about corruption and bribery, yet stymied by the Ghana defendants on forward progress, plaintiff Claude David Convisser revealed at a press conference in October 2020, five weeks before Presidential and Parliamentary elections, that President Akufo-Addo's second nephew Asensu, the Deputy Chief of Staff, had demanded of him inside the President's Office $20,000 to perform a small favor.

a.    Rather than permit this disclosure to make news where it would buttress negative impressions of its friend the President and imperil his re-election bid, agents working for defendant Exxon Mobil Corporation and John Doe Standard Oil Trust Intelligence Service Number 1 that evening murdered by poisoning in his home former President Jerry John Rawlings, the founder of Ghana's Constitution in effect today and the ruler of the country for more than twenty years.

b.    Rawlings's death and commemorations of him, his rule, and his contributions to Ghana had the effect in that country of 30 million people of dominating all news coverage for the next week.  This coverage sucked up all other news, thus squashing in its entirety plaintiff Claude David Convisser's revelation of corruption at the summit of President Akufo-Addo's Government and assuring his and party's re-election by a narrow margin.

185.    Plaintiff Claude David Convisser reported this misadventure and crime by defendants Exxon Mobil and John Doe Standard Oil Trust Intelligence Service Number 1 by way of a nine-page letter to the United States Congress in December 2020, including to several federal legislators from and in Virginia.

71

a.     At the time, he thought the CIA was responsible, but his meeting with these defendants' "Queen Mother" Brenda Jones in Accra, Ghana in October 2023 set him straight that they were directly responsible.

b.     The Exxon Mobil defendants committed this murder solely to keep in the Ghanaian Government's good graces to be able to defeat plaintiffs' business.

c.     When plaintiff Claude David Convisser's report to the U.S. Congress eventually gained media attention in Ghana six months later, it got widespread coverage and is now accepted my many people on the street as the true explanation for the sudden and surprising death of that country's George Washington.

186.     In October 2018 at the hotel where plaintiff Claude David Convisser was living in Tamale, northern Ghana, three men introduced themselves to him identifying themselves falsely as agents of the Canadian intelligence service.

a.     They were in fact agents of the Exxon Mobil defendants simply acting by subterfuge.

b.     They told him that while Prime Minister Justin Trudeau voiced opposition to global warming, in defense of Canada's biggest export and revenue generator, western Canadian tar sands petroleum, the Canadian government would block plaintiff POP Diesel's project in Ghana.

c.     Defendant Exxon Mobil Corporation, through Canadian subsidiaries and affiliates, is one of the biggest, if not the biggest, exploiter of tar or oil sands in western Canada, the dirtiest source of petroleum on earth.

187.     Defendants Exxon Mobil Corporation and John Doe Standard Oil Trust Intelligence Service Numbers 1 and 2, using their leverage with governing party officials, began

a concerted campaign of driving plaintiffs from all land and every building they occupied in northern Ghana.

      a.     First, acting through a non-profit front organization for the Exxon Mobil defendants named the Christian Children's Fund of Canada, now calling itself Children Believe, in April 2020, they laid an unauthorized water pipe across POP Diesel Africa's 40-acre industrial site in northern Ghana.

      b.     Their goals were (a) to impair the Company's title and control of the land and thereby prevent any investment secured by it and (b) because CCFC, acting by design of these defendants, unreasonably refused to recognize POP Diesel Africa's right to relocate the pipe when it started construction, turn the local population against the Company.

188.    As a result of the incident described in the preceding paragraph:

      a.     Plaintiff Claude David Convidser was arrested and put through a six-month criminal trial on a baseless charge that was ultimately shelved;

      b.     He was kidnapped for the second time and held at the local Assemblyman's house (the first time being three months earlier when, by design and as agent of defendants Exxon Mobil Corporation and John Doe Standard Oil Trust Intelligence Service Number 1, the local mayor had security officers literally haul him from his office for interrogation by the Ghanaian Immigration and Intelligence Services), where:

      c.     He was beat up and left with black-and-blue bruises up and down his spine, and;

      d.     He was jailed overnight for the first of three times in Ghana.

189.    The Exxon Mobil defendants' second expulsion of plaintiff Claude David Convidser from his rightful premises took pace in August 2020.

a.     American agents Judith Simon and an unnamed American military man reporting to principals, the Exxon Mobil defendants and Jane Doe Retired Government Security Agent Intelligence Service forced plaintiffs' landlord to evict them without notice from their residence and office in Tamale, the biggest city in the north of Ghana.

b.     This forcible ejection, done while plaintiff Claude David Convisser was away for the evening, put him and plaintiff POP Diesel on the street homeless for the first time.

190.    Third, despite plaintiffs' having secured a written leasehold of two years on their next residence in Tamale, which they recorded on the Land Registry, the same set of defendants caused plaintiffs' next landlord to attempt over a six-month period to expel them from their next residence in Tamale, northern Ghana.

a.     Finally in August 2022, the landlord welded the metal front door shut to keep plaintiffs out, rendering them homeless a second time.

b.     In the interim, this landlord's goons fulfilling the Exxon Mobil defendants' script beat plaintiff Claude David Convisser up seven times on the property, leaving him with a broken right rib, a cracked left hand, sprained wrist, and red welts covering his torso and arms.

i.      They also brought three more baseless sets of criminal charges against him;

ii.     They imprisoned him for two more nights, and;

iii.    They bribed the local police so they would not investigate or prosecute any of his criminal complaints against their assaults and batteries of him.

200.    Acting on these defendants' impetus, the Ghana Immigration Service arrested him three more times in Tamale for no valid reason, attempting to find some flaw in his visa status or to intimidate him into quitting Ghana.

201.    Meanwhile, defendants John Doe Standard Oil Trust Intelligence Service Number 1 and Jane Doe New York Organized Crime Mafia Number 1 gave plaintiff's former partner and biggest shareholder Adam Awal $10 million in 2020 which should have gone into POP Diesel to start a food crop and jatropha tree project in the very area where plaintiffs intended to launch, in the western area of Ghana's Northern Region, around Yendi and Bimbila.

a.    They have since gained for their preemptive project the support of tribal chiefs across Ghana's north, and additional funding from the wealthy king of the gold-rich Ashanti people based further south in Kumasi, all steps intended to displace plaintiffs from Ghana with a project that is guaranteed for a host of reasons to fail.

b.    Among other sins:

i.    They have killed all the indigenous *jatropha* tree stands and isolated trees in Ghana and other parts of West Africa.

ii.    They have introduced replacement *jatropha* seeds from abroad that defendant John Doe Standard Oil Trust Intelligence Service Number 3, acting with its allies such as petroleum services company Koch Industries, genetically modified to succumb to a future contagion.

202.    In addition to the murder of former Ghanaian President Jerry John Rawlings set forth above, defendants John Doe Standard Oil Trust Intelligence Service Number 2, upon information and belief with the cooperation of Jane Doe New York Organized Crime Mafia Number 1, killed five other associates of plaintiff POP Diesel in Ghana who had recently beforehand helped the Company in some way or other, or who stood in the way of these defendants' blocking the plaintiffs.  May their souls rest in peace, these people were:

a.    a middle-aged, friendly taxi driver in Accra named Christian who died of a

strange heart attack in 2017 within days of introducing plaintiff Claude David Convisser to

former Ghanaian Presidential candidate Frimpong-Boateng, who later became Environment

Minister in President Akufo-Addo's first government and whose son Jojo is now one of the

principal Africans running defendants Jane Doe New York Organized Crime Mafia Number 1

and John Doe Standard Oil Trust Intelligence Service Numbers 1 and 2's copycat *jatropha*

project in Ghana and other West African countries;

      b.     the senior civil servant in the Ghanaian Ministry of Trade & Industry

named Twombley, discovered dead in his home in 2018 within a day or two of having

introduced plaintiff Claude David Convisser to his daughter, who was then a Deputy Minister of

Finance, about a possible public-private partnership;

      c.     a young Konkomba man named Philip whom plaintiff Claude David

Convisser had trained as a Farm Production Assistant and who died in September 2019 in

supposedly a solo motorcycle accident that happened in broad daylight on a good road days after

aiding plaintiffs as a translator prospecting new cultivation areas in Ghana's Northern Region

with Konkomba farmers;

      d.     the senior member of the Yendi Municipal Assembly, named Timothy, a

middle-aged Konkomba man who had been in good health, was in a position to help plaintiff

POP Diesel, and was fearless in telling the truth; who knew the local authorities were interfering

with plaintiff POP Diesel at the behest of the defendants' outside interests; and who was

prepared to speak out at any critical point; yet who died of a sudden illness in 2022, and;

      e.     the troublesome senior chief of the Abudu Clan of the Dagomba Tribe,

Mion Lana, who died mysteriously just as these defendants were ready in 2022 to expand their

copycat *jatropha* project around Yendi, Zabzugu and Bimbilla Districts.

203.    Similarly, on April 11, 2022, defendants sent plaintiff Claude David Convisser a fake email threatening to kill him.  Ostensibly from his lawyer Victor M. Glasburg of Alexandria, Virginia, the comic strip attachment to this email stated that "the oil-producing countries," of which the USA is by far the biggest, would kill anyone competing with fossil fuels.  However, Victor M. Glasburg did not send this email.

<u>Chronology in Mali</u>

204.    Plaintiff Claude David Convisser visited Mali in the center of West Africa for the first time in August 2021 because the plaintiffs' project deserves to launch all across the non-forested expanse of the region.  Yet Mali has been beset by terrorism and warfare for the last ten years, rendering futile any investment so long as instability persists there and in the country standing between Mali and Ghana, neighboring Burkina Faso, which has been equally insecure since 2016.  Plaintiff Claude David Convisser's investigation determined that the original West Sahelian terrorists, of the Ifogha clan of the Tuareg people, had been fighting the central government in Bamako since Mali's independence in 1960.  The French colonists themselves had never been able to conquer their mountainous area of Kidal and had therefore given them autonomy by the Treaty of Bourem in 1907.  Owing to vast, unexploited petroleum and natural gas deposits defendant Exxon Mobil coveted in the terrorists' homeland of northern Mali, this defendant now moderated its approach to plaintiffs from violent physical attacks to mere obstructionism, recognizing reluctantly that plaintiff Claude David Convisser might be able to help it gain access to these resources.

205.    Nonetheless, defendants Exxon Mobil Corporation and its John Doe Standard Oil Trust Intelligence Service Number 2 continued to block plaintiffs at every turn in Mali.  On plaintiff Claude David Convisser's first visit, he took a nine-day boat trip up the Niger River

aiming for Gao and from there, the terrorists' home area of Kidal to deliver a simple message of peace he had learned in their native language.  Agents of John Doe Standard Oil Trust Intelligence Service Number 2 caused his arrest as soon as he disembarked from the boat at Gao, leading the Malian Army to return him on instruction from the U.S. Embassy to the capital city of Bamako.  The Malian Army held him for six days until an American agent of John Doe Standard Oil Trust Intelligence Service Number 2 and Jane Doe Retired Government Security Agent Intelligent Service, a former Special Forces soldier who called himself "Bob Bullard," visited him in the Army's prison, returned his U.S. passport to him with Malian visa already stamped, "Anulled," and ordered him out of the country.

206.    Because Malian officials assured plaintiff Claude David Convisser that he had not violated any laws, he was able to secure another visa and return to Mali in December 2022.

207.    This time, the brother of the chief of the Tuaregs in Kidal invited plaintiff Claude David Convisser to visit and asked the United Nations Peacekeeping Force to give him a seat for a trip there on one of their regular airplane flights.

208.    However, the United Nations, acting on instructions from the Exxon Mobil defendants' worldwide headquarters for defeating plaintiffs located in Secretary General Gutterres's home country of Portugal, had plaintiff Claude David Convisser arrested again, on a specious charge of being a vagabond, whereupon he was imprisoned in Bamako's Central House of Arrest for 26 days.

a.    On plaintiff Claude David Convisser's third day in this prison, the same "Bob Bullard" visited him again, offering safe passage and an exit from Malian prison to Ghana or the USA, which plaintiff Claude David Convisser declined since again, he had not violated any laws, whereupon "Bob Bullard" stormed out of their meeting in the Prison Warden's Office.

78

b.    The Prison Warden, recognizing that "Bob Bullard" had not treated plaintiff Claude David Convisser fairly, started the process of freeing him, but it took 24 more days for a judge to agree and then a criminal trial two weeks later before he was found not guilty and the charge dismissed.

209.    In the meantime, the United Nations Organization and CIA, acting against plaintiffs, did everything they could to drive plaintiff Claude David Convisser into submission and quit Mali and plaintiff POP Diesel.

a.    They directed the Malian gendarmes who arrested him to take all his money, which meant that once inside Bamako's Central House of Arrest, he did not have any money to pay for meals, for a space lying on the concrete floor to sleep at night packed like a sardine between other prisoners, or to exit the communal holding pen he shared with 400 young men to a courtyard during the day.

b.    Until a friend sent him the equivalent of $50 for a space on the floor, he spent the night propped on a chair inside the latrine.

c.    Once plaintiff Claude David Convisser got the money to pay for a sleeping space on the holding pen's floor, prison supervisors acting on instructions from the Petroleum-Mafia-CIA, put him next to an aggressive and violent inmate who accosted him every night barely without halt, leading them to exchange punches and kicks throughout the night fighting for a few inches of space to lie on the floor and catch a few winks of sleep.

d.    The circumstances described in the preceding subparagraph amounted to torture under international law.

210.    The CIA acting for the business conspiracy had pre-arranged for three other prisoners to meet plaintiff Claude David Convisser inside Bamako's Central House of Arrest.

a.      One was an employee of defendant Exxon Mobil Corporation in Nigeria who wanted to accompany him to northern Mali.

b.      The second was a Malian-American gangster from Harlem, New York cooperating with federal law enforcement pursuant to a plea agreement to reduce his U.S. federal prison time, who sought to introduce plaintiff Claude David Convisser to other Malian agents of Jane Doe New York Organized Crime Mafia Number 1 interested in cooperating in the domain of agriculture and *jatropha* tree cultivation in Mali.

c.      The third was a gold merchant connected to John Doe Standard Oil Trust Intelligence Service Number 2 who, once both men were out of prison, defrauded plaintiffs of their proposal to Defense Minister Sadio Camara to implement plaintiff POP Diesel's integrated agricultural and industrial project in Mali.

211.    Out of Malian prison and free of the criminal charge, plaintiff Claude David Convisser, acting to fulfill plaintiff POP Diesel's strategy for securing big investment to launch its project across the non-forested Sahel region of West Africa, consulted with all the parties to Mali's conflict who would meet with him.  He developed a four-page proposal for implementing a cease-fire and peace in central Mali.  He presented this plan at conferences he organized there and in Bamako and modified and improved it with feedback he received.

212.    Over time and a dozen meetings with *al Qaeda* liaisons in Bamako, that organization came to trust plaintiff Claude David Convisser.  It finally informed the Malian Government in early 2023 that it was prepared to invite him to negotiate peace and a possible military alliance against their arch-enemy Islamic State, who operate just south of the *al Qaeda* area, mainly in far eastern Mali and in neighboring Burkina Faso and Niger.

213.    In the meantime, defendant John Doe Standard Oil Trust Intelligence Service Number 2 did everything it could to steal plaintiffs' peace initiative in order to deprive plaintiff POP Diesel's business of the opportunity to raise investment to accompany peace. This included:

a.    employing and thus stealing two dozen Malian staff plaintiffs had recruited to manage the plaintiffs' peace roll-out in central and northern Mali;

b.    foolishly inducing the Governor of Timbuktu to give an award to the head of *al Qaeda*'s religious police to encourage him to re-open Koranic schools, without first eliciting what would have been a more important promise from him to permit re-opening of academic schools – although once again, the Exxon Mobil defendants do not care about the outcome of their misadventures, since they act consistently with the primary purpose of depriving plaintiffs of any initiative which might lead to favorable publicity or investment, and;

c.    preparing and attempting four times to kidnap plaintiff Claude David Convisser from Bamako and deliver him to their own terrorist contacts in central Mali for detention there, until he gave up on plaintiff POP Diesel.

214.    As in Ghana and plaintiffs fear, across West Africa, defendants John Doe Standard Oil Trust Intelligence Service Number 2 and Jane Doe New York Organized Crime Mafia Number 1 acting for defendant Exxon Mobil Corporation compelled local Malian officials and their own agents to destroy all indigenous *jatropha* trees everywhere and farmers to plant in their place genetically modified strains set up to perish from a pathogen they will introduce at some point in the future. They did this solely with the intent of defeating POP Diesel's long term business plan of replacing 22% of worldwide petroleum diesel supply with pure *jatropha* plant oil diesel engine fuel coming from West Africa.

Effect on Plaintiff POP Diesel's Business of the Defendants'
Inflicting Harm upon Plaintiff Claude David Convisser's Reputation

215.    An example of the damage of plaintiff POP Diesel's business that defendants'

malicious attacks on plaintiff Claude David Convisser's reputation caused took place in New -

Mexico in November 2023.

216.    In early December 2019 at Amma's program in Detroit, Michigan, defendants

John Doe Standard Oil Trust Intelligence Service Number 3 and Jane Doe Retired Government

Security Agent Intelligence Service inflicted a predicate attack on plaintiff Claude David

Convisser's reputation setting up the damage plaintiff POP Diesel would suffer four years later in

New Mexico, as follows.

      a.    Stuart J. MacIndoe and his American-born wife are Amma devotees living

in Wisconsin.  He is originally from Australia, upon information and belief was an agent of the

Australian intelligence service, and is now affiliated with Jane Doe Retired Government Security

Agent Intelligence Service.  He volunteers service in security on Amma's tours of North

America.

      b.    On or around the evening of December 1, 2019 while at Amma's 2019

Detroit program, plaintiff Claude David Convisser made a remark to Stuart J. MacIndoe pointing

out something having to do with security, trying to be helpful.

      c.    Stuart J. MacIndo reacted negatively and stated that this remark made

plaintiff Claude David Convisser himself a security threat, to which reaction plaintiff Claude

David Convisser protested verbally but not aggressively or threateningly.

      d.    As a result, with intent and a plan premeditated by defendants Rajan

Krishnan and Kenneth E. Steben, other agents of defendants John Doe Standard Oil Trust

Intelligence Service and Jane Doe Retired Government Security Agent Intelligence Service

acting with these defendants' blessing, used their roles of authority within Amma's tour

organization conferred by defendant John Doe Standard Oil Trust Intelligence Service Number

3's funding arranged by defendant Kenneth E. Steben to publicly portray defendant Claude

David Convisser in a false and negative light.

      i.     On or around the evening of December 1, 2019, sixty or so

volunteers who had signed up in advance, including plaintiff Claude David Convisser, were

gathered in a group outside a big conference hall at the hotel venue, waiting to fill and distribute

small, plastic cups of water that Amma was going to bless to several thousand more people

seated in attendance.

      ii.    These agent organizers called out the names of every one of the

sixty volunteers one at a time, whom they said had passed their "security clearance" to

participate in the ritual.  They invited each volunteer whose name they called out to step to one

side, approved.

      iii.    Of the sixty volunteers, plaintiff Claude David Convisser's name

was the only one they did not call out.

      iv.    He was left on the wrong side, standing alone, for the other 59

Amma devotees from all across the country to see that he had not passed the "security

clearance."

217.    Julie Rose is a successful entrepreneur and businesswoman, a fellow devotee to

plaintiff Claude David Convisser of Amma, and friend of his dating back to the time of his

arrival to New Mexico in 2006.

218.    They were two of around 400 staff persons who assisted on Amma's tour of

northern India in February and March 2019 and discussed then the possibility of Julie Rose's

getting involved in plaintiff POP Diesel's business or investing in it after she earned more money from the real estate license she had recently acquired.

218.    In November 2023, plaintiff Claude David Convisser went to New Mexico seeking investment in plaintiff POP Diesel pursuant to its Investment Prospectus as it then stood.

219.    Plaintiff Claude David Convisser met Julie Rose at the Amma Temple in Santa Fe on Saturday, November 11, 2024.

220.    Julie Rose had finished selling real estate and also recently sold her catering business. Since she was ready to try some new kind of business, plaintiff Claude David Convisser invited her to work with him and plaintiff POP Diesel.

221.    Julie Rose promised they would speak again and she would consider the matter further the week following, reasonably creating in plaintiffs a business expectancy that she would devote her talents to and also financial investment in the Company.

222.    However, before the evening was finished, a number of other devotees approached Julie Rose, including Cathy or Steve Schmidt the founders of Amma's Temple in Santa Fe, and discouraged her from even speaking with plaintiff Claude David Convisser.

223.    Steve Schmidt sits on the nationwide board of directors of Amma's organization together with defendant Kenneth E. Steben.

224.    Cathy Schmidt is connected to many, if not all, of the spiritual communities dedicated to Amma around the U.S.

225.    Both Steve and Cathy Schmidt were aware of the sacred water ceremony ostracizing of plaintiff Claude David Convisser that had taken place four years earlier in Detroit, Michigan.

226.    In addition, defendant Kenneth E. Steben had raised the subject of plaintiff Claude David Convisser in a negative light before the nationwide board of directors on which Steve Schmidt sits.

227.    Due to the authority Steve and Cathy Schmidt hold in the Santa Fe Amma spiritual community, and the number of other ordinary devotees who had communicated their unjustified, negative sentiments gleaned from them and the rumor mill about plaintiff Claude David Convisser to Julie Rose on the evening of November 11, 2023, she canceled her appointment with him the following week and plaintiff POP Diesel went without her valuable investments of talent, time and money.

Advent of POP Diesel's $100 Billion Investment Prospectus
<u>and Stock Subscription Undertaking</u>

228.    Having earned the trust and willingness of the main terrorist organization in West Africa to discuss peace with him, yet fearing that if he waited until there was peace, nobody would have an incentive to invest, plaintiff Claude David Convisser renewed plaintiff POP Diesel's push beginning in April 2023 for investment, which the defendants had previously thwarted at every turn, to start its project at large scale, at last.

229.    The building block was $100 million per iteration of 30,000 smallholder farmers. Each farmer plants one acre of *jatropha* trees to generate 4.3 million gallon annually of pure *jatropha* plant oil after four years of the trees' maturity and also 2 megawatts of renewable electricity to power all of the companion food crop processing.

230.    Knowing of the Exxon Mobil defendants' and the New York Organized Crime Mafia defendants' proclivity for thievery and copying, yet aware that from its research on past efforts and the Company's own experiences in Mexico, Ghana and Mali that a competitive model for *jatropha* will not work, plaintiffs realized they had to go big, to entice those like the

Petroleum-Mafia who think they can to steal plaintiff's thunder, to invest instead in plaintiff POP

Diesel and under plaintiff Claude David Convisser's leadership, and reap profits from their

investment.

231.    Therefore, plaintiffs constructed their Stock Subscription Undertaking to include

many iterations of the core project model costing $100 million, as well as adding equivalent

funding for associated road and infrastructure and community development.

232.    Plaintiffs mailed defendant Exxon Mobil Corporation copies of plaintiff POP

Diesel's Investment Prospectus in July 2023 as it then stood.

233.    Upon information and belief, defendants Jane Doe New York Organized Crime

Mafias Numbers 1 and 2 got a copy of plaintiff POP Diesel's July 2023 Investment Prospectus,

and defendant John Doe Standard Oil Trust Intelligence Service Number 3 got another copy,

from a staff person at the FedEx on Barracks Road in Charlottesville named Lindsay, who had

wrongly and without plaintiffs' authorization stored it on a FedEx computer, for which tort the

FedEx store manager later refunded plaintiffs' cost of the entire printing amounting to around

$1,000.

234.    The Exxon Mobil defendants and New York Organized Crime Mafia defendants

then got world leaders at the G-20 summit in India in October 2023 to endorse a Global Biofuel

Alliance, whose sole purpose is to deprive plaintiff POP Diesel of the benefit of its Stock

Subscription Undertaking.

235.    The Global Biofuel Alliance is planning to cultivate *jatropha* trees and other

plants for their biofuel potential in multiple countries around the tropical world, which planting

started in December 2023.

86

a.      During plaintiff Claude David Convisser's recent stay in India for six

months, defendants Jane Doe New York Organized Crime Mafias Numbers 1 and 2, by such

agents as Nick Hodgson of southern California, kept trying to get him to quit plaintiff POP

Diesel and join their venture.

b.      Defendant John Does Standard Oil Trust Intelligence Service Number 2

wants plaintiff Claude David Convisser to visit Vietnam, where they are attempting to deploy

their version of plaintiff POP Diesel's agricultural model, which is bound to fail.

c.      Plaintiff Claude David Convisser will never quit plaintiff POP Diesel, nor

its Stock Subscription Undertaking, because the plaintiffs have constructed and are fully ready to

deploy the only, foolproof method for succeeding to commercialize *jatropha* tree cultivation on a

massive scale.

d.      The defendants recognize that they need plaintiff Claude David

Convisser's vision and leadership for commercial *jatropha* cultivation to succeed; otherwise,

they would not continuously try to get him to quit and go work for them.

236.    Therefore, in stages, plaintiffs expanded plaintiff POP Diesel's Investment

Prospectus and Stock Subscription Undertaking, eventually reaching the level of $100 billion in

equity investment in the version dated July 1, 2024.

a.      This sum of $100 billion includes funding to launch between six and nine

nodes of 25 projects each like the $100 million one previously planned for West Africa elsewhere

in the tropical world.

b.      This sum includes $15 billion each for related initiatives first, to serve the

impoverished and isolated African countries to unite into one nation and second, for the sake of

humanity and the earth, to save the Congo Forest, one of earth's two lungs along with the

Amazon Forest, from destruction by mining companies and biodiesel interests who want to tear down rain forest to plant palm oil trees.

<u>Sabotage of the Investment Raise in Albemarle County, Virginia</u>

237.    Plaintiff Claude David Conviser arrived in the USA to visit his parents respondents Martin and Colette Marie Conviser residing in defendant Linden House on June 24, 2024.  He also sought on this trip to raise some investment for plaintiff POP Diesel Africa, Inc.

238.    On July 25, 2024, plaintiff Claude David Conviser printed out select pages from plaintiff POP Diesel's Investment Prospectus at the FedEx on Barracks Road in Charlottesville, Virginia.

239.    As part of their comprehensive attempts to monitor plaintiffs and control plaintiff Claude David Conviser at all times, defendant John Doe Standard Oil Trust Intelligence Service Number 3, presumably with the knowledge and consent of FedEx thus making FedEx a member of the business conspiracy against plaintiffs, places its agents on the FedEx staff at the Barracks Road store, such as Lindsay mentioned above, knowing it is one that plaintiff Claude David Conviser uses whenever he is visiting his parents in Charlottesville.

240.    The FedEx staff person helping plaintiff Claude David Conviser on or around July 25, 2024, named Kelsey, had to wait a long time for the FedEx printing machine to read the electronic storage drive he gave her and print the pages, complaining that this wait was abnormal.

241.    Upon information and belief, the FedEx printing machine took such a long time on or around July 25, 2024 because it had been programmed to store and was making a copy of plaintiffs' file containing the July 1, 2024 Investment Prospectus.

242.    On Saturday, July 27, 2024, defendant Marcus T. Wiley appeared at a gathering of men at a neighborhood breakfast eating and coffee drinking gathering in western Albemarle County, which group plaintiff Claude David Convisser had taken to frequenting ("the breakfast group").

243.    Several group members, Elbert Dale and defendant Ray W. Hughes, had previously asked for, read and found compelling plaintiff POP Diesel's July 1, 2024 Investment Prospectus, and seemed poised to invest.

244     Defendant Ray W. Hughes had described to plaintiff Claude David Convisser before July 20, 2024 a group of successful and wealthy investors whom he met with every Tuesday morning at the Yellow Mug café in Crozet, Virginia, all alumni of the University of Virginia's Colgate Darden Graduate School of Business ("the Darden businessmen"), whom he thought might be interested to invest in plaintiff POP Diesel, if they knew more about the opportunity.

    a.    Defendant Ray W. Hughes on July 20, 2024 informed plaintiff Claude David Convisser that he thought the Darden businessmen would take plaintiff POP Diesel's Investment Prospectus as a serious opportunity to invest and make money.

    b.    At the same time, defendant Ray W. Hughes said he was meeting with two men, whose names he did not give, the following morning, July 21, 2024, who could help take the investment in plaintiff POP Diesel big.

    c.    He further implied that his contacts with Chinese investors might also be interested in plaintiff POP Diesel.

245.    Another breakfast group member, defendant Charles M. Steppe, whom plaintiff Claude David Convisser met in early July 2024, had informed a group of wealthy people he was acquainted with in Albemarle County of plaintiff POP Diesel's investment opportunity.

246.    The interest of persons and entities mentioned in the preceding three paragraphs in investing in plaintiff POP Diesel created a business expectancy in plaintiffs of prospective advantage.

247.    On July 26, 2024 to the breakfast group, defendant Marcus T. Wiley misrepresented himself and spoke metaphorically informing plaintiff Claude David Convisser that he was going to sabotage the prospect of investment for plaintiff POP Diesel coming from any member of this breakfast gathering or their various associates.

    a.    Defendant Marcus T. Wiley claimed to the breakfast group to be a building contractor licensed by the Commonwealth of Virginia.  His license is not current; it has lapsed.

    b.    Defendant Marcus T. Wiley said he owns and runs a radon mitigation company.  In fact, he failed radon training given by a legitimate radon mitigation company in Charlottesville, and he does not own such a company or work as a poisonous radon eliminator.

    c.    Defendant Marcus T. Wiley said that radon infects a house no matter on which level, worse on the bottom level but still present and dangerous on higher levels above the ground floor.

        i.    He was speaking metaphorically of the tiers of investment presented in plaintiff POP Diesel's Investment Prospectus, the bottom tier being Tier 1 for angel investors at the minimum level of $25,000, the highest Tier 3 being for a minimum investment of $1 billion.

ii.      His point was that he would eradicate plaintiff POP Diesel's investment at the base level of Tier 1 from angel investors present in the breakfast group so as to prevent this "radon" from creeping upwards to the higher-level Tiers 2 and 3 of investment.

iii.      By the foregoing metaphor, defendant Marcus T. Wiley was informing plaintiffs of the Exxon Mobil defendants' intent to abort and steal the business expectancy plaintiffs had reasonably earned in the breakfast group's members and respective investment leads.

d.      Defendant Marcus T. Wiley said his company did not perform radon detection inspections.

i.      He said his company did just the mitigation or elimination of radon.

ii.      He said they left the inspections for the risk of radon poisoning to others.

iii.      Again, he was speaking metaphorically and was in actuality referring to entering to destroy plaintiff POP Diesel's investment opportunity with the assembled men and others in the breakfast group after some of them had investigated and were already considering investing.

e.      Defendant Marcus T. Wiley pointedly asked plaintiff Claude David Convisser about his relationship with his landlord Wick McNeely during his last year at the University of Virginia School of Law in 1990-91.

i.      Defendant Marcus T. Wiley remarked that he was already going to visit Wick McNeely immediately after leaving the breakfast restaurant.

ii.    Defendant Marcus T. Wiley knew from the Exxon Mobil defendants' comprehensive electronic surveillance they have planted on all of plaintiff Claude David Convisser's clothing that the latter had already mentioned this relationship to defendant Keith Ford in a prior conversation.

f.    Plaintiff Claude David Convisser replied to defendant Marcus T. Wiley that his landlord for that one year 33 years ago Wick McNeely might remember him on account of one small glitch that had happened that year.

i.    His housemate, another law student, had moved out in the middle of the year owing to a dispute about who was responsible for mowing the lawn.

ii.    Plaintiff Claude David Convisser, then on a student budget, had let Wick McNeely know that he might be a little late with paying half of the next month's rent until he found a replacement housemate.

iii.    In the end, plaintiff Claude David Convisser made good on the rent without there ever being any tardiness or shortfall.

f.    Defendant Marcus T. Wiley also stated his and his principals' intent to emulate the manufacture in the USA of plaintiff POP Diesel's high-protein, low cost, vegetable sauce made with textured soy protein.

i.    The Company would like to manufacture and provide this vegetable sauce to the Ghana School Feeding Program under the name Alafei Foods, which means "Healthy Foods" in the Hausa language and other languages of the Western Sahel in Africa, to alleviate the under-nourishment which is prevalent in northern Ghana, where the average income is less than $2 per day.

ii.      Defendant Marcus T. Wiley indicated that the defendants' intent in soliciting investment for defendant Wende's Where's the Beef Healthy Vegetable Sauce Manufacturing Company was to preempt investment in plaintiff POP Diesel.

iii.      This was representative and part of the Exxon Mobil and New York Organized Crime Mafia defendants' recurring pattern and *modus operandi* of stealing all ideas and initiatives originating from plaintiffs Claude David Convisser and POP Diesel, no matter in which domain, to prevent plaintiffs from gaining any recognition and investment to advance plaintiff POP Diesel's business mission and goals.

248.    In furtherance of the business conspiracy's goal of starving plaintiffs of all funding, defendant Marcus T. Wiley and/or defendant Keith Ford subsequently made a series of spurious, injurious and defamatory statements about plaintiff Claude David Convisser intended to portray him in a reprehensible to Ray Knight, Elbert Dale, defendants Ray W. Hughes and Charles M. Steppe, and others attending the breakfast group and elsewhere in Albemarle County, and to one or more intermediaries such as Keith Ford who passed his words onto them and their associates.

a.      Defendants Marcus T. Wiley and/or Keith Ford, fulfilling part of a scheme that defendant Marcus T. Wiley warned plaintiff Claude David Convisser of, told these men and others that according to Wick McNeely, plaintiff Claude David Convisser had behaved improperly and Wick McNeely would not welcome him back as a tenant.

b.      However, Wick McNeely's statement recounted in the preceding subparagraph cannot be true, since Wick McNeely, after receiving plaintiff Claude David Convisser's message, had nonetheless permitted him to remain in the rental cottage for the six months remaining of the year, even though they had no written lease between them.

c.    Defendant Marcus T. Wiley said that the spat between plaintiff Claude David Convisser and his housemate in 1990-91 had been a lover's quarrel, when the two men were simply housemates, not lovers, and each had a girlfriend at the time.

d.    Defendant Marcus T. Wiley said that plaintiff Claude David Convisser had been issued a No Trespassing Order by the Linden House defendants for which he was at fault, which as discussed below was true, but immaterial to plaintiff Claude David Convisser's reputation, if the actual cause of his whistle-blowing explained below had been recounted or understood, which defendant Marcus T. Wiley failed to do.

e.    Defendant Marcus T. Wiley made other disparaging remarks about plaintiff Claude David Convisser which will come to light during discovery, all of which prompted Elbert Dale within a few days to withdraw his intent to invest in plaintiff POP Diesel because, as Elbert Dale told plaintiff Claude David Convisser, "I have not heard anything good about you."

249.    Similarly, defendant Ray W. Hughes and his wife defendant Elizabeth Ann Hughes (hereinafter "the Hughes defendants") withdrew their intent to invest four days later, on July 31, 2024, citing implausible circumstances that they contrived to lessen disappointing plaintiffs and to cover the truth.

250.    Nonetheless, defendant Ray W. Hughes invited a member of the Darden businessmen whose first name was Charles ("Darden businessman Charles") to attend the breakfast group, which he visited on occasion on or around the following Saturday, August 3, 2024.

251.    Darden businessman Charles was aware before his arrival, since defendant Ray W. Hughes had pre-advised him, of two pieces of information concerning first, the unlawfulness

of the business conspiracy against plaintiffs and second, the defendants' networking that had

already taken place to dispossess them of their business expectancy in the breakfast group's

members, their contacts, and reasonable prospects for their investment in plaintiff POP Diesel.

      a.    First, Darden businessman Charles wore a somewhat wrinkled T-shirt with

the word "Virginia" printed in large font on the front.

          i.    Such a T-shirt was not normal attire for this Darden businessman.

          ii.    He wore this particular T-shirt to spark conversation and make a

point to plaintiff Claude David Convisser.

          iii.    He said that which he said he had gotten used at the Salvation

Army store on Route 29 north of Charlottesville and that was where he got all his clothing.

          iv.    He suggested plaintiff Claude David Convisser go there to shop for

clothing.

          v.    His point was two-fold:

          A.    He knew that plaintiff Claude David Convisser's existing

clothing had hidden, electronic surveillance devices planted on it, and;

          B.    He would feel more comfortable speaking with him further,

or plaintiff Claude David Convisser would stand a better chance of securing investment if, the

latter was not wearing clothing that permitted predators of his business and its supporters to

follow their conversation and take preventive or retaliatory actions afterwards.

      b.    Second, Darden businessman Charles pointed to defendants Charles M.

Steppe and David Butler and said:

> Let me make sure I understand the connection. You [indicating
> defendant David Butler] are the brother-in-law of you [indicating
> defendant Charles M. Steppe]. Your [defendant Charles M.

Steppe's] wife is the sister of you [indicating defendant David Butler].

   i.  Both people he was speaking to confirmed the truth of what he asked about.

   ii.  Darden businessman Charles made the foregoing point to alert plaintiff Claude David Convisser that defendant David Butler had intervened on behalf of Jane Doe Retired Government Security Agent Intelligence Service with his brother-in-law Charles M. Steppe to divert the latter's wealthy investment prospects towards defendants Wende's Where's the Beef Healthy Vegetable Sauce Manufacturing Company and Wende's Where's the Beef Tropical Jatropha Tree Planting Company and away from plaintiff POP Diesel.

  252. Before any further conversation could take place between Darden businessman Charles and plaintiff Claude David Convisser at the breakfast group on the morning of August 3, 2024, a young man whom the latter recognized as an agent spy of the Exxon Mobil defendants walked in, sat down at the open table space, and made a remark to shift the focus of conversation.

   a.  Plaintiff Claude David Convisser knew from experience that further conversation that stood any chance of eliciting investment via Darden businessman Charles with the Darden businessman would be futile.

   b.  Plaintiff Claude David Convisser also suspected, given the Hughes defendants' past misrepresentations to him about why they were not going to invest in plaintiff POP Diesel, that defendant Ray W. Hughes had invited Darden businessman Charles to get plaintiff Claude David Convisser to go to present plaintiff POP Diesel to the Darden businessmen to elicit from this plaintiff more insights about the business prospect, which they could then use in deciding whether to invest in fact in Wende's Where's the Beef Healthy

Vegetable Sauce Manufacturing Company and Wende's Where's the Beef Tropical Jatropha Tree Planting Company.

      c.      Therefore, plaintiff Claude David Convisser left the venue of the breakfast group at that time.

      i.      In so departing, he left the newly arrived spy agent of the Exxon Mobil defendants to lure Darden businessman Charles into their alternative investment fold.

      ii.      Plaintiff Claude David Convisser reasonably assumes Darden businessman Charles is with them today, a member of the business conspiracy against plaintiffs, who was curious enough about meeting plaintiff Claude David Convisser and investing in plaintiff POP Diesel that he came to the breakfast group on August 3, 2024 on defendant Ray W. Hughes' urging, but not prepared to reach out to plaintiff Claude David Convisser afterwards in the face of the temptations of the Hughes defendants and the Exxon Mobil defendants' spy agent to invest elsewhere.

      iii.      A reasonably valid yet more sinister alternative is that Darden businessman Charles from the start of his visit to the breakfast group on August 3, 2024 had already joined his colleague defendant Ray W. Hughes and the business conspiracy against plaintiffs and he pointed out the in-law relationship which he already had knowledge of between defendants Charles M. Steppe and David Butler not to be helpful to plaintiff Claude David Convisser, but to coerce plaintiffs into going along and surrendering more of their confidential insights via a presentation to the Darden businessmen, or end up with nothing.

      iv.      Since given the proven duplicity of the Exxon Mobil and New York Organized Crime Mafia defendants, and the mistruths told him by the Hughes defendants, plaintiffs would have ended up with nothing whether plaintiff Claude David Convisser had at

that point made a presentation to the Darden businessmen or not, his decision to depart the breakfast group at the moment he did was reasonable.

253.    In fact, the true causes for terminating the intent of the Hughes defendants, the Darden businessmen, and the associates of defendant Charles M. Steppe to invest in plaintiff Claude David Convisser were:

        a.    first, untruthful, damaging and defamatory remarks about plaintiffs initiated by defendant Marcus T. Wiley on behalf of defendants Exxon Mobil Corporation and Jane Doe Standard Oil Trust Intelligence Service Number 3 for the malicious purpose of denying investment in plaintiff POP Diesel, or initiated by defendant Keith Ford acting for the Exxon Mobil and New York Organized Crime Mafia defendants, which remarks had the effect of temporarily removing plaintiff POP Diesel's "radon" from the ground floor of the breakfast group's potential investors, and;

        b.    second, presentation to the Hughes defendants, the Darden businessmen, and defendants Charles M. Steppe and David Butler by the New York Organized Crime Mafia defendants and their agents in Albemarle County and Charlottesville of an alternative target of their investment, a more superficially attractive, but ultimately specious, implementer of plaintiff POP Diesel's business plan and manufacturer of plaintiff POP Diesel's products, such as defendants Wende's Where's the Beef Healthy Vegetable Sauce Manufacturing Company and Wende's Where's the Beef Tropical Jatropha Tree Planting Company.

254.    Meanwhile, defendant Marcus T. Wiley and other agents of the Exxon Mobil defendants prompted defendants Jane Doe New York Organized Crime Mafias Numbers 1 and 2 to behave according to their predilection and steal plaintiff POP Diesel's Investment Prospectus for their own fundraising and replication.

255.    Defendant Michael Goff admitted as much as is stated in the preceding paragraph to plaintiff Claude David Convisser when he spoke with Bill Meyers about winning the lottery in this plaintiff's presence on or around August 10, 2024 at the breakfast group's gathering place in western Albemarle County.

a.    Defendant Michael Goff asked rhetorically, and referring to plaintiff Claude David Convisser, "If you were the person who wrote the lottery's business plan, would you make money?"  Bill Myers replied, "Of course, they are making money hand over fist," or something to that effect.

b.    Due to the universal history of failed commercial *jatropha* cultivation, defendant Michael Goff does not understand, as Jane Doe New York Organized Crime Mafias Numbers 1 and 2 have so far not yet accepted, that he and his business associates will only make money from *jatropha* tree cultivation, or from whatever adaptation of plaintiff POP Diesel's integrated agricultural and industrial model they may attempt:

i.    if plaintiff Claude David Convisser is in charge, owing to the fact that he developed the idea in the first place and as he has told defendants before, he retains many secrets about how to implement it inside his head, and;

ii.    This means, for them to succeed, they have to invest in the plaintiff company POP Diesel Africa, Inc., pursuant to the July 1, 2024 Stock Subscription Undertaking.

256.    Defendants Jane Doe New York Organized Crime Mafias Numbers 1 and 2 are presently offering securities and engaged in raising equity investment for defendants Wende's Where's the Beef Healthy Vegetable Sauce Manufacturing Company and Wende's Where's the Beef Tropical Jatropha Tree Planting Company utilizing plaintiff POP Diesel's Investment

Prospectus to conduct their own vegetable sauce manufacturing in the USA and *jatropha* cultivation projects in the tropical developing world.  They either:

      a.      aim to make a profit out of greed, or;

      b.      will disappoint their investors because:

      c.      they do not know what they are doing and;

      d.      are, in the alternative, acting on the Exxon Mobil defendants' motive to preempt POP Diesel from gaining a foothold in the marketplace.

257.    In addition to keeping up with the foregoing machinations, plaintiffs must always deal with the commonplace, day-to-day harassment that the Exxon Mobil and New York Organized Crime Mafia defendants mete out to them in an attempt to make them quit and foreclose on plaintiff POP Diesel's business.  These defendants not frequently use their ownership of or pervasive influence on significant swaths of the American economy for the business conspiracy's malign purposes.  Here are a few examples drawn recently from Charlottesville, in addition to those recited elsewhere in this complaint and too many others to recount herein:

      a.      When plaintiffs rented a car from Hertz at the Charlottesville Airport, Hertz set them up with a car one of whose rear wheels was unbalanced.  It made such a wobble and noise that plaintiff Claude David Convisser could not safely drive it north on Route 29 to northern Virginia on Company business.  When he attempted to return and exchange the car before setting out northwards, the Manager refused and billed him for the car's use to that point.  A female Hertz desk attendant that morning had remarked on the appearance at that hour of two men who joined her behind the desk which she said was unusual and prompted her to wonder why.  The answer was to set plaintiffs up with a rotten car.

100

b.      Plaintiff Claude David Conviser suffered poisoning by sauteed mushrooms infused with a laxative that made him defecate suddenly and with diarrhea after his meal at the Wood Buffet and Grille, after he had already defecated completely and healthily earlier that day.  He detected this was a set-up by hints given by the waiter and chef, both of whom had been bribed, and because of the off-taste of the mushrooms.  This sort of incident became so common in Ghana and Mali a few years before that now there are only a few restaurants where he can go and safely eat there that serve food to all customers from the same common pot he can observe or whose owners he knows and particularly trusts.

c.      Defendants enforced their total, unlawful, electronic surveillance of plaintiffs by in Charlottesville stealing a brand-new pair of clear, prescription, bifocal, Ray Bann spectacles plaintiff Claude David Conviser purchased from his ophthalmologist's office in Washington, D.C. and surreptitiously replacing them with tinted ones that undoubtedly house their electronic devices and capabilities on them.  A year before, he paid for but never picked up a previous pair of new bifocal spectacles from another optometrist he went to high school with named Chris Prestera in Merrifield, Virginia after Chris Prestera indicated that he was aware that someone, either defendants John Doe Standard Oil Trust Intelligence Service Number 3 or Jane Doe New York Organized Crime Mafia Number 1 or 2, had rigged those spectacles with surveillance and tracking capability, or he had sent them off to experts who had done so with his knowledge.

i.      One of these defendants directed Chris Prestera to signal to plaintiff Claude David Conviser that his spectacles were doubling without his consent as devices used to spy on him and everyone in his presence by, after the latter had never come to

pick them up after several weeks, calling him on the phone to tell him the eyeglasses were ready for pick-up.

        ii.     This happened at the precise moment when plaintiff Claude David Convisser was having a lunch conversation with Miguel Gomez in Albuquerque, New Mexico about the theft by defendants Standard Oil Trust Intelligence Service Number 3 and Jane Doe New York Organized Crime Mafia Number 1 of his former POP Diesel USA partner Abel R. Teller in New Mexico and others, and their surveillance of plaintiff POP Diesel's enterprise.

        d.     As a homeless person camping in the Shenandoah National Park under circumstances described below, plaintiff Claude David Convisser took the chance of wrapping his laptop computer and some other personal belongings in plastic and hiding them at the base of a tree on Loft Mountain. The Exxon Mobil or New York Organized Crime Mafia defendants used a bloodhound to find his stored belongings, and since they already knew the password to his computer from their surveillance, disabled the administrative commands, thus blocking him out of it. He fortunately had enough of his scarce funds remaining to purchase another, used one.

<u>Defendant Julie Michelle Convisser's Agency for the Exxon Mobil Defendants</u>

258.    The Petroleum-Mafia-CIA rewarded defendant Julie Michelle Convisser for working with them in or around 2018 by giving her a plum training job at a conference in the Middle East teaching American military and security supervisory personnel how to recognize and treat post-traumatic stress disorder in their soldiers, which is within her professional competency as a clinical social worker specializing in trauma to the body and movement therapy.

259.    Defendant John Doe Standard Oil Trust Intelligence Service Number 3, at the time with the consent of the CIA, asked defendant Julie Michelle Convisser to work with them in monitoring and cabining the activities of her older brother plaintiff Claude David Convisser

because of his advocacy for pure plant oil diesel engine fuel and plaintiff POP Diesel's business mission.

260.     In exchange, defendant John Doe Standard Oil Trust Intelligence Service Number 3 on behalf of defendant Exxon Mobil Corporation promised to take care of her two sons, Jacob Dargan Rambo born in 1997 and Lucas Dion Rambo born in 2001.

a.     As a result, Lucas Dion Rambo, following his third year in college at California Polytechnic State University in San Luis Obispo, California, won a coveted internship for the summer of 2023 at one of the U.S. Government's premier advanced engineering think tanks and laboratories, Lawrence Livermore National Laboratory in northern California.

b.     Even before the summer internship was over in 2023, Lawrence Livermore Laboratories made a highly unusual job offer to Lucas Dion Rambo guaranteeing full-time employment after he finished his undergraduate degree or pursued a master's degree after earning his Bachelor of Science degree.

c.     Upon information and belief, Jacob Dargan Rambo has received preferential treatment as a Marine Corps officer, such as fulfilling his mother's wish, that he has not been put in any active combat positions or assigned any lasting role on active combat missions.

d.     Upon information and belief, defendant Julie Michelle Convisser wanted her son Jacob Dargan Rambo to be stationed near his brother Lucas Dion Rambo, a condition that is currently satisfied by their both being in California.

261.     The objective of John Doe Standard Oil Trust Intelligence Service Number 3 with regards to defendant Julie Michelle Convisser was to gain control of her parents Martin and Colette Marie Convisser's finances so that their money could no longer support plaintiffs in

advancing plaintiff POP Diesel's business and realizing the value incipient in plaintiff Claude

David Convisser's and the Company's ownership shares.

262.    In late May 2021, defendant Julie Michelle Convisser organized and conducted a

60th wedding anniversary dinner for Martin and Colette Convisser at a restaurant in western

Fairfax County, Virginia.

        a.    All of their closest friends were present.

        b.    While standing engaged in conversation, Martin Convisser fainted and had

to be taken by ambulance to the hospital for examination and evaluation.

        c.    While this incident turned out not to be serious, it sent a signal to all of

Martin and Colette Convisser's closest friends that Martin's health was fragile.

        d.    Defendant John Doe Standard Oil Trust Intelligence Service Number 3

manufactured this incident by causing Martin Convisser to ingest something that made him faint

at that particular moment or during that event.

        e.    In so doing, defendant John Doe Standard Oil Trust Intelligence Service

Number 3 was preparing Martin and Colette Marie Convisser's friends for the news that soon,

neurologist Dr. James E. Bicksel would declare Martin Convisser to be totally mentally

incapacitated. This was part of defendant John Doe Standard Oil Trust Intelligence Service

Number 3 and other defendants' pre-arranged plan, acting for the business conspiracy against

plaintiffs.

263.    Plaintiff Claude David Convisser visited his parents Martin and Colette Convisser

in northern Virginia in June 2021.  Martin Convisser was then in full command of his mental

capacities and drove plaintiff Claude David Convisser from their apartment in Alexandria,

Virginia to Reagan National Airport, where Martin Convisser dropped plaintiff off and drove himself home.

264.    Yet defendant Julie Michelle Convisser told plaintiff Claude David Convisser at that time that their parents would be dead within one year, since their mother respondent Colette Marie Convisser was wheelchair bound and their father Martin Convisser had a congestive heart condition.

265.    On August 18, 2021, Dr. James L. Bicksel, a neurologist in McLean, Virginia, published a letter declaring that respondent Martin Convisser "lacks the capacity to make informed decisions about his medical care and administration of property" ("the Bicksel letter") and ordering defendant Julie Michelle Convisser to exercise control of his and respondent Colette Marie Convisser's medical and financial affairs.

266.    The Bicksel letter stated what was at the time a false conclusion, it was not premised on sound or ordinary medical evaluation, and it performed a disservice and was a breach of its author's duty of care to principal and respondent Martin Convisser.

267.    Moreover, as an act of a business conspiracy in which defendant Julie Michelle Convisser willingly participated against plaintiff and petitioner Claude David Convisser and his company plaintiff POP Diesel, whether he was aware of this goal or not, Dr. Bicksel drafted his letter in order to meet an end the conspiracy sought: to hand defendant Julie Michelle Convisser control of their parents' finances as agent designated in Martin Convisser's power of attorney so that she could on behalf of the business conspiracy along with defendants Kathi L. Ayers and Jennifer C. McManus constrain plaintiffs' financial resources which respondent Martin Convisser had always generously offered and provided them from his and respondent Colette Marie Convisser's accounts, as needed.

268.     Defendant Julie Michelle Convisser's exercise of agency of principals, respondents Martin Convisser and Colette Marie Convisser's power of attorney premised on Dr. Bicksel's August 18, 2021 letter was fraudulent from its very start, based on the false and prematurely-declared incapacity of its principal, respondent Martin Convisser.

269.     At least through August 2021, Martin Convisser had not had any problems driving his automobile.

a.     He had never gotten lost in any abnormal way that required outside help.

b.     He had not been involved in any more car accidents in his senior age than he was earlier in his adult life.

c.     Yet Dr. Bicksel's letter ordered that his driver's license be taken away.

d.     Martin Convisser later complained about the disappearance of his driver's license from his wallet.

e.     Martin Convisser asked plaintiff Claude David Convisser whether it was true, as defendant Julie Michelle Convisser apparently told him, that Virginia drivers were required to surrender their driver's licenses after a certain age.

f.     As events would later show, defendant Julie Michelle Convisser's seizing of her father's driver's license was not necessary, since he had already given his and respondent Colette Marie Convisser's two cars to their grandson Jacob Dargan Rambo, and he had no desire ever to rent a car.

g.     Instead, defendant Julie Michelle Convisser took her father's driver's license to curtail his ability to show picture identification at his banks and other places necessary to function as an autonomous adult in modern American society.

h.     On March 18, 2024, plaintiff Claude David Convisser sent an email to his cousins on the Convisser side of the family marking the death by car accident of Martin's 93 year-old first cousin Sam Convissor, explaining his view that defendant John Doe Standard Oil Trust Intelligence Service Number 3 had killed Sam in a wanton and willful act of retribution to justify defendant Julie Michelle Convisser's taking of her father's driver's license from him, and to satisfy their bloodlust since plaintiff Claude David Convisser had already alerted authorities about their potential murder of respondents Martin and/or Colette Marie Convisser in furtherance of cutting off their funds for him and plaintiff POP Diesel.

i.     Afterwards and as a result of the foregoing email message, apparently attempting a subsequent remedial measure, defendant Julie Michelle Convisser or another agent of the business conspiracy at Linden House restored Martin Convisser's driver's license to his wallet, after three years of its disappearance.

j.     Defendant John Doe Standard Oil Trust Intelligence Service Number 3 murdered Sam Convissor in retribution for plaintiff Claude David Convisser's having stymied their intent he detected to kill his parents by a letter he wrote on February 14, 2024 to the Virginia Chief Medical Examiner, copying defendants Julie Michelle Convisser and Linden House, requesting in advance that autopsies be performed in the event of the death of either of his parents respondents Martin Convisser and Colette Marie Convisser.

270.     While defendant Julie Michelle Convisser wrote on September 10, 2022 that. "Dad's memory, judgement and processing are all impacted by his dementia now," respondent Martin Convisser beat plaintiff Claude David Convisser fair-and-square at successive, complete games of Scrabble on August 31 and September 1, 2022, just as he nearly always had done.  His meticulous scorekeeping was further evidence of his complete mental competency at that time.

271.    Following a 90-minute interview and interaction with respondent Martin Convisser on September 26, 2022, which she conducted *pro bono*, Charlottesville forensic psychologist Dr. Marylin Minrath ("Dr. Minrath") pronounced her preliminary view, subject to verification by a full battery of competency tests which defendant Julie Michelle Convisser prevented from ever taking place, that Martin Convisser retained his cognitive competency to make important decisions for himself, his wife Colette Marie Convisser, and their family.

272.    Dr. Minrath offered a free family therapy session since at that time, defendant Julie Michelle Convisser was at odds with Martin Convisser, Colette Marie Convisser, and plaintiff Claude David Convisser about a loan of money the former three were willing and prepared to make to the latter for his and plaintiff POP Diesel's use.

273.    However, defendant Julie Michelle Convisser would not participate in the free family therapy session offered by Dr. Minrath, and so, it never happened, nor did that loan.

274.    Plaintiffs were able to sustain their minimal business activities through early 2019 relying on investment, contributions and loans from people plaintiff Claude David Convisser knew or met who were outside of his family.

275.    Yet respondents Martin Convisser and Colette Marie Convisser have nearly always since 2011 supported plaintiffs financially when plaintiff Claude David Convisser asked, including a $100,000 loan made in 2011, $16,000 in 2020, and $10,000 in early 2021.

276.    Beginning in April 2019, Martin Convisser and Colette Marie Convisser sent plaintiff Claude David Convisser $3,000 per month as a support allowance for him and plaintiff POP Diesel, plus often made his minimum monthly credit card payments amounting to around $500 per month and made an automatic monthly credit card payment to publish plaintiff POP

Diesel's website and retain plaintiff Claude David Convisser's Company email address, all of which enabled them to continue in business.

277.    With the advent of the Bicksel letter in August 2021, defendant Julie Michelle Convisser began her active and malign manipulation in favor of the business conspiracy of relations between plaintiff Claude David Convisser and their parents, respondents Martin and Colette Marie Convisser.

278.    For instance:

      a.    On the understanding that respondents Martin and Colette Marie Convisser were in need of an assisted living arrangement closer to where she lived, defendant Julie Michelle Convisser brought respondents Martin and Colette Marie Convisser from their then-home in northern Virginia to Charlottesville in September 2021 to visit three facilities, none of which were Linden House.

      b.    When it came time for the move in October 2021, however, defendant Julie Michelle Convisser instead put them into Linden House, which they had never visited before moving in.

      c.    Superiors in the business conspiracy instructed defendant Julie Michelle Convisser to move respondents Martin and Colette Marie Convisser into defendant Linden House.

      d.    Defendant Linden House's operation and ownership affiliation with defendants Exxon Mobil Corporation and John Doe Standard Oil Trust Intelligence Service Number 3 permitted the business conspiracy's comprehensive surveillance of the communications and interactions between plaintiff Claude David Convisser and respondents Martin and Colette Convisser, and the ability to intrude negatively thereon, when needed.

279.    The first negative intrusion by the business conspiracy in the relations between plaintiff Claude David Convisser and respondents Martin and Colette Convisser using defendants Julie Michelle Convisser and Linden House as their agents took place in November 2021.

a.    Plaintiff Claude David Convisser stated from Ghana his desire to visit respondents Martin and Colette Convisser in their new residence at Linden House for Thanksgiving 2021, after defendant Julie Michelle Convisser had moved them there the month before.

b.    Defendant Julie Michelle Convisser initially welcomed this visit by inviting plaintiff Claude David Convisser to stay at her house in Charlottesville.

c.    However, after plaintiff Claude David Convisser had already purchased a round-trip air ticket, defendant Julie Michelle Convisser informed him that defendant Linden House had just announced its first-ever COVID outbreak, starting with a single case of infection of a staff member, and lockdown.

d.    Plaintiff Claude David Convisser had spent the entire COVID pandemic except for two weeks in June 2021 in tropical West Africa, where the outbreak was not nearly as severe as it was in the USA.  In northern Ghana, where he normally was, there were no, or very few, cases.  He was unfamiliar with the terminology and permutations of COVID restrictions then common in the USA.

e.    Defendant Julie Michelle Convisser insisted that plaintiff Claude David Convisser cancel the trip because he would not be able to spend time with their parents, respondents Martin and Colette Marie Convisser.

f.    On her instruction, plaintiff Claude David Convisser cancelled the trip.

110

g.    Only afterwards did he learn that she had welcomed their parents to her house for Thanksgiving dinner, and despite the lockdown, he and they would have been able to meet, go elsewhere, and spend time together outside of defendant Linden House.

280.    Upon information and belief, just as the murder of former Ghanaian President Jerry John Rawlings created conditions to obscure plaintiff Claude David Convisser's message of corruption that would have imperiled the re-election of defendant Exxon Mobil Corporation's preferred candidate President Akufo-Addo, the COVID outbreak at Linden House was manufactured to give an excuse for the business conspiracy acting through defendant Julie Michelle Convisser to block plaintiff Claude David Convisser's visit to their parents at that time.

281.    The reason for the announcement of a COVID outbreak at Linden House after plaintiff Claude David Convisser had already purchased his airplane ticket to visit respondents Martin and Colette Marie Convisser over Thanksgiving 2021 and defendant Julie Michelle Convisser's insistence that therefore, he cancel this trip was that the business conspiracy was not yet ready to contain his communications with them during such an early visit after defendant Julie Michelle Convisser had so recently assumed command over their estate and finances: they might make a financial loan to him, the appearance of which would jeopardize the business conspiracy's upcoming plan for cutting the monthly allowance they had been sending him since April 2019.

282.    Due to his impending move to Mali and the necessity that he stay there on the ground to launch his peace initiative, plaintiff Claude David Convisser was not able to re-schedule his first trip to visit respondents Martin and Colette Marie Convisser at Linden House until August 2022.

283.    Defendant Jennifer C. McManus introduced herself to plaintiff Claude David Convisser as the Trustee of the Convisser Family Trust and the Claude Convisser Trust, established by grantor and respondent Martin Convisser, by email in February 2022.

284.    Grantor and respondent Martin Convisser made defendant Julie Michelle Convisser the Trustee of the Martin Convisser Trust where his and respondent Colette Marie Convisser's assets would be held until they both died and he made defendant Julie Michelle Convisser, as the Trust Protector of the Convisser Family and Claude Convisser Trusts (hereinafter, "the Trust"), the person responsible for transferring assets into the Trust for plaintiff Claude David Convisser.

285.    Defendant Jennifer C. McManus's first act as Trustee, acting on behalf of the business conspiracy and defendant Julie Michelle Convisser, was to cut the monthly allowance respondents Martin and Colette Marie Convisser had been sending plaintiff Claude David Convisser for nearly three years from $3,000 to $2,500 per month, to propose consolidating his three credit cards with a total credit limit of $22,000 into one with a credit limit of $2,000, and to finance the credit card debt with $500 per month of his parents' or Trust funds.

a.    The intent behind cutting plaintiff Claude David Convisser's credit limit was to impair his ability to travel internationally.  It is difficult to buy airplane tickets, rent cars, and make hotel bookings without a credit card.  Plaintiff Claude David Convisser always travels as cheaply as possible.  However, a one-way, budget airplane flight from West Africa to the USA on short notice can alone sometimes cost more than $2,000.  Therefore, the proposed $2,000 limit on all of his credit card credit was an attempt to knee-cap plaintiff POP Diesel's business and plan to implement its integrated agricultural and industrial model across multiple tropical countries.

b.      On plaintiff Claude David Convisser's appeal, Trust grantor and

respondent Martin Convisser intervened, emailing defendant Julie Michelle Convisser on March

8, 2022:

> Whether or not Claude actually "needs" $3,000 per month, I do not
> wish to turn down his request in order for me to "save" $6,000 per
> year.  A $6,000 annual increase will not significantly affect the
> total funds available to me, Mom, you or Claude.

c.      Disregarding Dr. Bicksel's letter stating that respondent Martin Convisser

was incapacitated from making informed decisions about the administration of his property,

defendants Jennifer C. McManus and Julie Michelle Convisser agreed in the end with respondent

Martin Convisser to restore plaintiff Claude David Convisser's allowance to $3,000 per month,

and defendant Julie Michelle Convisser agreed to contribute an additional $500 per month of

their parents' money for so long as respondent Martin Convisser is alive to cover the monthly

minimum credit card payments on his three credit cards.

d.      Taking advantage of respondent Martin Convisser's more recent

diminishing capacity and ability to stand up for his views, defendant Julie Michelle Convisser

and the replacement Trustee Ashley Goldsborough of Family Heritage Trust Company acting as

defendant Julie Michelle Convisser's and the business conspiracy's agent, in December 2023

whittled the monthly amount they send plaintiff Claude David Convisser down to $1,600, plus

still $500 to make his monthly credit card minimum payments.

i.      As discussed below, defendant Julie Michelle Convisser in July

2024 cut off even that amount in retaliation for plaintiff Claude David Convisser's raising grave

questions about the medical care and plan being given respondent Colette Marie Convisser.

ii.    Replacement Trustee Ashley Goldsborough reported on June 25, 2024 that her "hands are tied" by defendant Julie Michelle Convisser's halting the transfer of funds from the Martin Convisser Trust to the Claude Convisser Trust.

A.    In cutting off funds to the Claude Convisser Trust, defendant Julie Michelle Convisser changed her tune from her March 7, 2022 instruction to her father Martin Convisser regarding former Trustee defendant Jennifer C. McManus, at a time when in actuality he still had full mental capacity:

> When you were certified by Dr. Bicksel as no longer able to manage your own financial affairs, that is the point at which the Trustee Jennifer became fully legally responsible as Trustee for Claude's support through the Trust. **Since then, per the conditions of the Trust, neither you nor I nor Claude have any responsibility or legal standing to instruct, make changes, or even contest any decision Jennifer makes regarding Claude's support; as Trustee she has <u>sole</u> discretion. That includes the monthly wire amount and what it is spent on. We need to let her do her job without interference.**

(emphasis supplied).

B.    Despite replacement Trustee Ashley Goldsborough's earlier assurance that the Trust would always reimburse plaintiff Claude David Convisser's medical expenses, as grantor and respondent Martin Convisser intended, after defendant Julie Michelle Convisser cut off replenishment of the Trust, the Trustee stopped independently reimbursing plaintiff Claude David Convisser's medical expenses in July 2024.

C.    Replacement Trustee Ashley Goldsborough reported on August 18, 2024 that the final Trust balance of $3,3880.17 would be sent to plaintiff Claude David Convisser as follows: $1,164.34 on September 15, 2024, $1,600 on October 16, 2024, and $1,115.83 on November 15, 2024. Then the Claude Convisser Trust will be empty.

286.    Contrary to her legal duty to them, defendant Julie Michelle Convisser, as Trustee of the Martin Convisser Trust, repeatedly concealed the quantity and identity of her parents' assets from them, and accountability therefore.

a.    On three separate occasions that plaintiff Claude David Convisser is aware of documented during 2022 alone, grantor and respondent Martin Convisser, without any prompting from him, asked defendant Julie Michelle Convisser in writing for a list of his and his wife Colette Marie Convisser's assets, a copy of their federal tax return that would show sources of income and expenditures, and the lump sum their estate would receive in reimbursement from long-term residential care health insurance.

b.    Every time, defendant Julie Michelle Convisser dodged a straight answer, going so far as to cancel her upcoming meeting with him in the hope he would forget about and drop the subject later on.

c.    Combined with defendant Julie Michelle Convisser's absolute refusal ever to give any information to plaintiff Claude David Convisser about any financial matter pertaining to their parents, the identities of their medical providers, and care plans she has them registered for; her actions exercising agency under their power of attorney; her threats to plaintiff Claude David Convisser against his making any independent inquiries thereabout; and her cutting off all communications with him for no valid reason, the circumstances warrant the suspension of her authority over their financial, medical and residential affairs and the appointment of a conservator to conduct an accounting of their estate and financial affairs.

287.    When plaintiff Claude David Convisser first arrived at defendant Linden House and his parents, respondents Martin and Colette Marie Convisser's apartment on August 28, 2022, the conditions they were living in were disgraceful and hazardous.

115

     a.     Their bathroom smelled like the inside of an elephant pen at the zoo.

     i.     There was urine splashed all around the half of the floorspace near the toilet and feces stains on the top of the toilet seat and the wall next to it.

     ii.     Evidence will show that feces continue to this day regularly to stain the top of the toilet seat and the wall next to it because staff of defendant Linden House neglect to help respondent Colette Marie Convisser with her toileting needs and to clean up afterwards.

     b.     Respondent Colette Marie Convisser was regularly urinating in her bed at night and respondent Martin Convisser was leaving the soiled bedsheets on the bed they shae where they were.

     i.     When plaintiff Claude David Convisser drew these shortcomings to the attention of defendant Linden House's staff, they pointed to each other, none of them willing to take responsibility for installing a fresh bed pad or changing the soiled sheets.

     ii.     These sorts of problems continue to this day, be it an inexplicable delay of several days in replacing a soiled bed pad on respondent Colette Marie Convisser's side of the bed with a fresh one or staff's simply abandoning a soiled nightgown inside their apartment.

     c.     The bin in the bathroom for respondent Colette Marie Convisser's soiled diapers was full and nobody was coming to empty it at any time of the day or night, a problem which continues to this day.

     d.     Respondent Colette Marie Convisser was constantly scratching her eyes, indicating she had not been receiving lubricating eye drops for a dry eye condition; her mal-

116

adjusted spectacles were falling down her nose, blocking her breathing through her nose; and the lenses were filthy.

e.    Staff normally skipped one or both of their twice-weekly appointments to bathe respondent Colette Marie Convisser, which caused her skin to itch, and she was frequently scratching many parts of her body.

f.    The apartment was so dusty, and the carpeting so dirty, that they looked like they had never been cleaned since the respondents moved in ten months earlier, conditions that were present again when plaintiff and petitioner Claude David Convisser arrived most recently in late June 2024.

288.    Over the course of the next month, into September 2022, plaintiff Claude David Convisser noticed many other dangerous conditions at Linden House, including but by no means limited to that:

a.    the electronic pendants his parents were supposed to wear around their necks and push to call staff urgently went missing for days on end without any replacement being provided;

b.    no medications were delivered to any residents one day on account of a "problem with the Linden House pharmacy;"

c.    a medical nurse displayed an oxygen-reading device that she demonstrated was giving patently false readings, and;

d.    executive management Elizabeth Wells and Scoot Stovall of the Linden House defendants' refusal to allow respondent Martin Convisser access to his medical records and diagnosis, despite his requesting them repeatedly in writing and Virginia law requiring them to give him such access.

289.    On September 30, 2022, plaintiff Claude David Convisser submitted a 28-page report of neglect and abuse, together with 35 documentary exhibits, to the Virginia Department of Social Services Division of Licensing Programs and Albemarle County Adult Protective Services.

      a.    Neither one investigated, that he is aware.

      b.    As plaintiff Claude David Convisser was trying to print out emails from respondent Martin Convisser's computer archive documenting the conditions in his report, these emails were being deleted or the print commands were being countermanded, as recounted in the report.  Someone among the Linden House defendants was monitoring respondent Martin Convisser's email and computer and controlling what got printed out and what not.

      c.    Similarly, when in late June 2024, plaintiff Claude David Convisser upon his arrival to visit his parents was reminded again of the horrible conditions they were living in, he began reviewing email correspondence between respondent Martin Convisser and defendant Julie Michelle Convisser with permission of the former on his apartment desktop computer.

      i.    The computer suddenly suffered a malfunction induced by the Linden House defendants and John Doe Standard Oil Trust Intelligence Service Number 3, which prevented plaintiff Claude David Convisser from having further access to respondent Martin Convisser's email archive.

      ii.    Defendant Martin Convisser did not know the password and credentials to his email account, and therefore would not be able to restore his email until the computer was repaired for home Internet use via his Verizon service plan.

iii.    Defendant Julie Michelle Convisser and her husband Greg Goering did not get the computer repaired until after they had expelled plaintiff Claude David Convisser from defendant Linden House.

290.    During the month of September 2022, plaintiff Claude David Convisser found a warm and caring, family-run assisted living facility in Charlottesville that had a beautiful and spacious apartment for a married couple available and was willing to take respondents Martin and Colette Convisser in as new residents.

a.    He put a $3,000 deposit down in the form of a bank check drawn on his personal checking account, waiting for a family meeting to discuss upon defendant Julie Michelle Convisser's return to Charlottesville from her trip to the Exxon Mobil defendants' headquarters in Portugal for defeating plaintiff POP Diesel.

b.    Because this move would have entailed respondents Martin and Colette Convisser's leaving the watchful surveillance eye of the Linden House defendants and the ability of their superiors in the business conspiracy such as John Doe Standard Oil Trust Intelligence Service Number 3 to meddle in Convisser family affairs, defendant Julie Michelle Convisser refused to permit the move.

c.    Not only did defendant Julie Michelle Convisser stonewall, she herself picked up the bank check for this $3,000 that plaintiff Claude David Convisser had handed over and she deposited it to an account under her control.

d.    This money had come from funds respondent Martin Convisser had already reimbursed to plaintiff Claude David Convisser for his travel expenses from respondents Martin and Colette Convisser's joint checking account, as respondent Martin Convisser had always offered to do and had done on every prior trip of his son's to visit them; it was respondent

Martin Convisser's consistent practice to reimburse additional to the normal monthly allowance the expenses of plaintiff Claude David Convisser's trips from abroad to visit them.  This money rightfully belonged to plaintiff, and he had every right to pay it as a deposit for his parents' move or to expect its return to him on the move's cancellation.

      e.      Defendant Julie Michelle Convisser stole plaintiff Claude David Convisser's $3,000 to place financial pressure on him and plaintiff POP Diesel.

      291.    On October 12, 2022 in response to the foregoing events, defendant James P. Cox, III introduced himself to plaintiff Claude David Convisser by sending him an outrageous and frightening letter on behalf of defendant Julie Michelle Convisser.  This letter:

      a.      accused plaintiff Claude David Convisser of "improperly tr[ying] to manipulate [his] father for [his] own personal advantage;"

      b.      stated: "Your egregious actions during your most recent trip to Virginia have caused Julie as agent for your parents to take the necessary steps to protect your parents, both personally and financially, from any further attempts at your exploitation;"

      c.      cautioned him against "disruptive interactions with [his parents'] health care staff and [] unwarranted threats to everyone who is assisting [his] parents;"

      d.      suggested futilely that, "If you have questions or concerns about [your parents' living arrangements or medical] care, you should contact Julie directly by email," and;

      e.      warned him that "further action may be taken to limit your access to your parents."

      292.    Wondering what "necessary step" defendant James P. Cox, III had had defendant Julie Michelle Convisser take, worried plaintiff Claude David Convisser called the Albemarle County Circuit Court from Africa repeatedly asking if any legal action had been filed against

him, until finally defendant James P. Cox, III responded to his anxious queries to admit his threat had been a bluff, an unethical one, at that.

293.    Plaintiff Claude David Convisser was able to visit his parents, respondents Martin and Colette Marie Convisser at defendant Linden House during four additional trips to the USA during 2023, by the end of which, he had spent a total of more than 30 days with them at Linden House.

a.    As documented in many, extensive emails plaintiff Claude David Convisser wrote to defendant Julie Michelle Convisser and Elizabeth Wells, the Executive Director of defendant Linden House, his parents respondents Martin and Colette Convisser's living conditions were miserable every time he arrived, unless he had forecast his arrival beforehand to defendant Julie Michelle Convisser in which case she would alert defendant Linden House and they would sometimes take prophylactic measures.

b.    For instance, plaintiff Claude David Convisser noticed that respondent Martin Convisser had begun suffering bowel incontinence in October 2023, which defendants Julie Michelle Convisser and his health care provider the Linden House defendants did not take ordinary care to address.

i.    Plaintiff Claude David Convisser asked his father if anyone had taken him to see a urologist for this condition, and he shrugged his shoulders as if to say, "No," or, "Nobody cares."

ii.    When another incident arose in July 2024 which prompted plaintiff Claude David Convisser to ask his father the same question, he replied, definitively this time, "No."

121

       iii.     Plaintiff Claude David Conviser informed defendants Julie Michelle Conviser and Linden House about this particular deficiency in their care for his father by multiple emails, but apparently, they never took him to a urologist for assessment and any possible treatment.

       iv.     The foregoing circumstances explain why respondents Martin and Colette Conviser's apartment at defendant Linden House often smelled very bad, as documented in plaintiff Claude David Conviser's emails, which would have been noticeable to anyone entering its front door.

       c.     Certain supervisory staff at Linden House indicated that they were ignoring care for respondents Martin and Colette Conviser in retaliation for plaintiff Claude David Conviser's complaints, which kind of retaliation another Linden House resident named Betty Wood confided in him was common and she herself had been subjected to, as confirmed without plaintiff Claude David Conviser's inquiring by a third Linden House resident named Lois Sandy.

       d.     Only after plaintiff Claude David Conviser arrived at Linden House would its staff's attention to his parents' respondents Martin and Colette Conviser's living conditions and care improve, and that was due solely to his complaints, always made as gently as possible so as to avoid further retaliation against his parents or alienating them from himself.

       e.     Sticking to the business conspiracy's game plan of keeping plaintiff Claude David Conviser's parents where they were under the control of the Linden House defendants, John Doe Standard Oil Trust Intelligence Service Number 3, and Julie Michelle Conviser, she ignored or rudely rebuffed plaintiff Claude David Conviser's additional entreaties to move their parents elsewhere (after he heard Rosewood advertising openings in

their facility on the radio) or to get them supplemental care in the form of a nursing aide who would spend time with them every day to ensure they were properly clothed, bathed, and medicated, and their bathroom and apartment cleaned, which supplemental care they can afford to pay for out-of-pocket since insurance covers the cost of their stay and care at Linden House.

294.    Defendant Julie Michelle Convisser counseled plaintiff Claude David Convisser on November 17, 2021 before canceling his first visit to see their parents at Linden House: "[Mom and Dad] don't have the help they used to, so a lot falls on Dad and me in terms of Mom's care.  You can give Dad a break by being there for hours at a time."

295.    Yet although the last of her and Greg Goering's four children moved out of their house several years ago, defendant Julie Michelle Convisser only visits her parents once per week, for a half hour or so late on Wednesday afternoons, and only rarely takes them out, for instance to her home for a meal or on any other excuse.

296.    Due to defendant Linden House's inattentive care and failure to check on respondent Colette Marie Convisser's bathroom needs frequently enough, which defendant Julie Michelle Convisser authorized by her acquiescence to her parents' remaining there, respondent Colette Marie Convisser fell while trying on her own to stand from her wheelchair and broke her arm in 2023.

297.    Respondent Colette Marie Convisser sustained another fall in March 2024, about which defendant Julie Michelle Convisser did not inform plaintiff Claude David Convisser, and which he found out about only from concern voiced over the telephone by respondent Martin Convisser.

298.    Plaintiff Claude David Convisser's latest visit began on June 24, 2024.

299.    As usual, and as documented in letters and emails he wrote at the time, defendants Linden House were neglecting his parents, and began to give them any attention and semblance of ordinary care, which standard they have never attained, after his repeated complaints.

300.    On Monday, July 15, 2024, defendant Linden House's Executive Director Elizabeth Wells invited plaintiff Claude David Convisser into her office to discuss his latest missive pointing out flaws in his parents' care.

a.    Elizabeth Wells informed plaintiff Claude David Convisser that defendant Julie Michelle Convisser had enlisted respondent Colette Marie Convisser in hospice care with an outside agency not part of defendant Linden House.

b.    Neither Elizabeth Wells nor defendant Linden House's Wellness Director Felicia Correa, R.N., also present at the meeting, could identify to plaintiff Claude David Convisser the terminal illness that qualified respondent Colette Marie Convisser for hospice care.

c.    Elizabeth Wells exclaimed that without any fatal qualifying condition, those billing Medicare for respondent Colette Marie Convisser's hospice care would be engaging in fraud.

d.    Elizabeth Wells told plaintiff Claude David Convisser that Linden House was no longer responsible for the medical care of respondent Colette Marie Convisser because defendant Julie Michelle Convisser had changed her mother's attending physician to the one affiliated with the outside hospice care provider, which Elizabeth Wells stated was an unusual thing to do for a resident of an assisted living facility.

e.    Claiming patient confidentiality and refraining on instructions from defendant Julie Michelle Convisser, Elizabeth Wells would not name to plaintiff Claude David

Convisser the hospice care provider or attending physician employed there with whom defendant Julie Michelle Convisser had enrolled respondent Colette Marie Convisser.

301.    In fact, respondent Colette Marie Convisser does not have any terminal illness that would qualify her for Medicare reimbursement for hospice care, as Code of Federal Regulations Title 42, section 418.22 requires.

a.    In addition to Alzheimer's Disease and a PEH hiatal hernia, which as stated above, are not terminal conditions in the case of respondent Colette Marie Convisser, defendant Julie Michelle Convisser cited her "physical weakness" for justifying hospice care.

b.    However, physical weakness is not a medical condition, only a symptom.

c.    Any physical weakness respondent Colette Marie Convisser exhibits is not an adjunct or symptom of any illness she may have, but is due to defendants Linden House and Julie Michelle Convisser's acting on direction of the business conspiracy to deprive her of adequate nutrition, as follows.

d.    The business conspiracy's goal, as plaintiff Claude David Convisser suspected at the time he wrote the Virginia Chief Medical Examiner on February 14, 2024 requesting autopsies on the occasion of his parents' deaths (may that not happen any time soon), was to kill them off to deprive him and plaintiff POP Diesel of their financial support.

302.    In response to the meeting which Elizabeth Wells of the Linden House defendants called him into on July 15, 2024 and the information, or lack thereof, she gave him therein, plaintiff Claude David Convisser wrote to defendant Julie Michelle Convisser that evening by email asking eight questions seeking clarification about why their mother was in hospice care without any qualifying, terminal illness, as required by law for Medicare to reimburse, and who was the hospice care provider.

125

303.    In response to his queries about hospice care for respondent Colette Marie Convisser, defendant Julie Michelle Convisser not only refused to answer, giving only a short, general, reply, but she also threatened him against making further inquiries.  She wrote, "I warn you to not interfere with or harass any hospice care providers or any Linden House providers… I am not obliged nor will provide you with any other details regarding" their parents' care.

304.    Plaintiff Claude David Convisser enjoyed seven or eight lunch and dinner meals with his parents, respondents Martin and Colette Marie Convisser in the dining room of defendant Linden House between June 24 and July 18, 2024.

a.    In March 2023, defendant Julie Michelle Convisser and respondent Martin Convisser explained to plaintiff Claude David Convisser after the onset of respondent Colette Marie Convisser's PEH hiatal hernia that she was henceforth restricted to a liquid diet, and as such, the only way for her to be assured of receiving adequate nutrition every day and of maintaining her body weight and strength was to consume three small carton of specially-formulated, Ensure® high-vitamin and high-protein beverage daily (or a similarly formulated beverage), one at every meal.

b.    However, it is evident that respondent Colette Marie Convisser has lost body weight since September 2023.

c.    The reason for respondent Colette Marie Convisser's weight loss since September 2023, as plaintiff Claude David Convisser observed, was that defendant Linden House's waiters were now bringing chocolate pudding or applesauce to respondent Colette Marie Convisser at the start of every meal, instead of a carton of Ensure®.

d.    As a result, respondent Colette Marie Convisser sated her appetite on non-nutritious desert food before the waiters of defendant Linden House brought her the carton of

Ensure®, and she did not want to and would not consume that drink which she needs to do to stay alive.

   e. On Thursday, July 18, 2024 at 5:06 p.m., plaintiff Claude David Convisser sent an email to Elizabeth Wells of defendant Linden House and to his sister defendant Julie Michelle Conivisser recounting the following:

     i. A waiter in the Linden House dining room had told petitioner Claude David Convisser at lunch that day that wait staff was bringing respondent Colette Marie Convisser an appetizer of either chocolate pudding or applesauce before the Ensure®.

     ii. The waiter said they were doing this because respondent Colette Marie Convisser's dietician had so instructed.

   f. The next morning, plaintiff Claude David Convisser rode the Linden House elevator with one of the chefs from the dining hall.

     i. She, too, confirmed that defendant Linden House's dining hall staff was under orders to give respondent Colette Marie Convisser chocolate pudding or applesauce before the Ensure®.

     ii. The reason the chef cited they were doing this was to placate respondent Martin Convisser because his wife would see him eat a regular plate of food and frequently ask him for a taste of it.

   .  . iii. If respondent Martin Conviser declined her appeal for a taste of his meal out of respect for her liquid diet, they would both be unhappy, and if he granted it, it might defy doctor's orders.

iv.    The chef asked plaintiff Claude David Convisser if, as respondent

Colette Marie Convisser's son, he was instructing dining hall staff to stop that practice and to

serve her the carton of Ensure® first, and he replied out of a desire to preserve her life, "Yes."

305.    In August 2024, plaintiff Claude David Convisser met with the marketing

directors of three other assisted living facilities in the Charlottesville area and asked how each

one would see to it that respondent Colette Marie Convisser consumed the entirety of her three

cartons of Ensure® daily.  Every one of them gave the same, simple answer: put it into her Care

Plan which guides staff's daily interactions with every assisted living resident.  Each one said her

facility would treat the carton of Ensure® as a necessary medication, deliver it to her apartment a

half-hour before mealtime, and monitor that she drank it all before allowing her and respondent

Martin Convisser to proceed to the dining hall.

306.    It would have been a simple matter for defendants Linden House and Julie

Michelle Convisser to inform plaintiff Claude David Convisser following his email of Thursday

evening, July 18, 2024 that he had pointed out a flaw in their care of and instructions for

respondent Colette Marie Convisser, and henceforth, they would guarantee her complete

consumption of the three cartons of Ensure® daily in the same way that the three other assisted

living facilities determined was ordinary: by making her drink them in her apartment before each

meal, as part of her daily Care Plan.

307.    However, these defendants had other agendas to pursue more important to them

than respondent Colette Marie Convisser's care or life, as indicated below: isolation of plaintiff

Claude David Convisser and strangulation of his finances coming from his parents, all part of

blocking the $100 billion equity raise for plaintiff POP Diesel.

308.    If through the business conspiracy's comprehensive and unlawful surveillance of plaintiff Claude David Convisser, they have come to know of their mistake in retaliating against him for pointing out their plot to kill respondent Colette Marie Convisser by starving her of the nutrition via Ensure® that she needs to stay alive, and they are now trying to cover their tracks and the Linden House defendants have adopted the ordinary care of making sure she consumes the entirety of three cartons per day as part of her medical Care Plan, this subsequent remedial measure does not eradicate the threat to her life they posed by their actions and behavior and the danger they still present to both her and respondent Martin Convisser by their evil intent which still lurks.

309.    As a consequence of plaintiff Claude David Convisser's alerting defendant Linden House by its Executive Director Elizabeth Wells and defendant Julie Michelle Convisser on the evening of July 18, 2024 about a plot to end respondent Colette Marie Convisser's life prematurely by unjustifiably enrolling her in hospice care while denying her adequate nutrition to survive, these defendants, assisted by defendant James P. Cox, III, retaliated against him in two ways the next day, July 19, 2024.

310.    First, at 6:41 p.m. on July 19, 2024, the Linden House defendants, by Executive Director Elizabeth Wells, on defendants Julie Michelle Convisser and upon information and belief James P. Cox, III's orders, issued to plaintiff Claude David Convisser a No Trespassing Order, forbidding him from stepping foot on the Linden House property or the private road leading to it.

a.    This step effectively barred plaintiff Claude David Convisser from ever seeing his parents again.  If the Linden House defendants had permitted him to go up the private drive, they could have come outside the front of the building to see him.  Clearly, their intent, on

direction of defendants Julie Michelle Conviser and James P. Cox, III, was to terminate his relations with them.

      b.     Other than saying the No Trespassing Order was due to unspecified "conduct" of plaintiff Claude David Conviser at Linden House, Elizabeth Wells, the Linden House defendants, and defendant Julie Michelle Covisser have never given any facts or reasons for it, despite his repeated queries.

          i.     Following his queries and written protestations, the next business day, on Monday, July 22, 2024, the Linden House defendants' Elizabeth Wells wrote that they would be writing "rules relating to your visits and conduct while visiting" in the future, but they have never transmitted any such rules to him since then.

          ii.     Defendant Julie Michelle Conviser wrote plaintiff Claude David Conviser on July 25, 2024: "[Y]our conduct got you banned from LH (if you don't know why ask them, it's their NTO)."

      c.     Indicating her and defendant James P. Cox, III's involvement in the No Trespassing Order from the start, defendant Julie Michelle Conviser informed plaintiff Claude David Conviser the very evening of its issue that she had already collected all of his personal belongings stored at their parents' apartment 404 inside Linden House and was holding them for him to pick up.

      d.     Rubbing salt in the wound, defendant Julie Michelle Conviser threatened in writing to throw plaintiff Claude David Conviser's personal belongings out if he did not pick them up by two days hence, Sunday, July 20, 2024.

311.    The second form of retaliation against plaintiff Claude David Conviser for pointing out on July 18, 2024 a plot to murder respondent Colette Marie Conviser by starving

her to death while making her death as humane as possible by having it occur fraudulently billed to Medicare on hospice care she does not qualify for was that defendant Julie Michelle Convisser finally terminated their parents' financial support, once-and-for-all, by way of a letter she left for respondent Claude David Convisser on the evening of July 19, 2024.

      a.     Drafted upon information and belief by defendants Kathi L. Ayers or James P. Cox, III, signed by defendant Julie Michelle Convisser, and titled "Letter of Acknowledgement of Advancement of Inheritance," this letter offered plaintiff Claude David Convisser the entirety of the $7,395.73 then remaining in the Trust if he would countersign as agreeing to it.

      b.     It said any further transfer of money from the respondent the Martin Convisser Trust to the Claude Convisser Trust, if there were any, would come as an advance on his share of any inheritance from their parents.

      c.     It stated that upon their deaths, their parents' Will gave him half of their estate after payment of all taxes, to go into the Claude Convisser Trust, and upon information and belief, the other half, if any, is to go directly to defendant Julie Michelle Convisser, their only other child.

      d.     It referred also to the power of attorney that defendant Julie Michelle Convisser had been exercising as agent of their parents.

312.    Plaintiff Claude David Convisser replied as any prudent person, and certainly any lawyer, would: he asked before considering signing the Letter of Acknowledgement of Advancement of Inheritance to see respondent Martin and Colette Convisser's Will and the power of attorney on which the Letter and his sister's authorship of it relied.

a.    Plaintiff Claude David Convisser understood that respondents Martin and
Colette Convisser had paid for both of their grandchildren's, defendant Julie Michelle
Convisser's sons Jacob and Lucas's, college educations.  Hence, he wished to verify the 50-50
share in their parents' Will the Letter spoke of between him and his sister.

b.    Since defendant Julie Michelle Convisser had always refused to give him
any information on her exercise of their parents' power of attorney, he reasonably wished to
verify it was as she had represented to him.

313.    Defendant Julie Michelle Convisser responded on July 21, 2024 to his appeal for
information underlying the Letter of Acknowledgement of Advancement of Inheritance as
follows:

> [Y]ou are not in any position to make conditions regarding signing.
> You will not be given access to any documents.  Sign or not; no
> money will be disbursed to your Trust until you do.  Three
> different legal professionals of good standing have concurred.

314.    Upon information and belief, defendant Kathi L. Ayers is one of the lawyers to
whom defendant Julie Michelle Convisser referred in the preceding quote, as is defendant James
P. Cox, III, and she like he also was aware in assisting defendant Julie Michelle Convisser of the
true and unlawful retaliatory reason underlying the letter, *i.e.*, plaintiff Claude David Convisser's
whistle-blowing regarding the threat of nutritional starvation to their mother's life and fraudulent
billing of Medicare for hospice care of respondent Colette Marie Convisser.

315.    The consequences to plaintiff Claude David Convisser of the defendants'
terminating financial support for him and plaintiff POP Diesel from his parents were jolting.

a.    Since as discussed above and below, various business and national
interests came to see plaintiff Claude David Convisser at the Indian ashram or spiritual
community of his guru Amma to discuss plaintiff POP Diesel's Investment Prospectus, he

traveled from India to the USA on June 24, 2024 because the Indian Government advised him his home country was the best place for him to apply for a longer-term visa to re-enter their country, after expiration of his 6-month tourist visa spent mainly at Amma's ashram.

b.     Defendant Julie Michelle Convisser and respondent Martin Convisser favored plaintiff Claude David Convisser's return to India, which he pursued only because he thought it would help plaintiff POP Diesel's business prospects.

c.     From his many conversations with Indian Immigration authorities, plaintiff Claude David Convisser was aware that issuance of a new, longer-term visa could take six months or longer, certainly longer than the few weeks' worth of their parents' financial support that defendant Julie Michelle Convisser allowed him access to, which he had to spend most of out of necessity in the very first week.

d.     After respondent Martin Convisser endorsed plaintiff Claude David Convisser's call for more money to stay in the USA than she was allowing for, defendant Julie Michelle Convisser wrote to her father on June 18, 2019: "The Trustee Ashley and I will get Claude the funds he needs to stay in Charlottesville while he waits for his India visa renewal, and to return to the Ashram once he has it."

e.     However, the foregoing assurance of defendant Julie Michelle Convisser to her father proved to be just another in a long chain of her misrepresentations and obfuscations to him.

f.     Sensing financial trouble, plaintiff Claude David Convisser began camping in the forest, rather than spending money on a hotel room, from near the start of his arrival in Charlottesville in late June 2024.

g.      The Indian Embassy informed plaintiff Claude David Convisser in late July 2024 that his visa awaits final "clearance," and then he will be invited to bring his passport in for stamping of the visa inside.

h.      Upon the events of July 19, 2024 described above, without the roof of his parents' apartment at defendant Linden House any longer under which to store his personal belongings and with the impending termination of funds coming from the plaintiffs' most steadfast supporters since 2019, respondents Martin and Colette Marie Convisser, plaintiff Claude David Convisser became a hard-core homeless person.

g.      He lasted five weeks without contracting poison ivy, but then got the worst case of it in his life, which he still has not shaken because he lacked money or health insurance to go to a doctor.  He also may have incurred a double inguinal hernia, which he first had when he was eleven years old, and the orthopedic surgeon told him then it might recur in his older age.  If that is true, he got it from pushing his loaded bicycle up Loft Mountain in the Shenandoah National Park, where he had been camping every night, after a hurricane's several days of rain washed the soil from the trail, leaving rocks exposed as impediments.

316.     As soon as plaintiff Claude David Convisser had retrieved from defendant Julie Michelle Convisser on July 25, 2024 the personal belongings she had removed from their parents' apartment on the very evening six days earlier that defendants Linden House issued their No Trespassing Order against him, she informed him, "I decline to be in contact with you."

317.     Defendant Julie Michelle Convisser, for no provocation or reasonable cause coming from plaintiff Claude David Convisser, has in general declined to be in contact or communication with him since in November 2023 he pointed out more, deep flaws in defendants

Linden House's care of their parents and made constructive suggestions that she hire them

supplemental care, which she never did.

318.    Plaintiff Claude David Convisser is able to file this complaint without applying

for *in forma pauperis* status because a new line of credit became available to him a few days

before filing, which has permitted him to rent a motel room to complete drafting of the necessary

papers and cover the filing and service fees.


Damages

319.    In all circumstances, defendants' tortious actions proximately caused plaintiffs'

damages.

320.    In all circumstances, due to a motive of the Exxon Mobil defendants, defendants'

actions directed against plaintiff Claude David Convisser were directed at diminishing the value

of his and all of the authorized ownership shares in plaintiff POP Diesel; coercing him into

quitting it to render all of its ownership shares, business activities, and goals a nullity; and

putting plaintiff POP Diesel out of business.

321.    A harm caused by defendants to plaintiff Claude David Convisser was

temporarily in his affinity for his country of birth.

    a.    In February 2023, implementing the business conspiracy's strategy of

complicating plaintiff Claude David Convisser's life at every turn to make him give up on

plaintiff POP Diesel, defendant Julie Michelle Convisser refused to allocate any of their parents'

funds for him to stay at a hotel in northern Virginia, where hotels are generally more expensive

than in Charlottesville, to permit him to attend medical appointments and for other necessary

reasons.  As a result, he stayed at a less expensive motel in Charlottesville and commuted back

and forth to northern Virginia daily.  On the fourth evening after his arrival from Africa, due entirely to jet lag he knew he was suffering from, he fell asleep behind the wheel of his rental car going south on Route 29.  The car slid off the road and into a ravine, hitting a big tree head-on probably still going at least 40 miles per hour.  He is lucky to be alive today and thanks to the airbag, escaped uninjured, although the rental car was a total wreck.  This was the first serious car accident plaintiff Claude David Convisser had ever been involved in.  It was the first time he ever made a claim on his car insurance policy (which the insurer kindly honored).  The cause was due entirely to the facts that he was afraid to pull over and sleep on the side of the road, knew he was falling asleep despite caffeine intake, had zero money to pay for a motel *en route*, and knew his sister would not reimburse same, even if he had had any motel money.

b.      In November 2023, in the tunnel under Boston Harbor, Massachusetts leading to Logan Airport, two trucks, the one in the rear a big FedEx delivery truck, in a coordinated move attempted to block in plaintiff Claude David Convisser's next rental vehicle and tried to drive it off the road.  The car in front left a big gash on the side of his rental car which again his insurer kindly covered at a cost of more than one thousand dollars in repairs.  This and the preceding car wreck incident left plaintiff Claude David Convisser doubting whether he could ever again safely drive a car in the USA, given the defendants' various depredations.

c.      Later in November 2023, plaintiff Claude David Convisser made a business trip to Los Angeles, California for plaintiff POP Diesel and rented another car to get around the sprawling metropolis.  In another attempt to prevent them from making any progress and fearing a break-through on POP Diesel's investment, he believes the Petroleum-Mafia caused by arson a huge fire to consume the busiest portion of one of the busiest freeways in

America, I-10, which shut-down clogged traffic for days.  This was akin to former New Jersey

Governor Chris Christie's closure of a lane on the George Washington Bridge, and to defendant

Exxon Mobil's murder of former Ghanaian President Jerry John Rawlings: a dangerous prank to

bring about an evil political or business objective.

        d.     One month later, in December 2023, plaintiff Claude David Convisser

went to the United Arab Emirates trying to attend the United Nations' annual conference on

global warming, that year called COP 28.  After the U.S. Embassy refused to give him

credentials to enter the official side of COP 28 (although Exxon Mobil representatives swarmed

it), he made an appointment to meet in Abu Dhabi with the Embassy of the Seychelle Islands, a

chain off the coast of Africa in the Indian Ocean who like all island nations, are particularly

vulnerable to the sea level rise accompanying global warming.  He sought their sponsorship to

enter COP 28 as a consultant to their official delegation.  Early in the morning of their appointed

meeting, a giant explosion caused by defendant John Doe Standard Oil Trust Intelligence Service

Number 2 rocked the capital of the Seychelles.  By the time plaintiff Claude David Convisser

arrived at the Embassy later that morning, its staff were fully occupied fielding calls from

anxious expatriates inquiring about the well-being of loved ones back home.  They did not have

time to consider his appeal.

        e.     Having pursued 16 years of lobbying Congress and federal executive

agencies for POP Diesel Fuel and the Company's related interests and gotten nowhere, plaintiff

Claude David Convisser, spurred by the foregoing incidents, was ready to prioritize tropical

countries directly rather than gaining a foothold for plaintiff POP Diesel in the USA.  In June

2024, he applied for religious and political asylum in India, citing the U.S. Government's

seeming acquiescence to the Petroleum-Mafia's persecution.

i.       Amma's ashram at Amritapuri, Kerala, India had shown itself in the preceding five months to be a propitious meeting place between representatives of the petroleum and biodiesel industries, *i.e.*, defendant Standard Oil Trust Intelligence Service Numbers 2 or 3 and Jane Doe Organized Crime Mafia Number 1 or 2, and plaintiffs.

ii.      As usual, the Exxon Mobil and New York Organized Crime Mafia defendants were trying to steal plaintiffs' interest, now in spreading Amma's community uplift programs to new tropical regions, paired now with *jatropha* tree cultivation.

iii.     Plaintiff POP Diesel's Investment Prospectus states that a sweeping project and program like the Company's can only succeed for investors in West Africa if that Region's small, separate countries unite into one, just as many of the great nations of the world had started out fragmented but eventually unified each one into one country: for instance, the USA, Germany, Italy, the United Kingdom, Canda, India, China, Japan, and the European Union.

iv.      Claude David Convisser understood in advance that the chance of the Indian Government granting his application was slim.

v.       He recognized, however, that even if the petition was not granted, his merely applying for asylum would demonstrate his independence from the U.S. Government, and willingness to be neutral and objective in his dealings with foreign countries and peoples. Therefore, he thought, it would be worthwhile to apply, no matter what, especially since the six-month validity of his tourist visa was coming to a close.

vi.      Following a hearing on June 7 and 10, 2024, a two-judge panel of the Indian Supreme Court dismissed his petition.

vii.     Wherefore, for good cause which accrued after plaintiff Claude David Convisser's return to the USA on June 24, 2024, plaintiffs put their faith in the Judicial

Branch of the U.S. Government and the good men and women of the jury, if this suit reaches that stage.

322.    Many angel investors in the USA, while captivated by POP Diesel's Investment Prospectus:

a.    are fearful of retaliation for being identified with the mouse that is plaintiff POP Diesel standing up to one or more elephants like defendant Exxon Mobil;

b.    or they are aware of the defendants' unlawful surveillance of plaintiffs and fearful even of having face-to-face communications with them;

c.    or their family or close friends warn them of the long odds the Exxon Mobil defendants impose on plaintiff POP Diesel against success.

323.    All it takes is for one negative rumor about plaintiffs Claude David Convisser or POP Diesel like those recounted above to ward off smaller investors who may already be skittish about the Company and idea of taking on the petroleum industry.

324.    Defendant Jane Dow New York Organized Crime Mafia Number 2 are potentially middle-to-big sized, risk-taking investors, but only in businesses and industries they monopolize. So far, they have not shed their stealthy and theft-ridden character of conducting business to submit to plaintiff's hegemony and transparency.

325.    While in India at the ashram of his guru Amma, agents of the following national governments stated their approval to plaintiff Claude David Convisser of plaintiff POP Diesel's business plan, subject to agreement of the Exxon Mobil defendants and the New York Organized Crime Mafia defendants:

a.    Japan, the United Kingdom, France, Germany, Italy, Finland, the Netherlands, the Czech Republic, Spain, Italy, Canada, Australia, and possibly Israel and the USA.

b.    They all appear willing and ready to invest in the Company by way of its Stock Subscription Undertaking, provided the Petroleum-Mafia first signals its intent to go along.

c.    In plaintiffs' estimation, no national government will buck the Petroleum-Mafia, though they all wish plaintiffs success in trying.

326.    For the reasons stated foregoing and ensuing in this complaint, plaintiffs' compensatory damages are the full amount of their $100 billion equity raise, which they have been pursuing in one form or another for longer than the past year, going back 15 years in slightly less ambitious but incomplete form, and which defendants have foiled once again in Charlottesville and Albemarle County with more grave consequences for plaintiffs since June 24, 2024.

a.    This scale of equity raise is realistic.

b.    For example, in August 2023, Fahed Araket, the Director of Capital One Bank's Southwest Business Banking, called plaintiff Claude David Convisser unsolicited on the telephone to invite plaintiff POP Diesel to open its bank account there.

i.    Upon information and belief, Capital One Bank is a bank that holds earnings from businesses that the New York Organized Crime Mafia defendants invest in or run.

ii.    Fahed Araket is Jordanian by birth and mentioned that he has family in the petroleum-rich and wealthy countries surrounding the Persian Gulf.

iii.    After a meeting in Arlington, Virginia and dialogue, he offered to hold $500 million of plaintiff POP Diesel's investment raise in Capital One bank accounts and an additional $2 billion in accounts spread between four other banks that he would arrange for.

iv.    It appeared that the New York Organized Crime Mafia defendants were prepared then to invest at least $2.5 billion in plaintiff POP Diesel, which was the entire amount of the raise the Company was seeking at that time, provided it held this money in accounts at banks under their control.

v.    Plaintiffs thanked Fareed Araket for his bank's courtesy and interest, but declined this offer, since they need to control the investment funds to have authority to spend them in the correct way to fulfill the business and goals described in plaintiff Claude David Convisser's Investment Prospectus.

c.    Control of plaintiff POP Diesel's investment raise is critical.

i.    Wells Farge Bank is controlled and partially owned by affiliates of the Exxon Mobil defendants.

ii.    In November 2023, a sales agent at a South Dakota branch of Wells Fargo opened an account for plaintiff POP Diesel, but failed to note in the Bank's records that plaintiff Claude David Convisser was the sole shareholder and thus was the only person who could determine who else might have access to or permission to sign on the account.

iii.    This omission would have permitted others to set up corporations by the same or a similar name in other states, such as Nevada where the New York Organized Crime Mafia defendants have a preponderant interest, and otherwise to claim to have authority to transact on plaintiff POP Diesel's account.

iv.     The foregoing scenario could have happened with or without plaintiffs' knowledge.

v.     It was a realistic possibility at the time, all as part of the defendant's conspiracy to deprive plaintiffs of the ability to conduct their business and satisfy its mission of helping to alleviate global warming meaningfully while assuring investors and farmers of a fair return on their contributions.

vi.     Plaintiffs believe that he or she who controls the money of a business venture has the greatest influence on determining its outcome, subject to the higher will of God.

## LEGAL CLAIMS

## COUNT 1

### Civil Relief for Conspiracy to Injure Plaintiffs
### in Their Reputation, Trade, Business and Profession

### Virginia Code Title 18.2, Sections 18.2-499 - 500

against all defendants

327.     Plaintiffs reiterate paragraphs 1 – 326 and these paragraphs are incorporated as if re-stated herein.

328.     In addition, plaintiffs anticipate paragraphs 343 to 449 and these paragraphs following this Count 1 are incorporated as if re-stated herein this Count 1.

329.     At all times complained of, two or more of the defendants combined, associated, agreed, mutually undertook, or concerted together for the purpose of willfully and maliciously injuring plaintiffs Claude David Convisser and POP Diesel in their reputation, trade, business or profession.  Va. Code § 18.2-499(A)(i).

330.    Every one of the defendants engaged in the act stated in the preceding paragraph for some material period of time during the pendency of the business conspiracy against plaintiffs.

331.    The defendants engaged in the conduct set forth in the preceding paragraph by any means whatever.  Id.

332.    The defendants conduct complained of in this Count 1 was intentional, purposeful, and without lawful justification.

       a.    At least one of the defendant co-conspirators acted with such legal malice.

       b.    The legal malice motivating at least one of the defendant co-conspirators to injure plaintiffs in their trade or business was not necessarily, and need not have been, that defendant's or those defendants' primary and overriding purpose in so acting.

333.    The defendants contrived to accomplish a criminal or unlawful purpose, or to accomplish a purpose that was not in itself criminal or unlawful, by criminal or unlawful means.

334.    At least one of the defendant co-conspirators acted either with an unlawful purpose or by unlawful means.

335.    The defendants' actions complained of caused both plaintiffs to sustain substantial injury in the form of lost equity investment of $100 billion and forfeiting of value of their property interest in POP Diesel ownership shares.

336.    The defendants also attempted in violation of Virginia Code Title 18.2, section 499(B) to procure the participation, cooperation, agreement, or other assistance of any one or more persons to enter into one or more combinations, associations, agreements, mutual understandings, or concerts prohibited by Virginia Code Title 18.2, section 499(A).

337.    The evidence adduced at trial will prove the allegations of this Count 1 and also of Count 2, and the complaint more broadly, clearly and convincingly.

338.    Plaintiffs have drafted this complaint with particularity as to their allegations and the supporting details with regards to all defendants.

339.    Plaintiffs are entitled mandatorily to recover three-fold their damages they have sustained, or once they prove damages of $100 billion, $300 billion.

340.    Plaintiffs are entitled to recover the costs of suit, including a reasonable fee to plaintiffs' counsel.

341.    All defendants are jointly and severally liable for plaintiffs' damages.

342.    Plaintiffs pray that this Court will restrain and enjoin the defendants from continuing the acts complained of by way of such injunctions *pendente lite* and permanent as may become warranted as the case moves forward.

## COUNT 2

### Civil Relief under the Racketeering-Influenced and Corrupt Organizations Act

18 U.S.C. §§ 1961 – 1968

against defendants Exxon Mobil Corporation,
John Doe Standard Oil Trust Intelligence Service Numbers 1 through 3,
Jane Doe New York Organized Crime Mafia Numbers 1 and 2,
Jane Doe Retired Government Security Agent Intelligence Service,
Wende's Where's the Beef Healthy Vegetable Sauce Manufacturing Company,
Wende's Where's the Beef Tropical Jatropha Tree Planting Company, Marcus T. Wiley,
Michael Goff, Keith Ford, Charles L. Pinnell, Hunter S. Wyant, Ray W. Hughes, Elizabeth Ann
Hughes, Emil Kutilak, David Butler, Linden House, LLC, WIAL, LLC, Cambridge Healthcare
Holdings, LLC, Julie Michelle Convisser, and James P. Cox, III

343.    Plaintiffs reiterate paragraphs 1 – 342 and these paragraphs are incorporated as if re-stated herein.

344.     Defendants Exxon Mobil Corporation, John Doe Standard Oil Trust Intelligence Service Numbers 1 through 3, Jane Doe New York Organized Crime Mafia Numbers 1 and 2, Jane Doe Retired Government Security Agent Intelligence Service, Wende's Where's the Beef Healthy Vegetable Sauce Manufacturing Company, Wende's Where's the Beef Tropical Jatropha Tree Planting Company, Marcus T. Wiley, Michael Goff, Keith Ford, Charles L. Pinnell, Hunter S. Wyant, Ray W. Hughes, Elizabeth Ann Hughes, Emil Kutilak, David Butler, Linden House, LLC, WIAL, LLC, Cambridge Healthcare Holdings, LLC, Julie Michelle Convisser, and James P. Cox, III have separately or in one or more combinations:

a.     "received income derived, directly or indirectly, from a pattern of racketeering activity [] in which such person has participated as a principal within the meaning of section 2, title 18, United States Code" and has "use[d] or invest[ed], directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment of operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce;" 18 U.S.C. § 1962(a);

b.     "through a pattern of racketeering activity [] acquired[d] or maintain[ed], directly or indirectly, an[] interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce;" 18 U.S.C. § 1962(b);

c.     been "employed by or associated with an[] enterprise engaged in, or the activities of which affect, interstate or foreign commerce, [] conduct[ed] or participate[d], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity;" 18 U.S.C. § 1962(c); or

d.     "conspire[d] to violate" any of the foregoing provisions of 18 U.S.C. § 1962.  18 U.S.C. § 1962(d).

345.    Acts of "racketeering activity," defined at United States Code Title 18, section 1961(1), which some or all of the defendants identified in this Count 2 are alleged to have committed are stated elsewhere in this complaint.

346.    The acts that the preceding paragraph refers to against plaintiffs amount to "racketeering activity" because they constitute an "act or threat involving murder, [] arson [or] robbery" chargeable under State law and punishable by imprisonment for more than one year, 18 U.S.C. § 1961(1); fraud; a violation of United States Code Title 18, section 1832 governing misappropriation of trade secrets; or a violation of United States Code Title 18, section 1951 concerning interference with commerce by threats or violence.

347.    The defendants identified in this Count 2 engaged in a "pattern of racketeering activity," as that term is defined in United States Code Title 18, section 1961(5), consisting of at least two acts that were related to each other and were either part of a single scheme or related to an external organizing principle, which was in either case to defeat plaintiff POP Diesel's business and make it disappear.

348.    In addition, some of the defendants named under this Count 2 have engaged in racketeering activity or other conduct violating United States Code Title 18, section 1962 against other victims than plaintiffs that were part of the same course of conduct on behalf of their principals described elsewhere in this complaint.

349.    These defendants' pattern of racketeering activity is open-ended in that it has no obvious termination point, or it has continued for a substantial period of time, i.e., more than one year.

350.    Moreover, the threat of continuity of these defendants' predicate acts may be inferred from the character of their illegal enterprise or constitute the regular way they do business as one or more lawful enterprises.

351.    These defendants' enterprises referred to in this Count 2 may be a legal entity or simply a "union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).

352.    The defendants identified in this Count 2 have injured plaintiffs Claude David Convisser and POP Diesel Africa, Inc. in their business or property by one or more violations of United States Code Title 18, section 1962.  18 U.S.C. § 1964(c).

353.    Plaintiffs are entitled to recover threefold the damages they have sustained, the loss of $100 billion in equity investment, and the cost of the suit, including a reasonable attorney's fee.

354.    In addition, plaintiffs respectfully request that this Court make such appropriate orders as authorized by United States Code Title 18, section 1964(a).

## COUNT 3

### Judicial Relief under Virginia Code Title 64.2, Section 1614

### including an Accounting

**Uniform Power of Attorney Act, Virginia Code Title 64.2, sections 1600, *et seq.***

against defendants Julie Michelle Convisser and respondent the Martin Convisser Trust

355.    Petitioner Claude David Convisser reiterates paragraphs 1 – 354 and these paragraphs are incorporated as if re-stated herein.

356.    Martin Convisser, a respondent to petitioner Claude David Convisser's petition for guardianship and conservatorship below, as principal duly appointed defendant Julie Michelle

Convisser as his agent to exercise his power of attorney in accordance with the Virginia Uniform Power of Attorney Act, Virginia Code Title 64.2, sections 1600, *et seq.* ("the power of attorney").

357.    Upon information and belief, defendant Julie Michelle Convisser began exercising the power of attorney as agent of principals, respondents Martin Convisser and Colette Marie Convisser in or around August 2021, as a result of the Bicksel letter.

358.    Petitioner Claude David Convisser, as a descendant of principals, respondents Martin Convisser and Colette Marie Convisser, petitions this Court pursuant to Virginia Code Title 64.2, section 1614 to construe the power of attorney and review the conduct of their agent defendant Julie Michelle Convisser and grant appropriate relief requested below.

359.    Defendant Julie Michelle Convisser has concealed the power of attorney from petitioner Claude David Convisser.  Therefore, he does not know its precise contents.

360.    Upon information and belief, Colette Marie Convisser, who is also a respondent to petitioner's claim for guardianship and conservatorship below, did not execute the same power of attorney as principal and respondent Martin Convisser did, or any power of attorney, naming defendant Julie Michelle Convisser as her agent.

361.    In the alternative that respondent Colette Marie Convisser did execute as a principal the same power of attorney as her husband respondent Martin Convisser did naming defendant Julie Convisser as her agent, then respondent Colette Marie Convisser's execution of such power of attorney was likely ineffective.

a.    Execution by respondent Colette Marie Convisser of the power of attorney was ineffective Virginia Code Title 64.2, section 1607 as likely done since the time respondent Colette Marie Convisser became totally incapacitated due to Alzheimer's Disease beginning in or

around 2012, within the meaning of subdivision 1 of the definition of incapacity in Virginia Code Title 64.2, section 1600.

b.     Execution by respondent Colette Marie Convisser of the power of attorney was ineffective because any writing or record made on or after the date of her executing the power of attorney by her attending physician, a second physician, a licensed clinical psychologist, or an attorney at law pursuant to Virginia Code Title 64.2, section 1607 attesting to her total incapacity would in fact and truth have had to have dated such incapacity to before the date she executed the power of attorney.

c.     If any writing or record made at or after the date of respondent Colette Marie Convisser's executing the power of attorney by her attending physician, a second physician, a licensed clinical psychologist, or an attorney at law pursuant to Virginia Code Title 64.2, section 1607 attesting to her total incapacity did not state that such incapacity began before the date she executed the power of attorney, such omission constituted fraudulent concealment of such material fact, thus vitiating her execution of it.

362.    Therefore, upon information and belief, defendant Julie Michelle Convisser has been exercising agency in the name of respondent Colette Marie Convisser without legal authority, as subject to a power of attorney in respondent Colette Marie Convisser's name that was never properly executed by her as a principal with legal capacity to so execute.

363.    If the power of attorney became effective upon the incapacity of principal Martin Convisser and defendant Julie Michelle Convisser was authorized to determine whether he was incapacitated, for reasons stated above, her determination made as a result of the Bicksel letter of August 18, 2021 was false and fraudulent.  Virginia Code Title 64.2-1607(C).

364.    If the power of attorney became effective upon the incapacity of principal Martin Convisser and he had not authorized any person to determine whether he was incapacitated, the power of attorney naming defendant Julie Michelle Convisser as agent did not properly become effective following the Bicksel letter because a second physician or licensed clinical psychologist after personal examination of respondent Martin Convisser never determined in writing before she began exercising agency that he was incapacitated within the meaning of subdivision 1 of the definition of incapacity in Virginia Code Title 64.2, section 1600.  Virginia Code Title 64.2-1607(C)(i).

365.    If the power of attorney became effective upon the incapacity of principal Martin Convisser and he had not authorized any person to determine whether he was incapacitated, the power of attorney naming defendant Julie Michelle Convisser as agent did not properly become effective by virtue of a determination in writing or other record by an attorney-at-law, if for reasons stated above the attorney-at-law was either or all of defendants Kathi L. Ayers, Jennifer C. McManus, and James P. Cox, III or any other lawyer from any law firm any of them work at. Virginia Code Title 64.2-1607(C)(ii).

366.    Defendant Julie Michelle Convisser has breached her duties as agent under the power of attorney, as follows:

    a.    She has not acted in accordance with the principal's reasonable expectations to the extent actually known by the agent.  Va. Code § 64.2-1612(A)(1).

    b.    She has not acted otherwise, in the principal's best interest.  Va. Code § 64.2-1612(A)(1).

    b.    She has not acted in good faith.  Va. Code § 64.2-1612(A)(2).

c.    Upon information and belief, she acted based on the false premise of the Bicksel letter beyond the scope of authority granted in the power of attorney, given respondent Martin Convisser's fully competent mental state that remained and persisted until at least October 2022.  Va. Code § 64.2-1612(A)(3).

d.    She has acted disloyally and not for the benefit of the principals, respondents Colette Marie Convisser and Martin Convisser.  Virginia Code § 64.2-1612(B)(1).

e.    She allowed creation of multiple conflicts of interest that impaired her ability to act impartially in the interest of principals Martin Convisser and Colette Convisser. Virginia Code § 64.2-1612(B)(2).

f.    She has not acted with the care, competence, and diligence ordinarily exercised by agents in similar circumstances.  Virginia Code § 64.2-1612(B)(2).

g.    While maintaining that both principals respondents Martin Convisser and Colette Marie Convisser have been suffering incapacity since August 18, 2021, as the term incapacity is defined in subdivision 1 of Virginia Code Title 64.2, section 1600, an allegation petitioner Claude David Convisser disputes with respect to respondent Martin Convisser, she has absolutely refused to provide to petitioner Claude David Convisser any details regarding her actions as the agent of either and both of these principals and the extent to which she has chosen to act, neither within 30 days of any request made nor ever.  Virginia Code § 64.2-1612(I).

367.    As detailed in Count 4 below, which plaintiff Claude David Convisser incorporates by reference into this Count 3, and stated above in this complaint, defendant Julie Michelle Convisser has forfeited the exoneration for acting in good faith from liability to any beneficiary of her parents' estate plan, such as petitioner Claude David Convisser, for failure to preserve the plan, stated in Virginia Code Title 64.2, section 1612(C).

368.    Defendant Julie Michelle Convisser has demonstrated that she has benefitted from her actions as agent while having an individual and conflicting interest in relation to the property or affairs of the principals, respondents Martin Convisser and Colette Marie Convisser, which assets embodied, for instance, in the Martin Convisser Trust her failure to act with care, competence and diligence for the best interest of both principals has exposed to liability. Virginia Code § 64.2-1612(I).

369.    Defendant Julie Michelle Convisser is liable for any decline in the value of the property of principals, respondents Martin Convisser and Colette Marie Convisser due to breaches of her duties to them.  Virginia Code § 64.2-1612(F).

370.    Defendant Julie Michelle Convisser has forfeited any provision of the power of attorney exonerating her of liability for breach of duty to the extent she behaved dishonestly, with an improper motive, and with reckless indifference to the purposes of the power of attorney and the best interests of the principals, respondents Colette Marie Convisser and Martin Convisser.  Virginia Code § 64.2-1613(1).

371.    Defendant Julie Michelle Convisser has failed to perform the acts necessary to maintain the customary standard of living of principals, respondents Martin Convisser and Colette Marie Convisser, their spouses each other, and petitioner Claude David Convisser whom they have customarily supported or indicated the intent to support.  Virginia Code § 64.2-1634(A)(1).

372.    Any compensation defendant Julie Michelle Convisser received for exercising agency under the power of attorney was not reasonable, under the circumstances.  Virginia Code Title 64.2-1610.

373.    In addition to the foregoing, defendant Julie Michelle Convisser breached a common law fiduciary duty owed to plaintiff Claude David Convisser as beneficiary of the Convisser Family and Claude Convisser Trust by defying the ordinary standard of care and withholding basic information from him about their parents' estate, power of attorney she is exercising for them, and their medical care and well-being, and fiduciary duties to them.

374.    For the foregoing breaches of defendant Julie Michelle Convisser's duty, petitioner Claude David Convisser prays for the following relief:

a.    Defendant Julie Michelle Convisser be compelled to respond to his discovery requests propounded pursuant to Virginia Code Title 64.2, section 1614(B).

b.    The person plaintiff and petitioner Claude David Convisser has nominated to become conservator of the estate and financial affairs of principals respondents Martin Convisser and Colette Marie Convisser, Lee Cress, CPA, be authorized and requested to conduct and produce an accounting of all of the assets belonging to the Martin Convisser Trust, the respondents' income and expenditures, and the financial dealings and affairs that defendant Julie Michelle Convisser conducted as Trustee of the Martin Convisser Trust and otherwise on behalf of respondents during her exercise of agency under their power of attorney from the date of her first such exercise until whichever date is earlier between the date of completion of the accounting or the suspension or termination of her authority to function as agent.

i.    Defendant Julie Michelle Convisser provide Lee Cress, CPA access to and copies of all of the financial and asset records she has and has access to pertaining to the estate and affairs of respondents Martin and Colette Convisser since she first exercised agency under their power of attorney.

153

           ii.      Lee Cress, CPA, be authorized to share such pertinent details with plaintiff and petitioner Claude David Convisser as they see fit.

         c.      The Court immediately suspend and terminate the authority of defendant Julie Michelle Convisser to function as agent under the power of attorney.

         d.      Defendant Julie Michelle Convisser reimburse the estate of principals Martin Convisser and Colette Marie Convisser any damages she is responsible for.

         e.      Defendant Julie Michelle Convisser pay the costs and reasonable attorney's fee of petitioner Claude David Convisser.

         f.      Further emergency, temporary, preliminary and final equitable and injunctive relief stated below and as stated and warranted elsewhere in this complaint.

## COUNT 4

### Breach of Contract, the Convisser Family Trust, and for Imposition of a Constructive Trust

against defendant Julie Michelle Convisser and respondent the Martin Convisser Trust

375.    Petitioner Claude David Convisser reiterates paragraphs $1-374$ and these paragraphs are incorporated as if re-stated herein.

376.    In her Letter of Acknowledgement of Advancement on Inheritance dated July 19, 2024, defendant Julie Michelle Convisser referred to herself as "Power of Attorney" of grantor and respondent Martin Convisser and respondent Colette Marie Convisser, Executor of their Wills upon both their deaths, and Trustee of the Martin Convisser Trust.  By "Power of Attorney," it is assumed that defendant Julie Michelle Convisser meant that she is serving as their agent under their power of attorney.

377.    Defendant Julie Michelle Convisser's Letter of Acknowledgement of Advancement on Inheritance states that upon their parents' deaths and pursuant to their Last Will

and Testament, plaintiff Claude David Convisser is "to receive half of the remainder of their Estate as an inheritance, to be provided [] exclusively through the Claude Convisser Trust (currently managed by Family Heritage Trust, Trustee)."

378.    Upon information and belief, defendant Julie Michelle Convisser is to receive directly the other half of the remainder of their parents' Estate.

379.    In paragraph (A) of Article III of the Convisser Family Trust Agreement, grantor and respondent Martin Convisser expressly appointed defendant Julie Michelle Convisser as "Trust Protector" of the Convisser Family Trust and by express implication, the Claude Convisser Trust created by its Article IX.

380.    Paragraph (A) of Article III of the Convisser Family Trust Agreement states in part: "No trust created under this instrument is required to have a Trust Protector acting with respect to that trust."

381.    Paragraph (D) of Article III of the Convisser Family Trust Agreement states that, "Any Trust Protector may resign by giving prior written notice to my Trustee."

382.    Defendant Julie Michelle Convisser accepted appointment as Trust Protector.

383.    Defendant Julie Michelle Convisser has never resigned and thus, continues to serve to this day as Trust Protector.

384.    Paragraph (E) of Article III of the Convisser Family Trust Agreement states:

> Notwithstanding any other provision of this instrument, my Trust Protector shall not participate in the exercise of a power or discretion conferred under this instrument for the direct or indirect benefit of my Trust Protector, my Trust Protector's estate, or the creditors of either, or that would cause my Trust Protector to possess a general power of appointment within the meaning of Section 2041 and Section 2514 of the Internal Revenue Code.

385.    Defendant Julie Michelle Convisser breached the foregoing provision by creating for herself a conflict of interest in the exercise of her discretion under Article IV of the Convisser Family Trust Agreement, whether or not to transfer funds from respondent the Martin Convisser Trust to the Claude Convisser Trust by way of the Convisser Family Trust.

386.    Article IV of the Convisser Family Trust Agreement states:

> I have transferred or will transfer to my Trustee certain assets, referred to herein as the "Trust Fund." All assets received by my Trustee shall be held in trust and managed and distributed in accordance with this Agreement [the "I" herein meaning grantor respondent Martin Convisser].

387.    It was grantor respondent Martin Convisser's intent, as defendant Julie Michelle Convisser stated in the Letter of Acknowledgement of Advancement on Inheritance, which intent has carried into practice, that the source of the assets going into the Convisser Family Trust and becoming the "Trust Fund" pursuant to Article IV quoted was the Martin Convisser Trust.

388.    As agent of grantor and respondent Martin Convisser's power of attorney, defendant Julie Michelle Convisser has the responsibility and discretion for performing and fulfilling, or not performing and fulfilling, the transfer of assets into the Convisser Family Trust Fund pursuant to Article IV of the Convisser Family Trust Agreement.

389.    Article VIII of the Convisser Family Trust Agreement states:

> Upon my incompetency or upon my death, whichever comes first, my Trustee shall retain the Trust Fund, as it is then constituted (including any assets received by the Trustee upon or by reason of my death), in trust, to be held, administered and disposed of for the benefit of my son, CLAUDE D. CONVISSER, in accordance with the Article hereof captioned, "CLAUDE CONVISSER TRUST," if CLAUDE D. CONVISSER is then living.

390.    Plaintiff Claude David Convisser is the sole beneficiary of the Claude Convisser Trust created by Article IX of the Convisser Family Trust Agreement.

391.    Following the Bicksel letter issued on August 18, 2021 declaring grantor and respondent Martin Convisser to be completely incapacitated, which conclusion plaintiff Claude David Convisser maintains was substantially premature in time, defendant Julie Michelle Convisser in fact multiple times transferred assets of principals, respondents Martin and Colette Convisser from the Martin Convisser Trust into the Convisser Family and Claude Convisser Trust.

392.    Plaintiff Claude David Convisser submits in Count 5 below, his petition for guardianship of and conservatorship for respondents Colette Marie Convisser and Martin Convisser, that respondent Martin Convisser now lacks capacity to administer his estate and financial affairs or to make medical and residential decisions for himself and his wife respondent Colette Marie Convisser, although he retains capacity to give input on financial priorities once their medical and residential needs are taken care of.

393.    Pursuant to Article VIII of the Convisser Family Trust Agreement and the definition of "incompetency" stated in paragraph (O) of its Article XIX, upon the incapacity of grantor and respondent Martin Convisser to administer his financial affairs, plaintiff Claude David Convisser is now the sole beneficiary of any transfers of funds defendant Julie Michelle Convisser, agent of principals, respondents Martin and Colette Convisser's power of attorney, chooses in her discretion under Articles III(E) and IV of the Convisser Family Trust to make to its Trust Fund and the Claude Convisser Trust.

394.    Defendant Julie Michelle Convisser wrote in the Letter of Acknowledgement of Advancement on Inheritance on July 19, 2024: "[I]t is apparent to Family Heritage Trust and to me that the need of additional funds for your daily basic living expenses is immediate, and anticipated to continue for some time into the future."

395.    However, despite defendant Julie Michelle Convisser's foregoing admission of plaintiff Claude David Convisser's need, by her refusal to replenish the Trust Fund for his benefit as stated in the Letter of Acknowledgement of Advancement of Inheritance based on objectively unreasonable and subjectively untenable conditions described and quoted above, "Sign or not; no money will be disbursed to your Trust until you do," she is "participating in the exercise of [] discretion" authorized by Article IV in refraining to replenish the Trust Fund in violation of the prohibition stated in paragraph (E) of Article III of the Convisser Family Trust stated above, since she the Trust Protector becomes the beneficiary of her exercise of discretion not to replenish the Trust Fund by thus reserving a greater share of their parents' estate for inheritance, of which she will get, if any, half.

396.    Plaintiff Claude David Convisser, as the Convisser Family Trust's sole beneficiary at this point, has standing to sue to enforce paragraph (E) of its Article III, which enforcement is the purpose and effect of this Count 4.

397.    To remedy defendant Julie Michelle Convisser's breach of paragraph (E) of Article III of the Convisser Family Trust Agreement by her self-made conflict of interest, plaintiff Claude David Convisser pleads for this Court to impose a constructive trust in his favor on such amount(s) or share of funds held in respondent the Martin Convisser Trust that this Court determines is fair and equitable, and order such amount(s) or share to be reserved and distributed to him as any inheritance he may receive pursuant to Virginia law, the Last Will and Testament of respondents Martin and Colette Marie Convisser, and the terms of the Convisser Family Trust Agreement, upon their deaths.

## COUNT 5

### Petition for Guardianship of and Conservatorship for
### Colette Marie Convisser and Martin Convisser

**Virginia Code Title 64.2, section 2000, *et seq.***

additional respondent the Martin Convisser Trust,
by its Trustee Julie Michelle Convisser

398.    Petitioner Claude David Convisser reiterates paragraphs 1 − 397 and these

paragraphs are incorporated as if re-stated herein.

399.    Petitioner Claude David Convisser petitions the Court to appoint himself as legal

guardian for respondents his parents Colette Marie Convisser and Martin Convisser, and to have

Lee Cress, CPA, appointed as conservator of their estate presently held in respondent the Martin

Convisser Trust and their financial affairs.  The following paragraphs recite the contents of a

petition as dictated by Virginia Code Title 64.2, section 2002 (2023 & 2024 Supp.).

Petitioner

400.    Because of circumstances described in the complaint above, petitioner Claude

David Convisser is temporarily while visiting Charlottesville on the day of this filing residing at

the Royal Inn Motel, 410 Premier Circle, Charlottesville, Virginia.  He has P.O. Box 7206,

Charlottesville, Virginia 22906.  He is a citizen of South Dakota with address there of 5103

South Louise Avenue, # 262, Sioux Falls, South Dakota 57108.  His address in Ghana is Picorna

Hotel, Aboabo, Tamale, Northern Region, Ghana.  He is the eldest child of two and the only son

of respondents Colette Marie Convisser and Martin Convisser.

Respondents

401.    Respondent Collette Marie Convisser née Dion, born REDACTED, 1930, resides

at Linden House Assisted Living, 1250 Branchlands Drive, Apartment 404, Charlottesville,

159

Virginia 22901 in Albemarle County.  Her postal address is the same.  Petitioner does not know

her social security number and defendant Julie Michelle Conviser, agent of any power of

attorney and advanced directive she may have executed, is withholding all such information from

petitioner.

402.    Respondent Martin Convisser, born REDACTED, 1932, resides with his wife

respondent Colette Marie Convisser at Linden House Assisted Living, 1250 Branchlands Drive,

Apartment 404, Charlottesville, Virginia 22901 in Albemarle County.  His postal address is the

same.  Petitioner does not know his social security number and defendant Julie Michelle

Conviser, agent of any power of attorney and advanced directive respondent Martin Convisser

may have executed, is withholding all such information from petitioner.

<u>Jurisdiction</u>

403.    Virginia Code Title 64.2, section 64.2-2107(1) confers on Virginia courts

jurisdiction to appoint a guardian and issue a conservatorship order for both respondents Colette

Marie Convisser and Martin Convisser.

404.    This Court's original jurisdiction is stated above.

405.    In addition, this Court has supplemental or pendent jurisdiction over this petition

by virtue of Title 28, United States Code section 1367(a) in that this petition is so related to the

legal claims above against all of the defendants, in particular against defendants Julie Michelle

Conviser and the Linden House defendants, that it forms part of the same case or controversy

under Article III of the United States Constitution.

<u>Respondents' Family Members</u>

406.    The only other child besides petitioner Claude David Conviser of the married

couple who are respondents Colette Marie Convisser and Martin Convisser is their daughter

defendant Julie Michelle Convisser, whose postal address is 305 Huntley Avenue,

Charlottesville, Virginia 22903.  She can also be reached at her work office, which is 710 East

High Street, # 201, Charlottesville, Virginia 22902.

Present Care Facility

407.    Respondents Colette Marie Convisser and Martin Convisser reside at the Linden

House Assisted Living facility which has assumed responsibility for their care and custody,

located at 1250 Branchlands Drive, Charlottesville, Virginia 22901, whose postal address is the

same.

Power of Attorney and Advanced Directive

408.    Defendant Julie Michelle Convisser is designated by respondent Martin

Convisser's durable power of attorney and advance directive as his agent, residing at the

following postal address: 305 Huntley Avenue, Charlottesville, Virginia 22903.  However:

409.    Petitioner Claude David Convisser states a claim above for judicial relief from

defendant Julie Michelle Convisser's power of attorney agency, seeking to terminate it for good

cause, pursuant to Virginia Code Title 64.2, section 1614.

410.    Petitioner Claude David Convisser does not know if respondent Colette Marie

Convisser has executed a durable power of attorney or advance directive.

411.    Respondent Martin Convisser has in any event been exercising such role for her

pursuant to Virginia Code Title 54.1, section 2986, and in his stead, defendant Julie Michelle

Convisser.

412.    Virginia Code Title 54.1, section 2990(C) states: "Nothing in [the Health Care

Decisions Act governing advanced directives, Virginia Code Title 54.1, sections 2981, *et seq.*]

shall be construed to condone, authorize, or approve mercy killing or euthanasia or to permit any

161

affirmative or deliberate act or omission to end life other than to permit the natural process of dying."

413.    In addition to petitioner Claude David Convisser's pleading above to terminate the power of attorney agency of defendant Julie Michelle Convisser, he also requests below in Count 6 below that this Court terminate any agency granted her in any advance directive executed by either and both of the respondents.

414.    Absent discovery of defendant Julie Michelle Convisser, petitioner Claude David Convisser does not have a copy of any power of attorney or advanced directive executed by either one of the respondents that she claims makes her their agent. Defendant Julie Michelle Convisser has concealed all of these kinds of documents from him.

415.    There has not so far been appointed any guardian, conservator or committee for either of the respondents, to date.

<u>Respondents' Primary Health Care Provider</u>

416.     Upon information and belief, Dr. Sarah Adams, Nurse Practitioner, is respondent Martin Convisser's primary care physician. Her location and post office address appear from the Internet to be 1560 Insurance Lane, Suite 200, Charlottesville, VA 22911. Linden House Assisted Living facility is his primary health care provider. However, plaintiffs' cause of action above for business conspiracy, including fraudulent Medicare claims for hospice care for respondent Colette Marie Convisser in which the owners and operators of Linden House are among the defendants, raises a question about the motives of any medical staff affiliated with defendant Linden House, including Dr. Sarah Adams, if in fact, she is affiliated with it, which petitioner does not know absent discovery.

417.    Respondent Colette Marie Convisser is enrolled with a hospice care provider who, according to defendant Linden House's Executive Director Elizabeth Wells, is supposed also to be her primary care provider.  Defendant Julie Michelle Convisser has concealed from petitioner Claude David Convisser the identity of this hospice care provider, despite his request for such identity.  Plaintiffs' cause of action above for business conspiracy, including fraudulent Medicare claims for hospice care for respondent Colette Marie Convisser when she is not suffering from any terminal illness which fraudulent claims this hospice care provider would be making, raises a question about the motives of any medical staff affiliated with this hospice care provider.

<u>Type of Guardianship and Conservatorship Requested</u>

418.    Respondent Colette Marie Convisser requires a complete legal guardianship, as the Alzheimer's Disease she has endured since diagnosis around twelve years ago has left her fully incapacitated as that term is defined at Virginia Code Title 64.2, section 2000, although she has not yet reached the terminal Stage 7 of that disease.

419.    Upon information and belief, respondent Colette Marie Convisser previously transferred all of her separate property to the Martin Convisser Trust, or else directly to her husband respondent Martin Convisser and he put it into the Martin Convisser Trust. Nonetheless, as a safe measure, any conservator appointed for him should also be appointed for her.

410.    Respondent Martin Convisser at this time has moderate cognitive loss that is gradually becoming more pronounced.  He can no longer make decisions alone about his or his wife respondent Colette Marie Convisser's medical and health care needs, or their finances.  He receives information well, but does not always remember it, even if he writes it down.  He responds to people, events and environments, but has lost the ability to evaluate some things

quickly.  As a result, his judgment is in question, although once his and respondent Colette Marie Convisser's primary medical and residential needs are properly taken care of, he retains the judgment to set priorities for his financial assets.  Defendant Julie Michelle Convisser has bullied him and succeeded in cowing him to her will on matters that otherwise, were his abilities sound, he might differ on her with.

411.    Respondent Martin Convisser is generally able to take care of his activities of daily living, but not his apartment-mate his wife respondent Colette Marie Convisser's without the aid of outside care-givers.  He suffers intermittent bowel incontinence that requires someone to monitor the clothes he wears every day, as well as promptly remove soiled ones from his and respondent Colette Marie Convisser's apartment for cleaning.  Since the congestive heart failure is causing his midriff to retain fluid and therefore expand, he requires someone to purchase trousers that fit his expanding waist, or else he will continue to wear every day the one pair he presently has that fit, until eventually it becomes soiled.

412.    Respondent Martin Convisser requires a full conservator over his estate and financial affairs.  Respondent Martin Convisser is now suffering from diminished cognition and is no longer "[]capable of making an informed decision," as that phrase is defined at Virginia Code section 54.1-2982.  The conservator's plan should follow priorities the respondent Martin Convisser has input on in consultation with the legal guardian and conservator.

413.    In no event will the conservator be permitted to distribute any money to petitioner Claude David Convisser without the Court's approval.

414.    Respondent Martin Convisser requires a full guardianship in which the guardian will:

a.    make medical, health care, and residential decisions for him, though in

164

consultation with him, if possible, and in deference to his preferences for medical care or lack

thereof stated in his advanced directive;

       b.     make medical, health care, and residential decisions for respondent Colette

Marie Convisser, and;

       c.     as necessary, exercise all of the functions and powers stated in the power

of attorney defendant Julie Michelle Convisser has been exercising agency of.

       415.    Until this Court makes a ruling concerning a final injunction and final equitable

relief on petitioner Claude David Convisser's claim in Count 3 above for judicial relief under

Virginia Code Title 64.2, section 1614 against defendant Julie Michelle Convisser's agency of

respondent Martin Convisser's power of attorney, in Count 4 against her for breach of the

Convisser Family Trust Agreement, and in Count 6 below for an injunction and Court-ordered

health care under various Virginia legal authority, in case of any conflict between on the one

hand, petitioner Claude David Convisser in his capacity as temporary, interim or permanent legal

guardian or the conservator, versus on the other hand, defendant Julie Michelle Convisser in her

capacity already appointed as assignee of respondent Martin Convisser's and if any, respondent

Colette Marie Convisser's power of attorney, as agent of their Advanced Directives, and in her

capacity as Trustee of the Martin Convisser Trust, plaintiff and petitioner Claude David

Convisser prays that this Court will order that the legal guardian and conservator shall take

precedence and priority and it shall grant them such authority.

<u>Services Currently Being Provided for the Respondents' Health, Care, Safety and Rehabilitation</u>

       416.    Defendant Julie Michelle Convisser has concealed from petitioner Claude David

Convisser all information about the services currently being provided for respondents Colette

Marie Convisser and Martin Convisser's health care, safety and rehabilitation, with the following

exceptions. The Executive Director of defendant Linden House, Elizabeth Wells, R.N., informed petitioner Claude David Convisser that respondent Colette Marie Convisser is enrolled in hospice care with a provider whom no one has identified to him, despite his queries. In addition, Nurse Wells informed him that respondent Martin Convisser continues to have his primary health care with defendant Linden House's medical staff.

417.    Petitioner Claude David Convisser has been very dissatisfied with the persistently uncaring, neglectful and abusive level of care respondents Colette Marie Convisser and Martin Convisser have received at defendant Linden House during the entirety of their stay there, and has written countless letters, emails and petitions complaining about same.

418.    Petitioner Claude David Convisser has pointed out above immediate and critical peril to the safety and health of respondent Colette Marie Convisser, for which defendants Julie Michelle Convisser and Linden House, LLC are immediately and particularly to blame.

419.    Petitioner Claude David Convisser has pointed out the hypocrisy and unlawfulness of placing respondent Martin Convisser in assisted living, while maintaining that he is fully incapacitated as defendant Julie Michelle Convisser does. Pursuant to her reliance on the suspect certification letter of Dr. James L. Bicksel stating in August 2021 that respondent Martin Convisser then suffered from a serious cognitive impairment and pursuant to Virginia Department of Social Services Standards for Licensed Assisted Living Facilities 22VAC40-73-530, respondent Martin Convisser would be required to be placed in a lock-down unit for his own safety.

420.    However, petitioner Claude David Convisser recognized, with sound evidence, that respondent Martin Convisser's mental acuity has not declined at the pace and to the degree which defendant Julie Michelle Convisser claimed for her and the business conspiracy's ulterior

motives. Therefore, as legal guardian, petitioner Claude David Convisser would aim to keep respondent Martin Convisser in assisted living, though in a different facility than defendant Linden House, rather than have to live in a lockdown unit.

421.    In addition, as they are inseparable, with appropriate support and supplemental care, which defendants Linden House and Julie Michelle Convisser are not presently in actuality providing, respondent Colette Marie Convisser is capable of residing with respondent Martin Convisser in assisted living in another facility apart from defendant Linden House, as she does not pose an active danger to herself or others and has not demonstrated any proclivity for wandering away, and is wheelchair-bound, in any event.

422.    As far as petitioner Claude David Convisser knows, there are no efforts currently underway to rehabilitate either respondent Colette Marie Convisser from her wheelchair and unsuccessful hip-replacement surgery or respondent Martin Convisser from his congestive heart failure.

Recommendation as to Living Arrangements and a Treatment Plan

423.    Petitioner Claude David Convisser recommends that all efforts be made to permit respondents Colette Marie Convisser and Martin Convisser to continue living together in the same apartment, as they are inseparable, but to move them to a different assisted living facility than defendant Linden House.

424.    To preserve respondent Colette Marie Convisser's life, presently threatened by starvation tactics described above, both respondents must together move to a different assisted living facility than defendant Linden House.

425.    In addition, both respondents need a higher level of daily attention and care than they have been receiving at defendant Linden House. Although either defendant Linden House

has respondent Colette Marie Convisser on one of its highest levels of care and charges her for it,
or else a hospice care provider arranged by defendant Julie Michelle Convisser is supposed to
provide respondent Colette Marie Convisser supplemental care which it is in actuality not doing,
defendants Linden House and Julie Michelle Convisser are not in fact giving her that higher level
of care.  Therefore, petitioner Claude David Convisser proposes hiring a supplemental caregiver
who will be with them at least 4 hours per day or night most days of the week.  This person can
not only help respondent Colette Marie Convisser with her various daily activity and nightly
bathroom needs, she can monitor every day that both respondents are properly dressed in clean
clothing; that the facility where they will move to has administered their daily medications both
as to dose and frequency; that they are not missing anything, such as trousers that fit respondent
Martin Convisser's waist which is expanding due to congestive heart failure or fresh library
books for him to read; that the bathroom and rest of the apartment are not soiled or flooded but
are clean and sanitary; that staff at the residential community are otherwise fulfilling their duties
to respondents; and that respondents' mood remains cheerful and optimistic.

426.   As neither respondent is in terminal mode, nor as far as petitioner Claude David
Convisser is aware, suffering from any immediately debilitating ailment (other than respondent
Colette Marie Convisser who is being purposely malnourished), there may be no particular need
to change their treatment or adopt new treatment for them at this time, other than for a new
assisted living facility to include in respondent Colette Marie Convisser's daily Care Plan her
consumption of three cartons per day of high-vitamin, high-protein Ensure®.

427.   However, since defendants Julie Michelle Convisser and Linden House acting on
her instruction have refused petitioner Claude David Convisser all access to respondents Martin
and Colette Marie Convisser's medical information, he cannot make certain assurances about

their present state and care until he has access to their medical records and the ability to consult medical and health-care providers which he currently has been denied.

Identities of Proposed Guardian and Conservator

428.    The proposed legal guardian of both respondents is their son petitioner Claude David Convisser, whose postal address is P.O. Box 7206, Charlottesville, Virginia 22906.

429.    The proposed conservator of the estate of both respondents is Lee Cress, CPA, whose postal address is Cress CPA Inc., Certified Public Accountants; 1006 East Jefferson Street, Charlottesville, Virginia 22902-5368.

430.    Lee Cress, CPA, formerly served as an executor of his clients' estates and is well-regarded in the Charlottesville community.

Respondents' Native Language

431.    Respondent Martin Convisser's native language is English.

432.    Respondent Colette Marie Convisser's native language is French, and she speaks and writes English fluently.

Respondents' Financial Resources

433.    Since defendant Julie Michelle Convisser, the agent of respondents' power of attorney, has concealed from her brother petitioner Claude David Convisser, and indeed, from respondents themselves, all information about their assets, property, income, other receipts, and debts, petitioner Claude David Convisser is unable without discovery to provide this information to the Court.

434.    However, petitioner Claude David Convisser understands from defendant James P. Cox, III's letter to him and Julie Michelle Convisser's Letter of Acknowledgement and

169

Advancement of Inheritance that respondents' assets and estate are held by respondent the Martin Convisser Trust.

435.    Petitioner Claude David Convisser requests that upon appointment, the conservator conduct an accounting of respondents' assets and finances dating to the present from defendant Julie Michelle Convisser's first exercise of the power of attorney agency and Trusteeship of the Martin Convisser Trust that respondent Martin Convisser appointed her to, which exercise, upon information and belief, began in or around August 2021.

436.    Petitioner Claude David Convisser is confident that respondents' estate contains sufficient resources, at least $75,000, to pay the fees of a conservator.

437.    Lee Cress, CPA, whom petitioner proposes serve as conservator, charges $280 per hour, which may be, upon information and belief, less than the hourly rate defendant James P. Cox, III has been charging to the Martin Convisser Trust.

438.    If appointed respondents' legal guardian, plaintiff Claude David Convisser will contribute his time as a lawyer *gratis* to managing their affairs, or if any subject arises which lies beyond his comfort zone as a lawyer, he will associate other counsel to assist.

<u>Respondents' Attendance at the Hearing</u>

439.    Petitioner Claude David Convisser offers the following mixed thoughts about the attendance of the respondents at any hearing on this petition.  He believes it would be helpful to respondent Martin Convisser's cognition if he could be permitted to attend any hearing on an emergency temporary restraining order, preliminary injunction, and final hearing, but respondent Martin Convisser will attend willingly only if he is allowed to be accompanied by respondent Colette Marie Convisser, because he will not want to leave her in anyone else's care or custody

at defendants Linden House for the duration of any Court hearing.  On the other hand, if the respondents are returned to the responsibility of defendant Julie Michelle Convisser after any hearing, she may misconstrue to them the substance of what happened and why, as she has been bullying and misleading them about various matters for several years.

Request for Appointment of Guardians <em>ad litem</em>

440.    Petitioner Claude David Convisser respectfully requests that this Court appoint guardians *ad litem* for each of the two respondents, his parents.  He expects to be able to pay these guardians *ad litem*'s legal fees, and believes also that there are sufficient funds in the *res* of their estate to cover such fees as a fallback, if necessary.  He has asked two-thirds of the 12 lawyers whose names are on the list of adult guardian *ad litems* for the 16th Circuit if they would consider serving as one in this case, and they are all either too busy already or not interested enough to return a phone message.  He prays that this Court will be willing to use its authority to help find g.a.l.'s.

Interim Relief

441.    Petitioner Claude David Convisser respectfully requests that this Court grant emergency temporary, preliminary, and final injunctions and equitable relief and the relief specified in the next Count 6 and in Count 3 above.

Final Relief

442.    Petitioner Claude David Convisser respectfully requests that the Court appoint him legal guardian of respondents Colette Marie Convisser and Martin Convisser and appoint Lee Cress, CPA conservator of their estate and financial affairs.

## COUNT 6

### Injunction and Court-ordered Health Care

**under Virginia Code Title 54.1, section 2985.1 of the Health Care Decisions Act,
Virginia Code Title 64.2, sections 2981, *et seq.*; under the
Uniform Power of Attorney Act, Virginia Code Title 64.2, sections 1600, *et seq.*;
and under Virginia Code Title 18.2, section 500(B)**

against defendants Linden House, LLC, WIAL, LLC, Cambridge Healthcare Holdings, LLC,
Julie Michelle Convisser, and James P. Cox, III

443.    Plaintiff and petitioner Claude David Convisser reiterates paragraphs 1 – 442 and these paragraphs are incorporated as if re-stated herein.

444.    Upon information and belief, defendant Julie Michelle Convisser exercises agency for principals Martin Convisser and Colette Marie Convisser under an Advanced Directive meeting the definition stated in Virginia Code Title 54.1, section 2982 of the Virginia Health Care Decisions Act, Article 8 of Title 54.1, sections 2981, *et seq.*, or else she has given authorization to provide, continue, withhold or withdraw health care to an attending physician of either or both Martin Convisser and Colette Marie Convisser pursuant to Virginia Code Title 54.1, section 2986(A)(3).

445.    For the reasons stated above, defendant Julie Michelle Convisser is no longer an appropriate person to continue lawfully exercising the authority stated in the preceding paragraph, either directly by herself or by her attorney at law defendant James P. Cox, III, or to continue serving as agent of their power of attorney for reasons set forth in Counts 3 and 4 above.

446.    Plaintiff and petitioner Claude David Convisser requests that this Court divest defendant Julie Michelle Convisser of any and all authority described in the three preceding paragraphs and invest it, instead, in him and his nominee for conservator, Lee Cress, CPA.

447.    Plaintiff and petitioner Claude David Convisser requests that this Court enjoin defendants Julie Michelle Convisser, Linden House, LLC, WIAL, LLC, Cambridge Healthcare Holdings, LLC, and James P. Cox, III from further unlawful, tortious and unauthorized health care actions and decisions relating to Martin Convisser and Colette Marie Convisser.

448.    Plaintiff and petitioner Claude David Convisser requests the following relief:

a.    Defendants Julie Michelle Convisser and the Linden House defendants shall cooperate with plaintiff and petitioner Claude David Convisser in permitting him to move Martin Convisser and Colette Marie Convisser immediately into another assisted living facility that is prepared to receive them, including:

i.    Plaintiff and petitioner Claude David Convisser shall be permitted to enter and remain on the premises of Linden House during normal opening hours to pack and move personal property belonging to respondents Martin Convisser and Colette Marie Convisser to the other assisted living facility, to hire contractors to do the same for which the Martin Convisser Trust shall reimburse him or pay directly, and to pick the respondents up and take them to register there and for any other medical or other appointments they may have.

ii.    These defendants shall provide to Claude David Convisser originals or copies of all of the medical records and all health care insurance contracts, payments and records in their custody pertaining to respondents Martin Convisser and Colette Marie Convisser, as well as electronic credentials to gain access to any accounts containing same with health care providers and other institutions.

iii.    These defendants shall deal with plaintiff and petitioner Claude David Convisser as the legal guardian of respondents Martin Convisser and Colette Marie

Convisser responsible for making decisions about their medical and residential affairs, just as they have been formerly dealing to date with defendant Julie Michelle Convisser.

      b.     Defendant Julie Michelle Convisser shall follow the instructions of plaintiff and petitioner Claude David Convisser in paying such bills and contracts for Martin Convisser and Colette Marie Convisser from their accounts, and to pay all other expenses of theirs or for their benefit, as he shall direct, or if the Court so orders as plaintiff and petitioner Claude David Convisser requests, she shall transfer all financial authority and records and control of respondents' assets to the nominee of plaintiff and petitioner Claude David Convisser to be the conservator of their estate and financial affairs, Lee Cress, CPA, and he shall follow and fulfill plaintiff and petitioner Claude David Convisser's decisions as to their care and residency.

      c.     Plaintiff and petitioner Claude David Convisser shall be entitled to rent a car and incur other reasonable expenses in managing the affairs of Martin and Colette Convisser, for which he shall be paid an advance and shall afterwards provide invoices or receipts to justify same.

      d.     Plaintiff and petitioner Claude David Convisser shall not be entitled to compensation or to any other disbursement from the accounts of Martin Convisser and Colette Marie Convisser without approval of the conservator and the Court.

      e.     Plaintiff and petitioner Claude David Convisser shall have leave to move this Court for additional interim relief on respondents' behalf as necessary when he gains access to and better understands respondents' medical records and health care providers and their financial posture.

      f.     An accounting be conducted and constructive trust imposed, as pleaded above.

g.      Payment by defendant Julie Michelle Convisser of petitioner Claude
David Convisser's costs and reasonable attorney's fee.

### JURY DEMAND

449.    Plaintiffs demand a jury on their statutory business conspiracy and civil RICO
claims, including those claims stated against defendant Julie Michelle Convisser, but not on
petitioner Claude David Convisser's pendent claims to terminate Julie Michelle Convisser's
agencies under her parents respondents Colette Marie Convisser and Martin Convisser's power
of attorney and advanced directive, against defendant Julie Michelle Convisser for breach of the
Convisser Family Trust Agreement, to appoint Claude David Convisser as respondents Colette
Marie Convisser and Martin Convisser's legal guardian and Lee Cress, CPA as the conservator of
their estate and financial affairs, and for emergency and temporary, preliminary and final
injunctions and other relief concerning respondents' health care, residence, and financial affairs.

### PRAYER FOR RELIEF

Plaintiff and petitioner Claude David Convisser and plaintiff POP Diesel Africa, Inc., by
counsel, request that this Court grant the relief they have pleaded above, and their costs, and such
further relief as is just.

Respectfully submitted,

CLAUDE DAVID CONVISSER,
Petitioner,
and POP DIESEL AFRICA, INC.,
Plaintiffs, by counsel

Claude David Convisser,
Attorney at Law
P.O. Box 7206
Charlottesville, Virginia 22906
5013 South Louise Ave., # 262
Sioux Falls, South Dakota 57108
Tel. 703-438-0071
cdc@popdiesel.com